# EXHIBIT 3
# PART 1 OF 2

ORIGINAL

MC–275

Name  THARON B. HILL

Address  SAN QUENTIN STATE PRISON

SAN QUENTIN, CA 94974

CDC or ID Number  D87967

**FILED**

JUN 1 4 2007

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT

BY_____SW_____ Deputy

THIRD DISTRICT COURT OF APPEALS

IN FOR THE STATE OF CALIFORNIA

(Court)

THARON B. HILL

Petitioner

vs.

BUTTE COUNTY SUPERIOR COURT

Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No. **C055955**

(To be supplied by the Clerk of the Court)

X-ref C055200 C016674
C051756 C004755
C057189
C047106

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC–275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page 1 of 6

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

MC–275

**This petition concerns:**

☐ A conviction                    ☐ Parole

☒ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name: _____ THARON B. HILL

2. Where are you incarcerated? SAN QUENTIN STATE PRISON

3. Why are you in custody?    ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   CONSPIRACY TO COMMIT MURDER

   _____

   b. Penal or other code sections: ___ 182

   c. Name and location of sentencing or committing court: BUTTE COUNTY SUPERIOR COURT
   ONE COURT STREET, OROVILLE, CA 95965

   d. Case number: _____ 96061

   e. Date convicted or committed: APRIL 22, 1988

   f. Date sentenced: JUNE 10, 1988

   g. Length of sentence: 25 YEARS TO LIFE

   h. When do you expect to be released? UNKNOWN

   i. Were you represented by counsel in the trial court? ☒ Yes.    ☐ No. If yes, state the attorney's name and address:

   DENNIS LATIMER

   CHICO, CA

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty    ☐ Guilty    ☐ Nolo Contendere    ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury    ☐ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial

6. GROUNDS FOR RELIEF                                                                          MC–275

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE CALIFORNIA BOARD OF PRISON HEARINGS FAILED TO UPHOLD

ITS OWN RULES AND REGULATIONS PURSUANT TO THE CALIFORNIA

CODE OF REGULATIONS TITLE 15 § 2000(59) – PREPONDERANCE

OF EVIDENCE.

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

THE USE OF THE PREPONDERANCE OF EVIDENCE IS MANDATE BY THE

STATE LEGISLATURE PURSUANT TO PENAL CODE 3041 AND THE BOARD'S

FAILURE TO UPHOLD LEGISLATIVE ENACTMENTS VIOLATES PETI-

TIONER'S DUE PROCESS RIGHTS.

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

IN RE ROSENKRANTZ, 80 CAL.APP.4TH 409; WOLFF V. MCDONNEL,

418 U.S. 539, 557.

MC-275 [Rev. January 1, 2007]             **PETITION FOR WRIT OF HABEAS CORPUS**                    Page 3 of 6

7. **Ground 2 or Ground** _____ *(if applicable):*                                     MC–275

    THE BOARD OF PRISON HEARINGS FAILED TO SHOW THERE IS "SOME
EVIDENCE" TO DENY PAROLE.

a.  Supporting facts:
    SEE ATTACHED WRIT OF HABEAS CORPUS

b.  Supporting cases, rules, or other authority:
    SUPERINTENDENT V. HILL, 472 U.S. 445.

MC-275

8. Did you appeal from the conviction, sentence, or commitment?    ☒ Yes. ☐ No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

THIRD DISTRICT COURT OF APPEALS

b. Result     DENIED                                    c. Date of decision: JANUARY 30, 1988

d. Case number or citation of opinion, if known:     C004755

e. Issues raised: (1) _____ JURY MISCONDUCT _____

(2) _____

(3) _____

f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

ROSS THOMAS, 342 FOLSOM ST., STE. 144, SAN FRANCISCO. CA

9. Did you seek review in the California Supreme Court?    ☒ Yes ☐ No.    If yes, give the following information:

a. Result     DENIED                                    b. Date of decision:  FEBRUARY 1992

c. Case number or citation of opinion, if known:     S035762

d. Issues raised: (1) _____ SAME AS ABOVE _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____

_____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

ADMINISTRATIVE REMEDIES ARE SATISFIED - THE SUPERIOR COURT DENIAL

IS ATTACHED TO THE BACK OF THE EXHIBITS.

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available? ☒ Yes. ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?  ☒☒ Yes. If yes, continue with number 13.    ☐ No. If no, skip to number 15.                    **MC–275**

13.  a. (1) Name of court:  BUTTE COUNTY SUPERIOR COURT

      (2) Nature of proceeding (for example, "habeas corpus petition"):  HABEAS CORPUS

      (3) Issues raised: (a)  INEFFECTIVE ASSISTANCE OF COUNSEL; NO PROOF OF

        (b) OVERT ACT IN FURTHERANCE OF CONSPIRACY.

      (4) Result (Attach order or explain why unavailable):  DENIED

      (5) Date of decision:  AUGUST 4, 1993

   b. (1) Name of court:  THIRD DISTRICT COURT OF APPEALS

      (2) Nature of proceeding:  SAME AS ABOVE

      (3) Issues raised: (a)  SAME AS ABOVE

        (b)

      (4) Result (Attach order or explain why unavailable):  DENIED - C016674

      (5) Date of decision:  09/16/93

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

    BUTTE COUNTY SUPERIOR COURT AUGUST 4, 1993.

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

    THERE ARE NO DELAYS.

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☒ Yes.  ☐ No. If yes, explain:

    TWO CASES ARE PENDING IN THE UNITED STATES FEDERAL COURT IN RELATION TO DENIAL OF PAROLE.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    N/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: June 11, 2007

▶ _(signature)_
                (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 2007]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page 6 of 6

IN THE THIRD DISTRICT COURT OF APPEALS

IN AND FOR THE STATE OF CALIFORNIA

| | |
|---|---|
| Tharon Hill<br>        Petitioner<br><br>    v.<br><br>Board of Prison Hearings<br>    Respondent | CASE NO.  C055955<br><br>CHARGED OFFENSE NUMBER IN THE<br>SUPERIOR COURT OF BUTTE COUNTY<br>#96061 (1987) |

**WRIT OF HABEAS CORPUS**

Tharon Hill
D-87967, 1-N-26L
San Quentin Prison
San Quentin, CA.
        94974

# CERTIFICATION OF COMPLIANCE

## Rule 8.204

Pursuant to California Rules of Court Rule 8.204(c)(1), I certify that the Petitioner's Writ of Habeas Corpus is:

Proprotionately spaced, has a typeface of 13 points or more, contains 7,315 words and does not exceed 40 pages.

Dated

Tharon B. Hill
Petitioner pro se

TABLE OF CONTENTS

VERIFICATION                                                              i.

TABLE OF CONTENTS                                                       ii.

TABLE OF AUTHORITIES                                                iii-iv.

MEMORANDUM OF POINTS AND AUTHORITIES                                 1-25
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS


INTRODUCTION                                                          1-6


ARGUMENT I - PREPONDERANCE OF EVIDENCE                                6-9


ARGUMENT II - SOME EVIDENCE                                         10-21


        a. Consequences of actions and magnitude                      11
        1. Especially atrocioius dispassionate & calculated           12
        2. Inexplicable and Trivial                                   16
        3. Parole plans                                               17
        4. Self-help and therapy                                      18
        5. Psychological report doesn't support parole                19

ARGUMENT III - THE BOARD VIOLATED PETITIONER'S                        21
               DUE PROCESS RIGHTS PURSUANT TO
               PENAL CODE § 3041

CONCLUSION                                                         20-25

EXHIBITS


PROOF OF SERVICE

TABLE OF AUTHORITIES

| Cases | Pages |
|---|---|
| Anderson v. Smith, 97 F.2d 239 | 8 |
| Armstrong v. Davis, 275 F.3d 849 | 10 |
| Biggs v. Terhune (9th Cir.2003) 334 F.3d 910 | 10,12,22 |
| Bolani v. Immigrations, 9 F.2d 1157 | 8 |
| Caldwell v. Miller, 790 F.2d 589 | 7 |
| Carson v. Block, 790 F.2d 562 | 7 |
| Envil.Def.Ctr. Inc. v. EPA (2003) 344 F.3d 832 | 11 |
| Greenholtz v. Inmates, (1979) 442 U.S. 1 | 10 |
| In re Capistran (2003) 107 Cal.App.4th 1299 | 10 |
| In re Dannenberg (2005) 34 Cal.4th 1061 | 14,15,17 |
| In re DeLuna (2005) 126 Cal.App.4th 585 | 12 |
| In re Elkins, 144 Cal.App.4th 475 | 6 |
| In re Lowe, 130 Cal.App.4th 1405 | 14 |
| In re Ramirez (2001) 94 Cal.4th 549 | 6,10 |
| In re Rosenkrantz (2002) 29 Cal.4th 616 | 6,10,12,13,14,15,22 |
| In re Rosenkrantz, (2000) 80 Cal.App.4th | 13 |
| In re Scott, 119 Cal.App.4th 871 | 6,13,15 |
| In re Scott, 133, Cal.App.4th 573 | 10,12,13 |
| In re Smith, 109 Cal.App.4th 503 | 11 |
| In re Van Houten, 11 Cal.App.4th 329 | 15 |
| Jancsek, 833 F.3d 1390 | 12 |
| McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895 | 10,12 |
| McBee v. Bonner, 296 F.2d 235 | 8 |
| Michelson v. United States, 335 U.S. 469 | 4 |

iii.

Morse v. Texas, 691 F.2d 770 — 4

Morton . Ruiz, 415 U.S. 199 — 7

North Carolina v. Alford, 400 U.S. 25 — 4

Pearce v. Director, 647 F.2d 716 — 7

People v. Burnick, 14 Cal.3d 306 — 20

People v. Neol (2005) Cal.App. Lexis 711, 148 — 11

Rosenkrantz v. Marshall, 444 F.Supp 2d 1063 — 6,15,22

Superintendent v. Hill (1985) 472 U.S. 445 — 1,8,10,15

Services v. Dulles, 354 U,.S. 363 — 7

Taylor v. U.S., 734 F.2d 1152 — 8

Turner v. Henman, 829 F.2d 612 — 7

United States v. Beechum, 582 F.2d 898 — 4

United States v. Davila, 698 F.2d 715 — 4

VanderMolen v. Stetson, 571 F.2d 617 — 7

Vitarelli v. Seaton, 359 U.S. 535 — 7

Wolff v. McDonell, 418 U.S. 539 — 7

## STATE STATUTES

Penal  Code § 3003 — 18
Penal Code § 3041 — 2,11,21
Penal Code § 5011 — 19
Penal Code § 5079 — 20
Penal  Code § 11177 — 18
Cal.Code of Regs., tit. 15 § 2000 — 8,9,25
Cal.Code of Regs., tit. 15 § 2281 — 9,10,24
Cal.Code of Regs. tit. 15 § 2236 — 19
Cal.Code Regs, tit. 15 §2402 — 2,9,11,12,13,16,17,18,22,24

## FEDERAL STATUTES

United States Constitution § 4218 — 8
Fed.R.Evid. 404(b) — 4

iv.

VERIFICATION

STATE OF CALIFORNIA  )
                     )
COUNTY OF MARIN      )

(C.C.P. section 446 & 2015.5; 28 U.S.C. section 1746)

I, THARON HILL, declare under penalty of perjury that:

I am a party in the above-entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my own knowledge, except as to matters stated therein upon information and belief, and as to those matters I believe they are true.

Executed this *11*th day of June 2007, at San Quentin State Prison, San Quentin, California 94974.

S/S Tharon Hill
   Tharon Hill

i.

IN THE THIRD DISTRICT COURT OF APPEALS

IN AND FOR THE STATE OF CALIFORNIA

Tharon Hill                        )
          Petitioner               )
                                   )        Case No.
     v.                            )
                                   )
Board of Prison Hearings           )
          Respondent               )
_____)

## INTRODUCTION

This writ contains two arguments. One in relation to the Board of Prison Hearings failing to uphold its own rules and regulations pursuant to California Code of Regulations title 15 § 2000(50), and the other in relation to the "some evidence" standard pursuant to <u>Superintendent v. Hill</u> (1985) 472 U.S. 445.

On December 19, 2006, the California Board of Prison Hearings held a parole consideration hearing pursuant to petitioner being found guilty of Penal Code § 182, conspiracy to commit murder.

It will be pointed out within the Board Hearing Record, that the commissioners violated petitioner's rights to a fair and impartial hearing. It will also be shown that the Board of Prison Hearings held nothing more than a summary hearing, and failed to address California Code of Regulations, title 15 § 2402, and the factors therein in relation to finding suitability or unsuitability in a parole hearing, which is

1.

required by law.

Moreover, the Board of Prison Hearings used the same reasons to deny parole during the previous parole consideration hearings, and failed to take into account petitioner's stellar prison record.

Specific factors applicable to the Board's decisions are set forth in Penal Code section 3041 and the Board's regulations (promulgated pursuant to subdivision (a) of section 3041) established criteria for determining suitability for release on parole. (Cal. Code Regs., Tit. 15 [CCR-15] section 2402.) The factor statutorily required to be considered, and of most importance, is public safety. As stated in subdivision (b) of Penal Code section 3041, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual..." The factors required to be considered by the Board regulations are for the most part, specified in section 2402.

Petitioner was denied parole for two years for the following reasons: (1) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the offense was carried out in a dispassionate manner. (2) The motive for the crime was inexplicable in relation to the offense. (3) Parole plans. (4) Need self-help

2.

or therapy. (5) Psychological report.

There are no negative differences between the October 2005 board hearing and the December 19, 2006, board hearing. There is, however, positive advances by petitioner. Petitioner did not receive disciplinary write-ups. Petitioner has viable parole plans. Petitioner continues to participate in self-help programs (AA, Positive Attitude, Painting classes, Creative Writing classes and Veterans programs). Even though the Board found to the contrary, the psychological assessment is supportive of release. "His level of dangerousness within the structured setting ... is very low.". (See Exh. A. P.70. Also see reference to probation officer's report at p.61.)

The Board's decision is not in accord with a proper reading of the relevant statutes, regulations and case law. The "some evidence" standard of review provides broad discretion to the Board, however, it is in fact bound by three requirements: (1) the evidence must be drawn from the factors enumerated in the statutory and regulatory framework; (2) the evidence must be deemed relevant and reliable; and (3) the evidence must reasonably speak to whether the inmate poses a current public safety threat.

Although there is no question that in most cases the statutory "commitment offense" factor is relevant pursuant to Rosenkrantz and Dannenberg, and at times may be enough to deny parole, Rosenkrantz and Dannenberg, do not apply in petitioner's case. Both Rosenkrantz and Dannenberg address

3.

commitment offenses in relation to murder, to which this petitioner did not commit murder. In other words, if the court uses a crime on the basis of conduct (Ronsenkrantz and Dannenberg) which do not constitute the crime, it offends the basic notions of justice and fair play embodied in the Constitution. <u>North Carolina v. Alford</u>, 400 U.S. 25; <u>United States v. Davila</u>, 698 F.2d 715 723; <u>Morse v. Texas</u>, 691 F.2d 770, 773. Further, evidence of the commission of a wholly separate and independent crime that is not on point with petitioner's conviction is inadmissible. (<u>Michelson v. United States</u>, 335 U.S. 469, 475-76, 69 S.Ct. 213, 218, 93 L.Ed. 168, the evidence cannot possess probative valve which is outweighed by undue prejudice. <u>United States v. Beechum</u>, 582 F.2d 898, 911, cert denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472.)

If the court uses citations in relation to a crime where murder was committed to deny this writ, it is tantamount to extrinsic evidence - for petitioner was not convicted of murder. It is required that the physical elements of the extrinsic offense include the essential physical elements of the offense for which petitioner was convicted. According to the Fed.R.Evid. 404(b): Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

The probative valve of Rosenkrantz and Dannenberg's offenses are deemed insufficient to outweigh the inherent prejudice caused to petitioner. Therefore, as a predicate

4.

to a determination that extrinsic offenses are relevant, the Court must offer proof demonstrating that petitioner committed murder. The Court must demonstrate relevance.

According to California Evidence Code section 210, "relevant evidence" means evidence that has a tendency to prove or disprove any disputed fact that is of consequence to the determination of the action.

Evidence Code section 210 encompasses a broad concept of relevance. That concept comprehends both the probative value of evidence and its relationship to a matter which is provable in the action. Thus, as broadly defined by Evidence Code section 210, "relevant evidence" has two distinct dimensions: (1) probative value, i.e., the "tendency [of the evidence] in reason to prove or disprove" the proposition for which it is offered and (2) relationship to a matter which is provable in the action, i.e., the "tendency [of the evidence] in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Under the broad definition of "relevant evidence" in Evidence Code section 210, evidence which has no "tendency in reason to prove or disprove any disputed fact of consequence to the determination of the action" is irrelevant. So also is evidence which does have "any tendency in reason to prove or disprove any ..." fact which is not of consequence to the determination of the action. Therefore, the Court's use of Rosenkrantz and Dennenberg, or any other case where murder was committed,

5.

to deny petitioner's writ of habeas corpus, is tantamount to using extrinsic evidence, and violates petitioner's due process rights.

As important to the foregoing is that the Board must show the crime is beyond the minimum elements necessary to sustain a conviction for the offense in order to satisfy the California Code of Regulation title 15 § 2402, and to meet the especially heinous, atrocious or cruel manner set forth therein. As will be shown, the Board's findings were not in accord with In re Rosenkrantz, 29 Cal.4th 615; Rosenkrantz v. Marshall, 444 F.Supp.2d 1063; In re Elkins, (2006) 144 Cal.App.4th 475; In re Scott, 119 Cal.App.4th 871, and In re Ramirez, 94 Cal.App.4th at p. 569. (The offense must be found on "all ... relevant factors." Rosenkrantz, supra, 29 Cal.4th at pp. 660, 677.)

Even though the foregoing was presented to the Butte County Superior Court, the Court found the writ lacked prima facie value and denied it on June 4, 2007. (Exh.F.)

### THE BPH IS REQUIRED TO USE THE PREPONDERANCE OF EVIDENCE STANDARD DURING A PAROLE HEARING

Failure on behalf of the California Board of Hearings to follow its procedures is fundamentally unfair, and a violation of the fifth Amendment.

The United States Constitution requires states and

6.

their agencies to comply with all the procedures they establish. Carson v. Block, 790 F.2d 562, 565-6. A violation of the BPH's rules authorizes relief in this proceeding if the rules are themselves essential components of due process of law - that is, if the procedures used by the BPH violates the Constitution. Under 18 U.S.C. § 4218, a parole board's failure to follow administrative rules and regulations violates constitutional provisions. Turner v. Henman, 829 F.2d 612.

Numerous federal courts, including the United States Supreme Court have found "an inmate is entitled to expect the Bureau of prisons to follow its own policies." Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2925, 41 L.Ed.2d 935. In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-425 also found the Board must determine parole suitability by following its own rules and regulations.

Caldwell v. Miller, 790 F.2d 589, 09, ruled that "An agency must conform its actions to the procedures that it has adopted." See Pearce v. Director, Office of Workers' Compensation, 647 F.2d 716; VanderMolen v. Stetson, 571 F.2d 617, 624; see also Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.) Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Services v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. "An inmate, too, has the right to expect prison officials to follow its policies and regulations."

7.

Anderson v. Smith, 697 F.2d 239. Here the proper procedure for the BPH and courts to follow is the "preponderance of evidence" standard within the Cal.Code of Regs. tit. 15 § 2000(50).

Section 2000(a) states: "The following rules of construction apply to the regulations contained in this division...". At the end of § 2000 reference is made to Penal Code § 3041 - thus all prison inmates have a liberty interest pursuant to Cal.Code of Regs. tit. 15 § 2000(50) preponderance of evidence, and not the more stringent "some evidence" standard, which is not mandated by the California State Legislature.

Whenever an abuse of discretion is made by an administrative agency, reviewing courts cannot set it aside unless the court has a definite and firm conviction that a clear violation in judgment has not taken place. Taylor v. United States Parole Commission, 734 F.2d 1152, 1154; Bolani v Immigration & Naturalization Service, 669 F.2d 1157, 1160; McBee v. Bonner, 296 F.2d 235, 237.

Although numerous courts are using the "some evidence" standard as set forth in Superintendent v. Hill, supra, 472 U.S. 445, and In re Rosenkrantz supra, 29 Cal.4th 616, the "some evidence" standard is in direct conflict with the Cal.Code of Regs. tit. 15 § 2000(50). The fact is, the law is what it is, and the "some evidence" standard should not be allowed to supersede the mandated preponderance of evidence within

8.

the Cal.Code of Regs. title 15 § 2000.

If the Legislature intended for the "some evidence" to be the applicable standard, the Cal.Code of Regs. tit. 15 § 2000(50) would have been repealed.

Cal.Code of Regs. title 15 § 2402 sets forth six (6) factors in finding an inmate unsuitable for parole: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors and (6) Institutional Behavior. § 2402 mandates nine (9) "Circumstances Tending to Show Suitability" which are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for Future and (9) Institutional Behavior.

There are a total of fifteen factors the Board must use to find suitability or unsuitability. If the Board implements the Cal.Code of Regs. title 15 § 2000(50) and uses the preponderance of evidence standard, eight of the above mentioned factors is required to find petitioner unsuitable for parole, not five as was done during the hearing.

According to the Cal.Code of Regs. title 15 § 2281(d)(7) the parole suitability determination process only requires that part one, or part two of § 2402 be satisfied, which is in conflict with the policy of using just one factor to deny parole.

9.

## THE BOARD OF PRISON HEARINGS
## FAILED TO UPHOLD
## THE SOME EVIDENCE REQUIREMENTS
## RESULTING IN A VIOLATION OF
## PETITIONER'S DUE PROCESS

While there is no federal constitutional right to parole, (Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1, 11-12) both federal and state courts have recognized that California's parole scheme bestows on prisoners a cognizable liberty interest in parole that is protected by due process. Biggs v. Terhune (9th Cir. 2004) 334 F.3d 910, 914; Armstrong v. Davis (9th Cir. 2001) 275 F.3d 849, 864; McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 903; and In re Rosenkrantz (2002) 29 Cal.4th 616, 655-659 [prisoner's have a liberty interest in parole protected by due process.]

Within the context of parole consideration in California, due process requires that "some evidence" support a decision by the Board to deny parole. (Superintendent v. Hill (1985) 472 U.S. 445, 456; Biggs, supra, 334 F.3d at 915; Rosenkrantz, supra, 29 Cal.4th at 667; In re Smith, 109 Cal.App.4th at 501-503; In re Capistran (2003) 107 Cal.App.4th 1299, 1305; In re Ramirez (2001) 94 Cal.4th 549, 564; In re George Scott (2005) 133 Cal.App.4th (#).

Accordingly, this Court must undertake a fact specific inquiry of whether there is evidence to deny parole under California law. (McQuillion, supra, 306, F.3d at 904-906; Biggs, supra, 334 F.3d at 915.) Specifically, the Court must determine whether there is some evidence that petitioner would

10.

currently present an "unreasonable risk of danger to society" if released on parole. (Cal.Code Regs., tit. 15 §2402(a); Penal Code, §3041(b).

### THE BPH HEARING RECORD

**a. Consequences of actions and magnitude**

Rosenkrantz held the "some evidence" standard is not met when the Board minimizes culpability. It did so after (1) delving into the entire record before the Board as to the relevant issue in question; (2) specifically reviewing evidence that the Board had omitted in making its determination; and (3) assessing the reasonableness of the Board's interpretation of the entirety of there circumstances.

After reviewing all the evidence before the Board on this issue, the court will find no reasonable interpretation of the circumstances would justify finding "some evidence." Indeed, the Board's failure to consider all relevant evidence is consistently deemed, in a variety of contexts, to be arbitrary and capricious and abuse of discretion. See e.g., Envil. Def. Ctr, Inc. v. EPA (2003) 344 F.3d 832, 858 n.35 (holding federal agency has acted in arbitrary and capricious fashion if the agency has "entirely failed to consider an important aspect... [or] its decision... runs counter to the evidence.") According to People v. Neol (2005) Cal.App. Lexis 711, at 148, "The trial Court was not permitted to substitute its conclusion... under circumstances where it could not explain how this... bit of evidence trumped the otherwise overwhelming

11.

counterrailing credible evidence..." This is the same as the Board has done in petitioner's case.

Evidence relied on by the Board must be "reliable," (Regs.. §§ 2402, subd. (b), 2281, subd. (b)); it must have "'"some indicia of reliability."'" (In re Scott (2005) 133 Cal.App.4th 573, 591, 34 Cal.Rptr.3d 905; Biggs, 334 F.3d at 915; McQuillon, 306 F.3d at 904; Jancsek, 833 F.3d at 1390.), Additionally, the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the discretionary authority of the Board. (In re Rosenkrantz (2002) 29 Cal.4th 585, 655. A prisoner is entitled to "an individualized consideration of all relevant factors.") (In re DeLuna, 126 Cal.App.4th at p. 591.) The Board's decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious," The forgoing requirement was not accomplished during petitioner's hearing. There is nowhere in the record that shows the Board used the California Code of Regulations, title 15 § 2402, and individually cited each factor in relation to their findings. In order for the Board to meet procedural due process embodied in the California Constitution it must address all fifteen (15) factors, and not give five (5) turgid reasons without implementing the applicable factors for each one.

Petitioner will now address each in numerical order:

**(1) Especially atrocious dispassionate and calculated**

12.

California courts implemented what is known as the "beyond the minimum necessary" in relation to the death of a victim. (In re Rosenkrantz, 29 Cal.4th at 683.)    In other words, what evidence indicates the commitment offense was "especially atrocious, dispassionate and calculated," given that there typically must be a finding of some level of heinousness, in order for anyone to have been convicted in the first place? Cal.Code Regs tit. 15 § 2402(c)(1); Smith 114 Cal.App.4th at 366-67 (noting that "all second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others."

In order for a crime to be "atrocious, dispassionate and calculated" and meet the "minimum necessary to sustain a conviction" pursuant to the Cal.Code of Regs., tit. 15 § 2402, the offense must have been carried out execution-style. Rosenkrantz, supra, 29 Cal.4th at p. 683.

The Rosenkrantz requirement cannot possibly apply to petitioner's case, because petitioner did not commit murder. (Petitioner incorporates pages 3-5 into this argument.) Moreover, there had to be multiple victims attacked, injured or killed in the same or separate incidents. ( See Cal.Code Regs, tit. 15 § 2402(a)(1)(A).)    In re George Scott, 133 Cal.App.4th (#) (Oct. 18, 2005) held "[it] is necessary to remember that denial of parole based upon the nature of the offense may rise to the level

13.

of a due process violation, as where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (_Rosenkrantz_, supra, 29 Cal.4th at p.683.) Therefore an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances went beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (_In re Dannenberg_, supra, 34 Cal.4th at p. 1098.) The Scott court went on to explain comparisons, "[in] Rosenkrantz... a full week of careful preparation, rehearsal and execution" took place, "[the] prisoner, fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement, carried out the crime with planning, sophistication or professionalism," is more aggravated or violent, and meets the "minimum necessary." (_Rosenkrantz_, at p.678.) Similarly, there was evidence of premeditation in _In re Lowe_ (2005) 130 Cal.App.4th 1405, which also involved a second degree murder conviction. There the prisoner purchased the gun shortly before the murder, entered his victim's bedroom in the middle of the night while he was asleep, unsuspecting, and in a special relationship of confidence and trust with his killer, 'shot him five times in the head and chest, execution style.' (Id. at p. 1414.) As this court' stated, this evidence showed the

14.

murder 'was a cold-blooded execution' and that the prisoner's 'egregious acts [were] far more aggravated than the minimum necessary to sustain a second degree murder conviction.'" (In re Scott, 119 Cal.App.4th 871, 889-892; In re Van Houten (2004) 116 Cal.App.4th 339; Rosenkrantz v. Marshall, 444 F. Supp.2d 1063; In re Dannenberg, 34 Cal.4th at p. 1098.))

The circumstances of petitioner's crime do not meet the foregoing requirements. The fact is, petitioner's crime is significantly less egregious than those in other cases in which the nature of the offense was found to support a finding of suitability. (See Rosenkrantz v. Marshall, supra, 444 F. Supp.2d 1063.)

There is no evidence petitioner "terrorized, or injured his victim before ... or that he gratuitously increased or unnecessarily prolonged pain and suffering." (See In re Scott, 119 Cal.App.4th 871, 892.) Because the relevant evidence shows no more callous disregard for human suffering than is shown by most offenses, the Board's use of this factor to conclude that petitioner committed his offense in an "especially atrocious dispassionate and calculated manner" is arbitrary and capricious. (In re Rosenkrantz, supra, 29 Cal.4th at 655.) Thus the Board's denial does not meet the "minimum necessary" standard as set forth in Rosenkrantz, or the "some evidence" standard in Superintendent v. Hill, supra, (1985) 472 U.S. 445.

Under the regulations applicable to evaluating an

15.

inmate's current dangerousness, the viciousness of the commitment offense must be balanced against the passage of time and any evidence of an inmate's rehabilitation. Among the indicators of parole suitability are: "(7) Age. The prisoner's present age (68) reduces the probability of recidivism. ¶ (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. ¶ (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd.(d).)

## (2) Inexplicable and trivial

The Scott court found "To fit the description of inexplicable and trivial in relation to the offense requires comparisons; the motive must be materially less significant (or more "trivial") than those which drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented." (119 Cal.App.4th at 894.) If the Scott court's reasoning is correct, the "inexplicable and trivial" standard does not meet the "some evidence" criteria in the Board's findings - for the victim's actions were directly related to petitioner's conduct. (Exh. A. pp.20,24,59.)

More importantly, to meet the "inexplicable and trivial" standard within the Cal.Code of Regs, tit., 15 § 2402,

16.

inexplicable and trivial must be tied in with expectionally heinous and callous pursuant to § 2402, subd. (c)(1), which requires a murder. (In re Dannenberg, supra, 34 Cal.4th at p. 1098.) As previously stated, petitioner did not commit murder, therefore, the inexplicable and trivial standard does not apply.

### (3) Petitioner needs parole plans

One of the factors (Cal.Code Regs, tit. 15. § 2402(d)(8).) in finding a prisoner suitable for parole is "the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (Emphasis added.) It is not required to have both, one is sufficient.

The record is indisputable, petitioner received certification in Mechanical Drafting and Voctional Plumbing. (Exh. A. p.108.) It is also shown within the record that petitioner was a general contractor. (Exh. A. p.39.)

As to parole plans, the Court will find letters of support from his brother in Utah, the Veteran's Administration in San Mateo, a long standing friend in San Bernadino County, and from a nephew, who is willing to give financial support. (Exh. A. pp.76-81. Also see Exh. B.) The Board, however, refused to accept the parole plans, indicating a need to have "some backup for Butte County." (Exh. A. p.107.)

The United States Congress in 1934 (Penal Code §

17.

11177) set forth an act granting the consent to any two or more states to enter into agreements of compacts. Penal Code § 11177(c) states: "That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called "sending state"), to permit any person convicted of an offense... and placed on... parole to reside in any other state party to this compact... (a) [If] such person is in fact a resident or has his family residing within the receiving state..." Also see Penal Code § 3003(b)(i) "An inmate may be paroled to another state pursuant to any law."

As previously mentioned, title 15 § 2402 subd.(d)(8) only requires to have parole plans or a marketable skill. Not both. Therefore, the some evidence standard is not met.

## 4) Petitioner's need for therapy

According to the Cal.Code of Regs., tit. 15 § 2402(c)(5) it is made clear "The prisoner [must have] a lengthy history of severe mental problems related to the offense." There is nowhere within the record showing petitioner has a mental history related to the offense. Nor is there anywhere within the title 15 § 2402, requiring a prisoner to attend therapy. Nor does the psychological report recommend therapy; to which the Board Commissioner realizes therapy may not be available (Exh. A. p.110.),

More importantly, there is a letter in petitioner's

18.

file from Cynthia E. Harris, a Licensed Clinical Social Worker, who was supervised by a psychiatrist; and petitioner's case worker. Ms. Harris found this petitioner has insight into the crime and control over lifes stresses. Ms. Harris also recommended petitioner's release. (Exh. C.)

How is it then, that the 2006 Board can find petitioner unsuitable for parole for failing to acquire therapy?

**(5) The Board found the Psychological report is not supportive of release**

The Court is directed to petitioner's psychological evaluation, where Doctor Starrett states on page 8: "In summary, this individual overall appears to rate in the low range in his propensity to commit violence in the future when compared to similar violent inmates. The inmate's crime is a crime of passion, or an affective crime, which do not reoccur and inmate's age is another factor." How much more is needed? The psychologist did not state petitioner was a risk to society.

The Board goes on to find petitioner needs more insight into the crime, and fails to recognize that petitioner on numerous occasions expressed remorse and responsibility for the crime. (Exh. A. pp.24,48,60. Also see Exh. C.)

Moreover, Penal Code § 5011(b) and the Cal.Code of Regs., title 15 section 2236 were invoked, (Exh. A. p.11.) and as such it was a violation of petitioner's rights for the Board to find a need for more insight into the crime,

19.

notwithstanding, ordering another psycholoical evaluation to specifically address petitioner's insight. (Exh. A. p.110.)

As far as being a risk to society, the State Supreme Court in People v. Burnick, 14 Cal.3d 306, 327; 121 Cal.Rptr. 488; 535 P.2d 352, found "The evidence, as well as the consensus of opinion by responsible scientific authorities, is now unequivocal." (Diamond, the Psychiatric Prediction of Dangerousness (1975) 123 U.Pa. L.Rev. 439, 451.) In the words of spokesmen for the psychiatric profession itself, "Unfortunately, this is the state of art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or 'dangerousness.' Neither has any special psychiatric 'expertise' in this area been established." (Task Force Report, Clinical Aspects of the Violent Individual (American Psychiatric Assn., 1974) p.28) And the same studies which proved the inaccuracy of psychiatric predications have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err; they predict acts of violence which will not in fact take place ("false positives"), thus bringing as "dangerous" many persons who are in reality totally harmless. (See generally id. at pp.23-30.)

What may be of further interest to the Court is that psychiatric evaluations and, "The recommendation shall be submitted to the Director of Corrections and shall not be effective until approved by the director." Penal Code § 5079. In that this is the case, petitioner's psychological evaluations

20.

are invalid - for the Director of Corrections did not review
and approve the recommendations.

In summing up this issue, the Court is directed to
Exh. C. where Doctor Falkenstein's psychiatric evaluation made
it clear that "This inmate should be removed from special
calendar because psychopathology is not significantly related
to future criminal behavior, psychiatric opinion will not
contribute to a release decision." Yet, the Board of Prison
Hearings, and <u>psychologists</u> have ignored the professional
opinion of a <u>psychiatrist</u>, who is more qualified, and chosen
to use whatever means possible to deny parole.

### THE BOARD VIOLATED
### PETITIONER'S RIGHTS
### PURSUANT TO PENAL CODE § 3041

In October 2005, petitioner appeared before the Board
of Prison Hearing for a parole consideration hearing, was found
unsuitable, and given a one year denial. The Board on January
19, 2006 again held a parole hearing and found petitioner
unsuitable for parole, and issued a two years denial in
violation of Penal Code § 3041.1(2). The 2006 Board used
the exact same reasons to deny parole as the 2005 Board, and
as such a one year, not a two year denial was appropriate.
To find "that it is not reasonable to expect that parole would
be granted at a hearing during the following year" (P.C. §
3041.1(2) requires more than boilerplate statements. There
must be something beyond that of what the previous Board found,
to which the 2006 Board did not find.

21.

## CONCLUSION

The Board during petitioner's parole consideration hearing failed to support is findings with applicable regulations when it based its unsuitable parole findings upon the gravity of the crime. (Cal.Code of Regs., tit. 15 § 2402.)

Moreover, the Ninth Circuit and California Supreme Court made it clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." <u>Biggs</u>, 334 F.3d at 917; <u>Rosenkrantz</u>, supra, 29 Cal.4th at 689.)

In the circumstances of this case, the Board's reliance upon the facts of petitioner's crime and his commitment offense as a reason to deny parole after 20 years of incarceration, violates due process. First, a continued reliance upon unchanging factors makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Second, the circumstances of the crime and petitioner's criminal history do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released.

As the Central District Court in <u>Rosenkrantz v. Marshall</u>, 444 F. Supp.2d 1063, 1081 stated:

> Whether the facts of the crime of
> conviction or other unchanged criteria, affect

22.

the parole eligibility decision can only be
predicated on the "predictive value" of the
unchanged circumstance. Otherwise, if the
unchanged circumstance per se can be used
to deny parole eligibility, sentencing is
taken out of the hands of the judge and totally
deposited in the hands of the BPT. That is,
parole eligibility could be indefinitely and
forever delayed based on the nature of the
crime even though the sentence given set forth
the possibility of parole - a sentence given
with the facts of the crime fresh in the mind
of the judge. While it would not be a
constitutional violation to forego parole
altogether for certain crimes, what the state
cannot constitutionally do is have a sham
system where the judge promises the possibility
of parole, but because of the nature of the
crime, the BPT effectively deletes such from
the system. Nor can a parole system, where
parole is mandated to be determined on
someone's future potential to harm the
community, constitutionally exist where despite
20 or more years of prison life which indicates
the absence of danger to the community in
the future, the BPT commissioners revulsion
towards the crime itself, or some other
unchanged circumstance, constitutes the alpha
and omega of the decision. Nobody elected
the BPT commissioners as sentencing judges.
Rather, in some realistic way, the facts of
the unchanged circumstance must indicate a
present danger to the community if released,
and this can only be assessed not in a vacuum,
after four or five eligibility hearings, but
counterpoised against the backdrop of prison
events. (Bair v. Folsom State Prison, 2005
WL 2219220, *12 n.3 (E.D.Cal. 2005), report
and recommendation adopted by, 2005 WL 3081634
(E.D.Cal. 2005).)

A review of petitioner's parole suitability hearings

reveals each board commissioner used the same factors to

deny parole as the previous Board; and failed to realize

that the commitment offense will never change. Does this

constitute that the jury's findings were a sham? What is

23.

there about the Penal Code pursuant to "Double Jeopary" the Board doesn't understand when continuing to retry petitioner's case over and over, from his first parole consideration hearing to the present?

The previous Board found, petitioner completed his life term pursuant to the matrix after 15 years of incarceration. (Exh. E.) Taking the matrix into consideration, along with "good time credits," petitioner has now been incarcerated equivalent to 25 years. The question must be asked, is petitioner sentenced to life in prison without the possibility of parole?

When the Board cites the same factors over and over to deny parole without taking into consideration Cal.Code of Regs., tit. 15 § 2402 and the 15 factors therein, which determines suitability or unsuitability, petitioner's due process rights are violated.

As stated earlier, the evidence relied on by the Board must be "reliable," (Regs., §§ 2402, subd. (b), 2281, subd. (b)); it must have "some indicia of reliability." It must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious.

During the hearing, the Board was accused of having made up its mind to deny parole prior to holding the hearing. This accusation was not disputed by the Board Commissioners, which constitutes an addmission of bias. (Exh. A. pp. 65-66.). Moreover, the issue at dispute during the foregoing

24.

was taken from a psychological evaluation in 2003, (Exh. A. p.69,70.) and not from the most recent evaluation in 2006. As important is that the Board used the 2003 evaluation to deny parole, then stated, "we are ordering a new psychological evaluation. We have done the paperwork for it, and again, because we found that the previous Panel's request in ordering the other psych were not adequately met by this current psych." (Exh. A. p.111)

To show further bais against petitioner, several letters were acquired from prison staff for the Board's review. Two of those letters were from therapy groups. However, the Board deliberately neglected to read them into the record. This failure is tantamont to the Board using the "need for therapy" to deny parole. If the letters had have been acknowledged, the Board would have found that petitioner has been participating in therapy groups for the past four years. (Exh D.)

It is, therefore, respectfully requested that this Honorable Court find that the Board of Prison Hearings violated petitioner's due process right when it failed to uphold the Cal.Code of Regs., tit. 15 § 2000(50) in relation to using the preponderance of evidence standard as mandated by the State Legislature. It is further requested that this Honorable Court find there is no evidence to support "an unreasonable risk to society," and order petitioner's release.

25.

DATED: June 11, 2007

Tharon Hill
Litigant Pro-se

PROOF OF SERVICE

C.C.P. section 1013a & 2015.5; 28 U.S.C. section 1746

I, THARON HILL, am a resident of San Quentin State Prison, in the County of Marin, State of California, am over the age of eighteen (18) years and am a party to the above-entitled action.  My State prison address is San Quentin Prison, San Quentin, California 94974.

On June 11, 2007, I served the foregoing information to which was a Traverse to Respondent's Answer to Petition for Review in the California State Supreme Court on the party(s) herein by placing a true copy(s) thereof, enclosed in sealed envelope(s), with postage thereon fully paid, in the United States Mail, in a deposit box so provided by the U.S. Postal Service, addressed as follows:

Clerk of the Court for the
Third District Court of Appeal
900 North Street, #400
Sacramento, CA 95814-4869

Office of the Attorney General
P. O. Box 944255
Sacramento, CA  95814-2550

There is delivery service by United States mail at the places so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed.  I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of June  2007.

ss _Tharon Hill_
Tharon Hill
Petitioner Pro-se

ORIGINAL

C055955

FILED

JUN 1 4 2007

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT

BY_____ Deputy

EXHIBIT  A     HEARING TRANSCRIPTS

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE**

| | |
|---|---|
| In the matter of the Life ) | |
| Term Parole Consideration ) | CDC Number D-87967 |
| Hearing of: ) | |
| ) | |
| THARON HILL ) | |
| _____ ) | |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

DECEMBER 19, 2006

9:05 A.M.

PANEL PRESENT:

Janice Eng, Presiding Commissioner
Deborah Star, Deputy Commissioner
Ronald Herron, Deputy Commissioner

OTHERS PRESENT:

Tharon Hill, Inmate
John Stringer, Attorney for Inmate
Francisco Zarate, Chief Deputy District Attorney
(Via Video)
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | | |
|---|---|---|
| _____ | No | See Review of Hearing |
| _____ | Yes | Transcript Memorandum |

**Stacy Wegner   House of Scribes**

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 29 |
| Post-Commitment Factors | 50 |
| Parole Plans | 76 |
| Closing Statements | 93 |
| Recess | 104 |
| Decision | 105 |
| Adjournment | 111 |
| Transcriber Certification | 112 |

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER STAR:**  Okay.  Ms. Eng, we're

3    on record right now.

4          **PRESIDING COMMISSIONER ENG:**  Good morning.

5          **INMATE HILL:**  Good morning.

6          **PRESIDING COMMISSIONER ENG:**  This is a

7    subsequent parole consideration hearing for Tharon

8    Hill, T-H-A-R-O-N, Hill, CDC number D-87967.  Today's

9    date is December 19th, 2006, and the time is 9:05 a.m.

10   We're located at San Quentin State Prison.  The inmate

11   was received on June 21st, 1988, from Butte County.

12   The life term began on June 21st, 1988.  The minimum

13   eligible parole date is April 6, 2004.  The controlling

14   offense for which the inmate has been committed is

15   conspiracy to commit murder in the first, case number

16   96061, count one, Penal Code 187.  The inmate received

17   a total term of 25 years to life.  This hearing is

18   being tape recorded, and for the purpose of voice

19   identification, each of us will be required to state

20   our first and last name, spelling out our last names.

21   And sir, when it comes to your turn, after you spell

22   out your last name, please provide us with your CDC

23   number.  So I'll begin, and we'll move to the right,

24   and don't forget we have somebody on video.  So my name

25   is Janice Eng, E-N-G, Commissioner.

26         **DEPUTY COMMISSIONER STAR:**  Deborah Star,

27   S-T-A-R, Deputy Commissioner.

2

1          **DEPUTY COMMISSIONER HERRON:**  Ronald Herron,

2     H-E-R-R-O-N, Deputy Commissioner.

3          **PRESIDING COMMISSIONER ENG:**  Sir.

4          **DEPUTY COMMISSIONER STAR:**  Mr. Zarate.

5          **DEPUTY DISTRICT ATTORNEY ZARATE:**  Okay.

6     Francisco Zarate, Z-A-R-A-T-E, Chief Deputy District

7     Attorney Butte County.

8          **INMATE HILL:**  Tharon Hill, H-I-L-L, D-87967.

9          **ATTORNEY STRINGER:**  John Stringer, S-T-R-I-N-G-

10    E-R, attorney.

11         **PRESIDING COMMISSIONER ENG:**  For the record, we

12    have two correctional officers present for security

13    reasons, and they will not be participating in the

14    hearing.  Before we begin, sir, you'll be required to

15    read aloud that ADA statement in front of you, so you

16    can begin at any time.

17         **INMATE HILL:**

18             "The Americans with Disabilities Act, ADA,

19             is a law to help people with disabilities.

20             Disabilities are problems that make it

21             harder for some people to see, hear,

22             breathe, talk, walk, learn, think, work,

23             or take care of themselves than it is for

24             others.  Nobody can be kept out of public

25             places or activities because of a

26             disability.  If you have a disability, you

27             have the right to ask for help to get

3

1           ready for the BPT hearing, get to the

2           hearing, talk, read forms and papers, and

3           understand the hearing process.  The BPT

4           will look at what you ask for to make sure

5           that you have a disability that is covered

6           by the ADA and that you have asked for the

7           right kind of help.  If you do not get

8           help, or if you don't think you got the

9           kind of help you need, ask for a BPT 1074

10          Grievance Form.  You can also get help to

11          fill it out."

12          **PRESIDING COMMISSIONER ENG:**  Thank you.  The

13   record reflects that you did sign the BPT Form 1073 on

14   September 20th of 2006, and that form is a reasonable

15   accommodation notice and request in accordance with the

16   provisions of the Americans with Disabilities Act.  And

17   this form indicates that you do not have any disability

18   as defined under the ADA.  Is that true, sir?

19          **INMATE HILL:**  That's true.  I have glaucoma, but

20   it doesn't effect me right now.

21          **PRESIDING COMMISSIONER ENG:**  Okay.  So the

22   information is still current and correct?

23          **INMATE HILL:**  Yes, ma'am.

24          **PRESIDING COMMISSIONER ENG:**  Okay.  So I still

25   have to go through some basic questions.

26          **INMATE HILL:**  Okay.

27          **PRESIDING COMMISSIONER ENG:**  Do you have any

4

1    problems walking up or down the stairs or for distances

2    of a hundred yards or more?

3              INMATE HILL:  No.

4              PRESIDING COMMISSIONER ENG:  Okay.  So I see

5    that you do have some glasses?

6              INMATE HILL:  Yes, ma'am.

7              PRESIDING COMMISSIONER ENG:  Are those for

8    reading and distance?

9              INMATE HILL:  Yes, ma'am.

10             PRESIDING COMMISSIONER ENG:  Okay.  Will those

11   be adequate to help you get through the hearing today

12   if you have to read any documents?

13             INMATE HILL:  Yes, ma'am.

14             PRESIDING COMMISSIONER ENG:  Okay.  Do you have

15   any hearing impairments?

16             INMATE HILL:  No, ma'am.

17             PRESIDING COMMISSIONER ENG:  Okay.  Sir, have

18   you -- I think we generally ask if you've ever been

19   included in the CCCMS or EOP programs.

20             INMATE HILL:  Currently?

21             PRESIDING COMMISSIONER ENG:  Well, if you've

22   ever been included.

23             INMATE HILL:  Yes, ma'am.

24             PRESIDING COMMISSIONER ENG:  Okay.  And yeah, I

25   did note -- I did read that in your file.  When were

26   you in -- when was the last time you were in the CCCMS?

27   Was that around 2002?

1           INMATE HILL:  Yes, ma'am.

2           PRESIDING COMMISSIONER ENG:  Okay.

3           INMATE HILL:  My wife passed away, and I was --

4           PRESIDING COMMISSIONER ENG:  Okay.  But you're

5     not currently in any one of those programs?

6           INMATE HILL:  No, ma'am.

7           PRESIDING COMMISSIONER ENG:  Okay.  So have you

8     taken any psychotropic medication either in prison or

9     on the streets?

10          INMATE HILL:  No, ma'am.

11          PRESIDING COMMISSIONER ENG:  Okay.  Sir, while

12    you were in school did you -- were you in any special

13    education classes?

14          INMATE HILL:  No, ma'am.

15          PRESIDING COMMISSIONER ENG:  Okay.  So do you

16    suffer from any disability that would prevent you from

17    participating in today's hearing?

18          INMATE HILL:  No, ma'am.

19          PRESIDING COMMISSIONER ENG:  So Counselor, are

20    there any ADA issues that you believe need further

21    discussion?

22          ATTORNEY STRINGER:  Commissioner, in my view, my

23    client can meaningfully participate in this hearing.

24    In any event, I'd stipulate on the reasonable

25    accommodation under Armstrong.

26          PRESIDING COMMISSIONER ENG:  Okay.  Thank you.

27    This hearing is being conducted pursuant to the Penal

6

1    Code and the rules and regulations of the Board of

2    Parole Hearings governing parole consideration hearings

3    for life inmates.  The purpose of today's hearing is to

4    once again consider your suitability for parole.  In

5    doing so, we'll consider the number and nature of the

6    crimes for which you were committed, your prior

7    criminal and social history, your behavior and

8    programming since your commitment, and your plans if

9    released.  So we've had the opportunity to review your

10   Central File, and you'll also have the opportunity to

11   correct or clarify the record.  We will consider your

12   progress since your commitment, your counselor's

13   report, and your medical -- your mental health

14   evaluations.  We'll focus on your progress and any new

15   reports since your last hearing, so any change in

16   parole plans should be brought to our attention.  We

17   will reach a decision today and inform you whether or

18   not we find you suitable for parole and the reasons for

19   our decision.  Sir, if you are found suitable for

20   parole, the length of your confinement will be

21   explained to you at that time.  Before we recess for

22   deliberations, the District Attorney's representative,

23   your attorney and you yourself will have an opportunity

24   to make a final statement regarding your parole

25   suitability.  Sir, your statement should be limited to

26   why you feel you are suitable for parole.  We'll then

27   recess, clear the room and deliberate.  Once we

7

1    complete our deliberations, we'll resume the hearing

2    and announce our decision. California Code of

3    Regulations states that regardless of time the served,

4    a life inmate shall be found unsuitable for and denied

5    parole, if in the judgment of the Panel the inmate

6    would pose an unreasonable risk of danger to society if

7    released from prison. Sir, you have certain rights.

8    Those rights include a right to a timely notice of this

9    hearing, the right to review your Central File, and the

10   right to present relevant documents. Counselor, have

11   your client's rights been met?

12        **ATTORNEY STRINGER:** As to those rights, yes,

13   Commissioner. I do want to note that I did not receive

14   the current psychological evaluation until the date of

15   the hearing.

16        **PRESIDING COMMISSIONER ENG:** So noted. You have

17   the additional right to be heard by as impartial Panel.

18   You've been introduced to this Panel, sir. Do you have

19   any objection to the Panel?

20        **INMATE HILL:** No.

21        **PRESIDING COMMISSIONER ENG:** Okay. Counselor,

22   do you have any objections to the Panel?

23        **ATTORNEY STRINGER:** I do not, Commissioner.

24        **PRESIDING COMMISSIONER ENG:** You will receive a

25   copy of our written tentative decision today, and that

26   decision becomes final within 120 days. You'll also

27   receive a copy of the decision and a transcript will be

8

1    sent to you. On May 1st, 2004, regulations regarding

2    your right to appeal a decision made at this hearing

3    were repealed. The current policy is entitled

4    Administrative Appeals, Correspondence, and Grievances

5    Concerning Board of Prison Terms Decisions, so if you

6    have any questions about that policy, you can speak

7    with your attorney or you can review the policy at your

8    prison law library. Okay. Sir, you're not required to

9    admit to or to discuss your offense. However, the

10   Panel does accept as true the findings of the Court.

11   Do you understand what that means?

12           INMATE HILL: Yes, ma'am.

13           PRESIDING COMMISSIONER ENG: Commissioner, is

14   there any confidential material in the file that will

15   be used today?

16           DEPUTY COMMISSIONER STAR: There is confidential

17   information, but we will not be using it.

18           PRESIDING COMMISSIONER ENG: Okay. Thank you.

19   You know what, I do not have a hearing checklist.

20           DEPUTY COMMISSIONER STAR: I have one right

21   here.

22           PRESIDING COMMISSIONER ENG: Okay. Mr. Zarate,

23   did you receive a hearing checklist with your packet?

24   Sir, you're on mute. We cannot hear you.

25           DEPUTY DISTRICT ATTORNEY ZARATE: Sorry.

26           PRESIDING COMMISSIONER ENG: That's okay.

27           DEPUTY DISTRICT ATTORNEY ZARATE: No, just a

9

```
 1    transfer checklist.
 2            PRESIDING COMMISSIONER ENG:  A transfer --
 3            DEPUTY DISTRICT ATTORNEY ZARATE:  Okay.
 4            PRESIDING COMMISSIONER ENG:  Okay.  Well, let's
 5    just go over this quickly because I don't believe --
 6    Mr. Stringer, did you have a hearing checklist?
 7            ATTORNEY STRINGER:  No, Commissioner.
 8            PRESIDING COMMISSIONER ENG:  Okay.  Let's just
 9    go through it very quickly.  Basically, our packets
10    contain the cumulative case summary, board reports,
11    psychiatric reports, prior decisions, and notices and
12    responses.  Do you have all those?
13            DEPUTY DISTRICT ATTORNEY ZARATE:  Yes.  Do you
14    have legal documents as well?
15            PRESIDING COMMISSIONER ENG:  Yes.  I was getting
16    to that.
17            DEPUTY DISTRICT ATTORNEY ZARATE:  Okay.
18            PRESIDING COMMISSIONER ENG:  In terms of the
19    legal documents, there is the probation officer's
20    report, it looks like the abstract of judgment, and the
21    appellate decisions.
22            DEPUTY DISTRICT ATTORNEY ZARATE:  Correct.
23            PRESIDING COMMISSIONER ENG:  Okay.  I don't
24    think there was a sentencing transcript in there.
25            DEPUTY DISTRICT ATTORNEY ZARATE:  I did not see
26    one.
27            PRESIDING COMMISSIONER ENG:  Okay.  All right.
```

10

1    Mr. Stringer, do you have all of those sections?

2         ATTORNEY STRINGER:  I do.

3         PRESIDING COMMISSIONER ENG:  Okay.  And just

4    note that all of us did receive the latest

5    psychological evaluation this morning.

6         DEPUTY DISTRICT ATTORNEY ZARATE:  Correct.

7         PRESIDING COMMISSIONER ENG:  Okay.  All right.

8         DEPUTY DISTRICT ATTORNEY ZARATE:  Also, I

9    received in addition this morning the letter to Mr.

10   Stringer advising him that he's been -- to represent

11   Mr. Hill, the psych report, and then some letters of

12   support.

13        PRESIDING COMMISSIONER ENG:  Okay.  All right.

14   It is in the record that Mr. Zarate has concurred with

15   the list.  Sir, this hearing checklist is labeled

16   Exhibit One, and it's basically to make sure that all

17   of us involved in the hearing are working off the same

18   set of documents.  So that's why we do that.  Okay.

19   Okay.  Counselor, are there additional documents to be

20   submitted to the Panel this morning?

21        ATTORNEY STRINGER:  Yes, Commissioner.  I have

22   additional chronos attesting to my client's

23   participation in several groups within --

24        PRESIDING COMMISSIONER ENG:  Okay.

25        ATTORNEY STRINGER:  -- San Quentin, the letter

26   from Yun Cheng.  He's a vocational plumbing instructor

27   at San Quentin, support.

11

1       **PRESIDING COMMISSIONER ENG:**  Support letter?

2       **ATTORNEY STRINGER:**  Yeah.

3       **PRESIDING COMMISSIONER ENG:**  Okay.

4       **ATTORNEY STRINGER:**  I have a letter -- actually,

5  it's a card, a Christmas card attesting to my client's

6  good character from someone that met him in the

7  institution, so I would like the Board to consider

8  that.

9       **PRESIDING COMMISSIONER ENG:**  Okay.

10       **ATTORNEY STRINGER:**  And I do have an additional

11  letter from a Cynthia Harris, LCSW.  It is dated

12  December 4th, 2004, but I believe I will reserve that

13  for my closing.

14       **PRESIDING COMMISSIONER ENG:**  All right.  Okay.

15  Sir, do you have any preliminary objections?

16       **ATTORNEY STRINGER:**  Not at this time,

17  Commissioner.

18       **PRESIDING COMMISSIONER ENG:**  Okay.  And will

19  your client be speaking with the Panel today?

20       **ATTORNEY STRINGER:**  Commissioner, the facts of

21  the life crime are well known.  I am going to invoke my

22  client's limited right under 5011(b) in Title XV

23  Section 2236 not to discuss the life crime because he

24  maintains his innocence; however, if the Board has

25  questions for him, I am going to instruct him to answer

26  those questions.

27       **PRESIDING COMMISSIONER ENG:**  All right.  All

12

1    right. So I'm going to -- we're going to go ahead and

2    swear you in for anything that you might be discussing

3    with us. All right. So please raise your right hand.

4    Do you solemnly swear or affirm that the testimony you

5    are about to give at this hearing will be the truth,

6    the whole truth, and nothing but the truth?

7            INMATE HILL: Yes, ma'am, I do.

8            PRESIDING COMMISSIONER ENG: Okay. So Mr.

9    Stringer, if we go over the line, you'll just let us

10   know in terms of any question?

11           ATTORNEY STRINGER: Yeah, I'll just object, yes.

12           PRESIDING COMMISSIONER ENG: Right. Okay. So

13   therefore, I am going to read into the record the

14   statement of facts about the crime, and I'm going to

15   take that from the appellate decision, which is under

16   the legal documents, page two through three.

17           "In early 1987 defendant came to Chico to

18           live near his estranged wife Vicky Hill.

19           Defendant wanted to reconcile with Vicky,

20           or failing that, to have her killed. On

21           April 20th, 1987, Vicky and defendant had

22           a violent argument. Shortly thereafter

23           Dalton, D-A-L-T-O-N, Moss, M-O-S-S, sold

24           defendant six or seven sticks of dynamite,

25           several blasting caps and fuse cords.

26           Defendant planned to dynamite Vicky's

27           truck or trailer home. Defendant's

13

1          daughter Shanna, S-H-A-N-N-A, Lopes, L-O-

2          P-E-S, recommended John Keefe, K-E-E-F-E,

3          to defendant to carry out his plan.  In

4          early May 1987 Keefe agreed to the sum of

5          $1,000 to be paid by the defendant to

6          dynamite Vicky's trailer home while Vicky

7          was inside.  Defendant gave Keefe some

8          dynamite, blasting caps and fuse cords.

9          Subsequently, Keefe decided not to blow up

10         Vicky's trailer home, but told defendant

11         he would dynamite her truck for the same

12         $1,000 fee.  On May 29th, 1987, Keefe

13         threw dynamite near Vicky's unoccupied

14         truck where it exploded.  Defendant still

15         wanted Vicky killed.  Dalton Moss

16         delivered four more sticks of dynamite to

17         Lopes for defendant.  Lopes arranged for

18         Mike Hoskison, H-O-S-K-I-S-O-N, to

19         dynamite Vicky's trailer home or truck.

20         On June 25th, 1987, Vicky shot Hoskison as

21         he attempted to light dynamite just

22         outside her trailer home.  Hoskison ran

23         off a short distance where he collapsed.

24         He died soon thereafter."

25         I am going to add this, "Defendant denied any

26    involvement in the May 29 bombing or the June 25th

27    bombing attempt.  Defendant specifically denied an

14

1    agreement with Keefe to dynamite Vicky's trailer home

2    in order to kill her." Okay. I am also going to read

3    into the, record because Mr. Hill is not going to speak

4    to the crime --

5            ATTORNEY STRINGER: He will answer questions --

6            PRESIDING COMMISSIONER ENG: Right.

7            ATTORNEY STRINGER: -- if you have specifics

8    ones about the life crime.

9            PRESIDING COMMISSIONER ENG: Right. I will read

10   in the prisoner's version. I'm going to take that from

11   the December 2006 board report.

12           ATTORNEY STRINGER: Okay.

13           PRESIDING COMMISSIONER ENG: And I'll read that

14   into the record.

15           ATTORNEY STRINGER: Thank you.

16           PRESIDING COMMISSIONER ENG: And it states that

17   after his arrest Hill provided a statement, which is

18   documented on pages 11 through 13 in the Butte County

19   probation officer's report dated 5/11/88.

20           "During a personal interview with his

21           assigned correctional counselor on 9/13/05

22           Hill had the aforementioned statement read

23           to him. He acknowledged the statement as

24           recorded in the POR as still fully

25           accurate and reflects his version of the

26           events. In addition to that statement,

27           Hill would also like the Board of Prison

15

1    Terms to recognize a notarized affidavit

2    dated January 12th, 1993, from his first

3    wife Karen Neavley, N-E-A-V-L-E-Y.  In the

4    affidavit Ms. Neavley states Hill's

5    daughter Shanna Lopes articulated to her

6    she (Ms. Lopes) was solely responsible for

7    the instant offense and Hill had nothing

8    to do with it."

9    And it just states that the affidavit can be

10   located in the BPT Section of the Central File.

11   **DEPUTY COMMISSIONER STAR:** You want to read the

12   POR statement on the --

13   **PRESIDING COMMISSIONER ENG:** Yeah, I better.  I

14   was looking at that.  I will read that into the record

15   pages 11 through 13 that states the defendant's

16   statement:

17   "Mr. Hill has submitted a short written

18   statement, which is attached to this

19   report.  When interviewed he related that

20   he has been convicted of this the offense

21   due to the lies of four people who were

22   granted immunity.  They lied to protect

23   themselves because they are the ones

24   responsible for those incidences.  He

25   stated that his daughter hated Vicky Hill

26   because she took $110,000 of his money and

27   that Shanna continually harped on it.

16

```
1        Although it was his money, he had

2        indicated to Shanna that she would be

3        getting part of it and that Shanna could

4        not wait for final proceedings in divorce

5        court.  He further stated that Ms. Lopes

6        admitted during the early part of the

7        investigation that she in fact did try to

8        kill Mrs. Hill.  He stated that, 'I admit

9        going astray,' referring to his leaving

10       his wife.  He states that she subsequently

11       told him that she would take him back if

12       they left the state, which they did.  They

13       moved to Washington, but she subsequently

14       told him that she had cancer and she

15       needed to come back to California.  He

16       figured that this was a lie, which allowed

17       her to return and take his money.  He

18       further states that in spite of this he

19       still didn't have any animosity towards

20       her, in as much as, 'My second wife got me

21       for one-quarter million.  I didn't do

22       anything to her, and this was nothing

23       compared to that amount.'  The defendant

24       states that, 'Common sense should show you

25       that I wouldn't involve my family in

26       something like this, especially with the

27       use of explosives.'  He relates that the
```

17

```
1      principals are either on drugs, drunk or
2      on welfare and that they are capable of
3      perpetrating this type of offense.  When
4      asked by this writer why he moved to Los
5      Angeles and why it indicates he made
6      between 60 and 70 phone calls to his
7      daughter during the three or four week
8      span of time that this incident occurred,
9      he related that, 'I moved to Los Angeles
10     to start a new life.  I'm a phone person.
11     Shanna had problems with her job and her
12     husband.  I also bought her a beauty
13     salon, and I called to see how she was
14     doing with her business.  I'm a family
15     type person, and I'm interested in my
16     family and how they're doing.'  He stated
17     that at no time did he indicate to his
18     daughter that he had someone in Garden
19     Grove who could, 'take care,' of Mrs.
20     Hill.  He stated that the individual the
21     police think he might have contracted with
22     was a Mr. Dart, D-A-R-T, who was living in
23     his trailer in Garden Grove.  He stated he
24     was living with a woman at this time who
25     he intended to marry and that Mr. Dart was
26     simply overseeing his trailer to make sure
27     nothing happened to it.  He related that
```

18

1       at this time he had arranged with two

2       other individuals to start a construction

3       company in the Los Angeles area, and that

4       they started with an earth moving job at a

5       local junior college when he was arrested.

6       He states he would like to one day start

7       an estimating school, and he feels that he

8       could make a successful living at that.

9       Defendant concluded his remarks by stating

10      that he had nothing personal against the

11      investigator in this matter, but he feels

12      that officers probably had something akin

13      to, 'tunnel vision,' and that they zeroed

14      in on him right away without even

15      bothering to investigate other people in

16      this matter and the stories they tell.  He

17      states that several jurors in this matter

18      have indicated that they are not satisfied

19      with the verdict they came to regarding

20      this matter, and that sooner or later he

21      will appeal this matter either locally or

22      through the appellate court, and that

23      eventually there will be a new trial,

24      which will vindicate him.  Says Mr. Hill,

25      'There's nothing I can do about it now,

26      but I hate to go to prison for something I

27      didn't do'"

19

1        Sir, you still stand by that statement?

2        INMATE HILL:  Yes, ma'am.

3        PRESIDING COMMISSIONER ENG:  Okay.  Sir, I

4    notice, and I'm jumping a little ahead with your

5    background, but you were in the service?

6        INMATE HILL:  Yes, ma'am.

7        PRESIDING COMMISSIONER ENG:  For quite a few

8    years?

9        INMATE HILL:  I was in the Navy.

10        PRESIDING COMMISSIONER ENG:  You were in the

11    Navy, okay.  And what was your area of specialty in the

12    Navy?

13        INMATE HILL:  It was in special weapons.

14        PRESIDING COMMISSIONER ENG:  Special weapons?

15        INMATE HILL:  Yes.

16        PRESIDING COMMISSIONER ENG:  Does that include

17    explosives?

18        INMATE HILL:  No, ma'am.

19        PRESIDING COMMISSIONER ENG:  Okay.

20        DEPUTY COMMISSIONER STAR:  What does it include,

21    sir?

22        INMATE HILL:  It was the maintenance of various

23    types of weapons on the ship, such as handguns and

24    machine guns and so forth like that.

25        DEPUTY COMMISSIONER STAR:  Okay.  Thank you.

26        PRESIDING COMMISSIONER ENG:  Sir, why do you

27    think that your daughter would go to such extremes?

20

1    **INMATE HILL**:  Well, there was two reasons.

2    Unbeknownst to me, my son, he was 16 years old, and he

3    moved in with Vicky and myself when we were living in

4    Salt Lake City.  And he got himself a job and was

5    working and doing quite well for himself during the

6    summer, and for some reason Vicky took a dislike to

7    him, which I never did figure out.  In fact, I didn't

8    know about it until years later.  And she loaded a

9    shotgun, handed it to him and told him that I hated

10    him, that his uncles hated him, that his whole family

11    hated him, and he needed to put that gun in his mouth

12    and pull the trigger, and walked out of the house and

13    left him alone with it.  He -- I came home from work,

14    and he said he wanted to leave.  He wanted to go back

15    to live with his mother.  I asked him what if problem

16    was, why, because he was doing so well, and he wouldn't

17    talk to me about it.  I didn't find out about it, like

18    I say, until several years later, but my daughter knew

19    about it because they were close.  He had told her all

20    about it, and then when she came up claiming to have

21    cancer and was playing on my sympathies with cancer and

22    moved up to Washington, and I put her on my checking

23    account and she took $110,000 of my money and then left

24    and came back to California.  I called my daughter and

25    I says, "Well, do you have any idea where she's at?"

26    And she says, "Well, I know where she works and I'll go

27    by and see if she's there."  And she did, and she comes

21

1    back and she says, "Something needs to be done about

2    this.  We can't let her get away with this."  And I

3    told at that time, "Well, you know, I made that money.

4    I can make more money.  Just leave it alone," but she

5    wouldn't let it go.

6             PRESIDING COMMISSIONER ENG:  So Shanna is your

7    daughter from your first marriage?

8             INMATE HILL:  Yes, ma'am.

9             PRESIDING COMMISSIONER ENG:  Okay.  And you were

10   pretty close to her, correct?

11            INMATE HILL:  We never were really close, Shanna

12   and I.  She's so independent and demanding, especially

13   with her mother, that it offended me in a lot of ways.

14   She bullied her mother around all the time telling her

15   mother what to do constantly, and I wasn't brought up

16   that way, you know.  That's not the type of respect

17   that I expected out of my home, but then again, I

18   wasn't there with her.  She was living with her mother.

19   So whenever I chastised her about it, she told me to

20   mind my own business.

21            PRESIDING COMMISSIONER ENG:  Well, you state

22   that you weren't that close with her, but yet you made

23   60 or 70 calls to her after the commitment offense, you

24   know, or during that period of time.  And for not being

25   very close, that tells me something totally opposite.

26            INMATE HILL:  Well, I promised her I would buy

27   her a beauty salon.  I did, okay, and I stayed in

22

1    constant touch with her to see if she needed money to

2    continue the operation of the beauty salon.  Plus, she

3    was having problems with her husband at that time, and

4    I would call and ask her if there's anything I could

5    do.  I'm a very family oriented man.  What I mean by we

6    weren't close, it was on her part, not my part because

7    I believe in family unity totally.

8            PRESIDING COMMISSIONER ENG:  How did you know

9    Dalton Moss?

10           INMATE HILL:  Construction.

11           PRESIDING COMMISSIONER ENG:  In construction?

12           INMATE HILL:  Yes.

13           PRESIDING COMMISSIONER ENG:  And Mr. Moss, how

14   did you know that he would have any dynamite?

15           INMATE HILL:  He was an explosive expert.

16           PRESIDING COMMISSIONER ENG:  He was?

17           INMATE HILL:  And he made that quite clear.  I

18   used to own a mine in Nevada, okay.  And we done some

19   work up in Forrest Hill up outside of Sacramento, and

20   there's a lot of areas up in there down in the river

21   and creeks that a lot of prospecting goes on for gold.

22   And I got with a fellow up there at one time, and he

23   wanted me to get some dynamite and go up and blow this

24   bolder out of the way so he could look for some gold.

25   That was in 1983.  That was four years prior to this

26   incident, and Dalton Moss gave me some dynamite at that

27   time.  I gave him the dynamite back to him afterwards,

23

1    and he burned it up because it was starting to sweat.

2    The dynamite was starting to sweat.

3           PRESIDING COMMISSIONER ENG:  This states in 1987

4    that Mr. Moss gave you dynamite.

5           INMATE HILL:  That didn't happen, ma'am.

6           PRESIDING COMMISSIONER ENG:  Did your daughter,

7    Ms. Lopes, did she know Mr. Moss?

8           INMATE HILL:  Yes, ma'am, she did.

9           PRESIDING COMMISSIONER ENG:  And how so?

10          INMATE HILL:  Well, he used to go in and get his

11   hair cut by her.  He knew that we worked -- she knew

12   that we worked together, and she had talked with him on

13   numerous occasions and knew what he did and what his

14   livelihood was.  She knew we were friends.

15          PRESIDING COMMISSIONER ENG:  How do you know Mr.

16   Keefe?

17          INMATE HILL:  That was her friend.

18          PRESIDING COMMISSIONER ENG:  But you did know

19   him?

20          INMATE HILL:  I met him once or twice, I think.

21          PRESIDING COMMISSIONER ENG:  How about Mr.

22   Hoskison?

23          INMATE HILL:  I never heard of him.  I never

24   knew he existed.

25          PRESIDING COMMISSIONER ENG:  I want to go ahead

26   and let my fellow Commissioners here intervene, if they

27   would like, if they've got other questions to ask

24

1    regarding the life crime.

2         DEPUTY COMMISSIONER STAR:  Mr. Hill -- thank

3    you, Commissioner.  Did you ever discuss with your

4    daughter her idea of blowing up your wife?

5         INMATE HILL:  No.  No.  She wanted to do damage

6    to my ex-wife and told me she was going to do damage,

7    and I kept telling her to leave it alone, okay, and she

8    just kept harping on it and harping on it.  And I

9    finally I said well, go ahead and do what you want to

10   do, and for that, I am extremely sorry.  That to me

11   puts full responsibility on my shoulders because I

12   could have said to her you just stop right now or I

13   could have got on an airplane and went up and sat down

14   and talked with her and said look, you know, you need

15   to leave this alone and let's get on with our live, but

16   I didn't, and that's my fault, completely my fault.

17        DEPUTY COMMISSIONER STAR:  Did she tell you the

18   details of how she was going to do it?

19        INMATE HILL:  No.

20        DEPUTY COMMISSIONER STAR:  She tell you who was

21   going to do it?

22        INMATE HILL:  No.

23        DEPUTY COMMISSIONER STAR:  You were upset with

24   your wife because she took $110,000?

25        INMATE HILL:  Yes, ma'am, I was.

26        DEPUTY COMMISSIONER STAR:  You were still

27   married?

1          INMATE HILL:  Yes.

2          DEPUTY COMMISSIONER STAR:  And this was -- you

3   were living in California?

4          INMATE HILL:  No, I was living in Washington.

5          DEPUTY COMMISSIONER STAR:  Okay.

6          INMATE HILL:  She was living in California and

7   told me she had cancer.

8          DEPUTY COMMISSIONER STAR:  Okay.  Did you have a

9   divorce pending?

10         INMATE HILL:  Yes.

11         DEPUTY COMMISSIONER STAR:  Or settlement?

12         INMATE HILL:  Yes, ma'am.  I had a divorce and a

13  settlement pending.

14         DEPUTY COMMISSIONER STAR:  Okay.

15         INMATE HILL:  And the settlement was finalized.

16         DEPUTY COMMISSIONER STAR:  So you knew you were

17  going to get some of this money back or had you -- was

18  that part of the settlement?

19         INMATE HILL:  Everything was settled completely.

20  We went to court.

21         DEPUTY COMMISSIONER STAR:  Okay.

22         INMATE HILL:  The judge settled everything.

23         DEPUTY COMMISSIONER STAR:  So --

24         INMATE HILL:  She took hers.  I took mine.

25         DEPUTY COMMISSIONER STAR:  And did that include

26  or exclude the $110,000?

27         INMATE HILL:  No.  The $110,000 was included in

26

1   the settlement.

2           DEPUTY COMMISSIONER STAR:  Okay.

3           INMATE HILL:  Okay.  And the Court ordered her

4   to have an X amount of dollars and for me to have X

5   amount of dollars, and the whole thing was settled.

6   And we went to the bank and settled everything up, and

7   she went her way and I went my way and it was over.

8           DEPUTY COMMISSIONER STAR:  Did you tell your

9   daughter this?

10          INMATE HILL:  Yes, yes.

11          DEPUTY COMMISSIONER STAR:  Well, then I'm going

12  to repeat a question from the same --

13          INMATE HILL:  Okay.

14          DEPUTY COMMISSIONER STAR:  Is why if you told

15  your daughter that you had a divorce and a settlement

16  that included an agreed upon decision on the $110,000,

17  why was your daughter continuing to be concerned about

18  the money that was taken from you?

19          INMATE HILL:  Because she figured that that was

20  her money, you know.  I'm her father and she was

21  entitled to a share of that money.  It was her money.

22  If the money was being taken from me, it was being

23  taken from her as well.

24          DEPUTY COMMISSIONER STAR:  If you should pass,

25  it would go to her, or did she feel some entitlement to

26  have it immediately?  Had you promised her some money?

27          INMATE HILL:  No, I did not.

27

1          PRESIDING COMMISSIONER ENG:  I'm going to

2     intervene here one second.  On that note, because I

3     thought that I'd also read that you had given up

4     somewhere near a quarter million dollars to a previous

5     wife?

6          INMATE HILL:  She cost me about a quarter

7     million dollars.

8          PRESIDING COMMISSIONER ENG:  So how did your

9     daughter respond to that?

10         INMATE HILL:  She was too young at the time.

11    She was only 12 years old, 13 years old.  She had no

12    idea what was going on.

13         DEPUTY COMMISSIONER STAR:  Am I correct then

14    that you say you had a divorce settlement that included

15    an agreed upon decision on the $110,000?  Did you

16    explain this to your daughter that this is what I got

17    out of the settlement and I'm satisfied with it?

18         INMATE HILL:  Yes, I did.

19         DEPUTY COMMISSIONER STAR:  But she continued?

20         INMATE HILL:  Yes.

21         DEPUTY COMMISSIONER STAR:  Why do you believe

22    that your daughter then ended up, and these other

23    parties because it wasn't just your daughter testifying

24    against you.

25         INMATE HILL:  Because they committed a crime,

26    and the District Attorney offered all of them immunity

27    to testify against me.  And they were all facing 25

28

1    years to life for the crime, and they took that

2    immunity to save their own souls, save themselves.

3         DEPUTY COMMISSIONER STAR:  Did you ever give

4    your daughter any money to finance any part of this?

5         INMATE HILL:  I did not.

6         DEPUTY COMMISSIONER STAR:  The purchase of the

7    dynamite or the payment of $1,000?

8         INMATE HILL:  I did not.

9         DEPUTY COMMISSIONER STAR:  Mr. Herron, do you

10   have any questions?

11        DEPUTY COMMISSIONER HERRON:  I do not.  Thank

12   you.

13        DEPUTY COMMISSIONER STAR:  Okay.  Ms. Eng, I

14   think that's all the questions I have.

15        PRESIDING COMMISSIONER ENG:  Okay.  Let me ask

16   you something else about your marriage to Vicky Hill.

17   Was there ever any physical altercations between you

18   and she?

19        INMATE HILL:  No, never.

20        PRESIDING COMMISSIONER ENG:  What about with any

21   of your other wives?

22        INMATE HILL:  I would rather not talk about

23   those at all.  Those are personal life events.

24        PRESIDING COMMISSIONER ENG:  Okay.  Well, Vicky

25   Hill was your second wife, correct?

26        INMATE HILL:  She's my third wife.

27        PRESIDING COMMISSIONER ENG:  She's your third

29

1    wife?

2          INMATE HILL:  Yeah.

3          PRESIDING COMMISSIONER ENG:  Okay.  I might come

4    back and ask some more questions later.  Let me move on

5    here a little bit.  In terms of your prior criminality,

6    I believe that the record reflects that there is no

7    juvenile record noted, correct, sir?

8          INMATE HILL:  That's correct.

9          PRESIDING COMMISSIONER ENG:  And regarding your

10   adult conviction and arrests, I see an arrest in

11   November of 1961 in Ogden, Utah?

12         INMATE HILL:  Yes, ma'am.

13         PRESIDING COMMISSIONER ENG:  For petty larceny,

14   and you were placed on six months probation?

15         INMATE HILL:  Yes, ma'am.

16         PRESIDING COMMISSIONER ENG:  Okay.  And then you

17   were arrested in February of 1973 by the Santa Ana

18   Police Department for assault and battery, but there

19   was no disposition noted.  And then arrested in June of

20   1987 for assault and battery and disturbing the peace,

21   and the charges were dismissed.  What happened with

22   those two?

23         INMATE HILL:  I'd rather not talk about them.

24         PRESIDING COMMISSIONER ENG:  Okay.  That's fine.

25         INMATE HILL:  Any of that.

26         PRESIDING COMMISSIONER ENG:  Okay.

27         INMATE HILL:  Would you introduce that, please?

30

1           ATTORNEY STRINGER:  Introduce what?

2           INMATE HILL:  The consideration of the past

3    arrest records.  It's right here.

4           ATTORNEY STRINGER:  Why don't you read it?

5           INMATE HILL:  May I read this, or would you like

6    to?

7           PRESIDING COMMISSIONER ENG:  Are you going to

8    read that entire page?

9           INMATE HILL:  No, no.  This is from the Title

10   XV.

11          PRESIDING COMMISSIONER ENG:  Uh-huh.

12          INMATE HILL:  Okay.  It's Section 2322, criminal

13   history.

14          PRESIDING COMMISSIONER ENG:  Okay.  Well, excuse

15   me.  Counselor, are you objecting to just my stating

16   what those are?

17          ATTORNEY STRINGER:  Can I have a minute?

18          PRESIDING COMMISSIONER ENG:  Sure.  We're going

19   to take a brief recess.  I'm going to put you on mute.

20          (Off the Record)

21          DEPUTY COMMISSIONER STAR:  Okay.  We're back on

22   record.

23          PRESIDING COMMISSIONER ENG:  Okay.  Mr.

24   Stringer?

25          ATTORNEY STRINGER:  I think I've quantified Mr.

26   Hill's objection.  Certainly, he's not objecting to the

27   fact that an arrest did occur because it's in the

31

1    record.  What he's objecting to is the Board using that

2    as a factor in a suitability consideration.  It's his

3    view that under Title XV Section 2322 the Board cannot

4    use those arrests in determining whether or not he's

5    suitable for parole, and so we would ask that the Board

6    not use those arrests during deliberations as a factor

7    in suitability.  Now, I have a copy of --

8         **PRESIDING COMMISSIONER ENG:**  Oh, I have Title

9    XV, thank you.

10        **ATTORNEY STRINGER:**  Okay.

11        **PRESIDING COMMISSIONER ENG:**  Yes.  Do you want

12   to make a comment?  Go ahead.

13        **DEPUTY COMMISSIONER STAR:**  Well, the Board can

14   use all relevant and available information.  The Board

15   just needs to properly reflect the appropriate

16   disposition that's on the record for those, and I think

17   as long as we show that there's been no disposition but

18   there was an arrest, we are accurately reflecting the

19   record.

20        **PRESIDING COMMISSIONER ENG:**  That's the way I

21   read it the way I did.

22        **INMATE HILL:**  Okay.

23        **PRESIDING COMMISSIONER ENG:**  Okay.

24        **ATTORNEY STRINGER:**  Well, he is here for

25   allegedly conspiring to kill his wife, and two other

26   assault and battery chargings could bias the

27   suitability consideration, even though they were

32

1  dismissed.

2       DEPUTY COMMISSIONER STAR:  Okay.  You know, I

3  don't want to jump too far ahead, Commissioner Eng, but

4  when we review the psych reports this is also an issue

5  in there, and certainly Mr. Hill and yourself will be

6  given an opportunity to comment on that as well at the

7  appropriate time, just like you may comment on the

8  record and what it reflects, if you choose to, about

9  there being an arrest.  Okay.

10      PRESIDING COMMISSIONER ENG:  But there are many

11  factors that come into play.

12      INMATE HILL:  I understand.

13      PRESIDING COMMISSIONER ENG:  Okay.  So

14  basically, I'm going overrule your objection.  Mr.

15  Zarate?

16      DEPUTY DISTRICT ATTORNEY ZARATE:  I just simply

17  wanted to comment that the Board is permitted to

18  consider the prior criminal record of a prisoner in

19  determining suitability, particularly where it's

20  relevant, and here a record of violent and assaultive

21  behavior is certainly relevant to the issue of

22  suitability and may be considered by this Board.

23      ATTORNEY STRINGER:  Well, this is what we argued

24  during the last hearing was, and that is -- and the

25  District Attorney, of course, is right, if there's a

26  disposition.

27      PRESIDING COMMISSIONER ENG:  That's correct.

33

1    And this is why I notated specifically about the

2    dispositions in terms of the arrests and that's it.  So

3    we're not going belabor this any longer.  I've

4    overruled his objection.  The Board is entitled to

5    consider many, many, many different, you know, all the

6    different information that we have at our disposal, and

7    we take a look at all the different factors, so that's

8    the end of it.  Okay.  We're going to move on.  Okay.

9    So taking a look, sir, at your personal history, I see

10   that you were born on March 22nd, 1939, in Bloomington,

11   Idaho?

12           INMATE HILL:  Yes, ma'am.

13           PRESIDING COMMISSIONER ENG:  Correct.  So that

14   makes you currently -- you are 67?

15           INMATE HILL:  Yes, ma'am.

16           PRESIDING COMMISSIONER ENG:  And it states you

17   that you graduated from high school.  When did you get

18   out of high school; do you remember?

19           INMATE HILL:  '56.

20           PRESIDING COMMISSIONER ENG:  In '56, okay.  And

21   right from high school you entered the United States

22   Navy?

23           INMATE HILL:  Yes, ma'am.

24           PRESIDING COMMISSIONER ENG:  Okay.  July 17th,

25   56, so you went right in.  Okay.  You were honorably

26   discharged from the service on April 17th, 1959, with

27   the rank of Seaman E-3.  Okay.  This states, and again

34

1    I'm taking this information from the December 2006

2    board report, this states that you were -- okay, you

3    were married three times prior to your life crime,

4    okay.  And I guess your -- okay, your first marriage

5    lasted 13 years?

6             INMATE HILL:  Yes, ma'am, 14.

7             PRESIDING COMMISSIONER ENG:  14 years?

8             INMATE HILL:  Yes, ma'am.

9             PRESIDING COMMISSIONER ENG:  Okay.  And that

10   was -- that was the mother of Shanna?

11            INMATE HILL:  Yes, ma'am.

12            PRESIDING COMMISSIONER ENG:  And your son also?

13            INMATE HILL:  My son also.

14            PRESIDING COMMISSIONER ENG:  Okay.  So you had

15   two children from that?

16            INMATE HILL:  Yes, ma'am.

17            PRESIDING COMMISSIONER ENG:  You want to go

18   ahead and turn over that tape because it gets to be

19   rather annoying.

20            DEPUTY COMMISSIONER STAR:  If we may, everyone.

21                    (Off the Record)

22            DEPUTY COMMISSIONER STAR:  Okay.  This is Tape

23   One Side B for the hearing for Mr. Hill, and we're back

24   on record.

25            PRESIDING COMMISSIONER ENG:  Okay.  So your

26   first wife, again, you were married to for 14 years.

27   What caused the divorce?

35

1          INMATE HILL:  Well, we grew apart.  I don't -- a

2    lot of things can be said, and I'm not one to be

3    putting down or running somebody else down, so I would

4    rather not get into it, if you don't mind.

5          PRESIDING COMMISSIONER ENG:  Okay.  Is this the

6    wife that you ended up -- that ended up costing you

7    about a quarter million dollars?

8          INMATE HILL:  No.

9          PRESIDING COMMISSIONER ENG:  Okay.  All right.

10         INMATE HILL:  This is the wife that made the

11   sworn affidavit as to my daughter's statement to her.

12         PRESIDING COMMISSIONER ENG:  Where is she living

13   right now?

14         INMATE HILL:  She's living in Chico right now.

15         PRESIDING COMMISSIONER ENG:  In Chico?

16         INMATE HILL:  Yes.

17         PRESIDING COMMISSIONER ENG:  Okay.  Where were

18   you living when you were married?

19         INMATE HILL:  We lived in southern California,

20   Anaheim.

21         PRESIDING COMMISSIONER ENG:  Okay.  So your

22   children were born in California?

23         INMATE HILL:  No, both of them were born in

24   Utah, and then we moved to southern California.

25         PRESIDING COMMISSIONER ENG:  Okay.  So your

26   second marriage lasted two years?

27         INMATE HILL:  Yes.

36

1    PRESIDING COMMISSIONER ENG:  Okay.  And what

2  happened with that one?

3    INMATE HILL:  We were incompatible, completely

4  incompatible.

5    PRESIDING COMMISSIONER ENG:  Were you married --

6  was that one in California too?

7    INMATE HILL:  Yes.

8    PRESIDING COMMISSIONER ENG:  Second marriage

9  was -- okay, so you were divorced in '72 from your

10  first wife, correct, and then your second marriage was

11  two years later, correct?

12    INMATE HILL:  Yes.

13    PRESIDING COMMISSIONER ENG:  In '74 it says.

14    INMATE HILL:  Yes.

15    PRESIDING COMMISSIONER ENG:  Okay.  And lasted

16  for two years.  Okay.  How did you meet your second

17  wife?

18    INMATE HILL:  At a restaurant.  She was a

19  strikingly beautiful woman, very, very beautiful,

20  Apache Indian.

21    PRESIDING COMMISSIONER ENG:  Okay.

22    INMATE HILL:  Cultural differences prevented us

23  from making a go of it.

24    PRESIDING COMMISSIONER ENG:  Were you -- at that

25  time, and during your first marriage, what was your

26  trade back then?  How were you making your money?

27    INMATE HILL:  Construction.

37

1        PRESIDING COMMISSIONER ENG:  So you've been in

2   construction pretty much all your life?

3        INMATE HILL:  Yes, ma'am.

4        PRESIDING COMMISSIONER ENG:  Since getting out

5   of the service?

6        INMATE HILL:  Well, I went to work for the Air

7   Force right after I got out of the service.

8        PRESIDING COMMISSIONER ENG:  Okay.

9        INMATE HILL:  In data processing.

10       PRESIDING COMMISSIONER ENG:  Okay.

11       INMATE HILL:  And then I was offered a position

12  in construction, so I moved to southern California to

13  take that.

14       PRESIDING COMMISSIONER ENG:  Was your family --

15  I mean, you were in born in Idaho, but did your family

16  move to Utah?

17       INMATE HILL:  Well, I was born in southeast

18  Idaho right next to Utah.

19       PRESIDING COMMISSIONER ENG:  Okay.

20       INMATE HILL:  Okay.  And it was just at the time

21  of the Second World War, and we had moved to Ogden,

22  Utah, because there's an army depot there, there's an

23  Air Force base there, and there was a Navy base there

24  as well, and they needed all the help they could get

25  during the Second World War, so we moved down there.

26       PRESIDING COMMISSIONER ENG:  Okay.  Is your

27  family Mormon?

38

1          INMATE HILL:  Yes, ma'am.

2          PRESIDING COMMISSIONER ENG:  Because I know

3    Ogden.  I'm very familiar with Utah, and Ogden is --

4          INMATE HILL:  I was raised in Ogden.

5          PRESIDING COMMISSIONER ENG:  Okay.  Okay.  So

6    then you chose to leave Utah and move to California?

7          INMATE HILL:  Yes, ma'am.

8          PRESIDING COMMISSIONER ENG:  Okay.  And when you

9    did that were your parents still alive?

10          INMATE HILL:  My mother was killed in an

11   automobile accident in 1958.  My father was still alive

12   at the time.

13          PRESIDING COMMISSIONER ENG:  That's right.  I

14   did notate that she did when you were 19.  Okay.  How

15   many siblings do you have?

16          INMATE HILL:  I have three living.

17          PRESIDING COMMISSIONER ENG:  Okay.  They

18   brothers, sisters?

19          INMATE HILL:  All brothers.

20          PRESIDING COMMISSIONER ENG:  All brothers?

21          INMATE HILL:  Yes.

22          PRESIDING COMMISSIONER ENG:  So you had all boys

23   in your family?

24          INMATE HILL:  Yeah, there were five of us.  One

25   passed away.

26          PRESIDING COMMISSIONER ENG:  Okay.

27          INMATE HILL:  My oldest brother is 82 now, and

39

1    my next one is 78, and my next one is 73.

2         PRESIDING COMMISSIONER ENG:  Okay.  And I see

3    they're all still living in Ogden, Utah?

4         INMATE HILL:  In Ogden, Utah.

5         PRESIDING COMMISSIONER ENG:  Okay.  So you were

6    working as a general contractor, and the second

7    marriage only lasted two years?

8         INMATE HILL:  Yes, ma'am.

9         PRESIDING COMMISSIONER ENG:  Okay.  And in

10   California, if you were divorced both times in

11   California, it's a community property, so did -- which

12   one cost you the quarter million?

13        INMATE HILL:  The second one.

14        PRESIDING COMMISSIONER ENG:  The second one

15   after two years of marriage?

16        INMATE HILL:  Well --

17        PRESIDING COMMISSIONER ENG:  Yeah.

18        INMATE HILL:  She dug into my bank account

19   pretty deep, pretty heavily.

20        PRESIDING COMMISSIONER ENG:  Okay.

21        INMATE HILL:  In fact, she was forging my name

22   to checks.

23        PRESIDING COMMISSIONER ENG:  Did you press

24   charges against her?

25        INMATE HILL:  No, ma'am.

26        PRESIDING COMMISSIONER ENG:  Did you think about

27   pressing charges?

40

1          INMATE HILL:  Yes.

2          PRESIDING COMMISSIONER ENG:  Okay.  No children?

3          INMATE HILL:  By her, no.

4          PRESIDING COMMISSIONER ENG:  Okay.  Did you just

5    have the two children?

6          INMATE HILL:  That's it.  That's all I have, the

7    two children.

8          PRESIDING COMMISSIONER ENG:  So then we move on

9    to your third marriage to Vicky Hill.

10         INMATE HILL:  Yes.

11         PRESIDING COMMISSIONER ENG:  And when did you

12   get married to Vicky?

13         INMATE HILL:  1978.

14         PRESIDING COMMISSIONER ENG:  Okay.  Two years

15   after the previous divorce?

16         INMATE HILL:  Yes.

17         PRESIDING COMMISSIONER ENG:  Okay.  And you

18   stayed married for nine years?

19         INMATE HILL:  Yes, ma'am.

20         PRESIDING COMMISSIONER ENG:  Okay.  And you were

21   living in California and then the moved to Washington?

22         INMATE HILL:  Well, I met her in Utah, okay.

23   She worked for the police department in Utah, Salt Lake

24   City Police.  And then after we were married we

25   ventured to Cortez, Colorado, and bought a restaurant

26   down there and tried something different.  And it

27   wasn't working out too well, and I went down to Texas

41

1    and built a ten million dollar shopping center, and

2    from there we came back to California.  And then I

3    moved to Washington by myself.

4         PRESIDING COMMISSIONER ENG:  Okay.  After your

5    divorce from your second wife did you move back to

6    Utah, or were you just like visiting there when you met

7    Vicky?

8         INMATE HILL:  No, I moved back to Utah.

9         PRESIDING COMMISSIONER ENG:  You had moved?

10        INMATE HILL:  Yes.

11        PRESIDING COMMISSIONER ENG:  So you left

12   California and moved back?

13        INMATE HILL:  Uh-huh.

14        PRESIDING COMMISSIONER ENG:  Okay.  How would

15   you describe your nine-year marriage to Vicky?

16        INMATE HILL:  We got along real well, real well

17   except --

18        PRESIDING COMMISSIONER ENG:  Was it tumultuous

19   in any way?

20        INMATE HILL:  No, no.  It was a lot of love, a

21   lot of emotions, a lot of feelings between me and her.

22        PRESIDING COMMISSIONER ENG:  No arguments or

23   anything?

24        INMATE HILL:  We never did argue.  She used to

25   take the -- our return checks -- check from the federal

26   government and forge my name to them and cash them, and

27   we had discussions over that, but that was as serious

42

1   as it ever got.

2       PRESIDING COMMISSIONER ENG:  Same type of

3   situation with wife number two?

4       INMATE HILL:  I guess.  She had an insecurity

5   thing going for herself, you know.

6       PRESIDING COMMISSIONER ENG:  Well, wife number

7   two, was that tumultuous or --

8       INMATE HILL:  No, that was not tumultuous.

9       PRESIDING COMMISSIONER ENG:  Okay.

10      INMATE HILL:  Well --

11      PRESIDING COMMISSIONER ENG:  Were all three of

12  your marriages basically the same?  How would you

13  describe them?

14      INMATE HILL:  A lot of love.  I have a

15  philosophy.  I can be alone and be miserable.  I don't

16  have to be with somebody to make me miserable.  So

17  that's basically when it comes to that point, I just

18  say it's time for me to leave, so I leave.

19      PRESIDING COMMISSIONER ENG:  How is it that

20  your -- that so far, because we were only on wife

21  number three, these two wives in a row forging your

22  name and cashing checks?  Did you control the finances

23  in the family?

24      INMATE HILL:  Well, wife number three, I took

25  one paycheck and she took the next paycheck, so that's

26  how we used to do it.  So she had her own account, and

27  I had my account.  The checks she forged was the

43

1  federal government check coming back from our tax

2  returns.  She went and paid off her car and some other

3  things and some other bills that she had.  That was

4  when we first got married.

5       PRESIDING COMMISSIONER ENG:  Did she talk to you

6  about any of the financial debts that she had?

7       INMATE HILL:  No, in fact, she owed her ex-

8  husband $5,000, and I didn't know about that, which I

9  had to pay.

10      PRESIDING COMMISSIONER ENG:  How about your

11  first wife?  Did she --

12      INMATE HILL:  No.

13      PRESIDING COMMISSIONER ENG:  Did you ever have

14  any financial problems there?

15      INMATE HILL:  Never.

16      PRESIDING COMMISSIONER ENG:  Okay.  Who was wife

17  number four?

18      INMATE HILL:  That was -- Barbara was her name,

19  and she passed away with cancer.  We were married for

20  11 years.

21      PRESIDING COMMISSIONER ENG:  So when -- okay,

22  when did you get divorced from Vicky?  What year was

23  that?

24      INMATE HILL:  '87.

25      PRESIDING COMMISSIONER ENG:  Okay.  And when did

26  you marry wife number four?

27      INMATE HILL:  '88.

44

1    PRESIDING COMMISSIONER ENG:  Okay.  And you were
2    married for how long?

3    INMATE HILL:  11 years.

4    PRESIDING COMMISSIONER ENG:  11 years.  Okay.
5    You didn't divorce?

6    INMATE HILL:  No, she passed away.

7    PRESIDING COMMISSIONER ENG:  She just passed
8    away?

9    INMATE HILL:  Yes.

10    PRESIDING COMMISSIONER ENG:  Okay.  Sorry about
11    that.  So you basically -- you married her while you
12    were in prison?

13    INMATE HILL:  We got married in county jail, but
14    I knew her for 20 years prior to that.

15    PRESIDING COMMISSIONER ENG:  Where did you know
16    her from?

17    INMATE HILL:  Southern California.

18    PRESIDING COMMISSIONER ENG:  Okay.  I see here
19    that you state that you didn't have any drug use at
20    all?

21    INMATE HILL:  No, ma'am.

22    PRESIDING COMMISSIONER ENG:  Okay.  But you did
23    acknowledge -- you do acknowledge that you drank
24    alcohol regularly?

25    INMATE HILL:  No, it wasn't regularly.  It was
26    the time that I was going through my divorce with Vicky
27    and she took the $110,000.  I started drinking beer for

1   a couple weeks.

2        PRESIDING COMMISSIONER ENG:   I have a little

3   concern here because you keep referring to when she

4   took $110,000.   That was a settlement.   That was the

5   divorce.

6        INMATE HILL:   No.   What happened was the divorce

7   settlement came after that.

8        PRESIDING COMMISSIONER ENG:   Well, I thought,

9   unless I'm mistaken, I thought you stated when

10  Commissioner Star was asking you about that $110,000

11  that you stated in fact that you had a divorce

12  settlement, and the Court had ordered that that was her

13  share of the settlement.

14       INMATE HILL:   I'll explain.

15       PRESIDING COMMISSIONER ENG:   Okay.

16       INMATE HILL:   I moved to Washington.   I had a

17  lawsuit going over in Texas over the construction job,

18  the ten million dollar construction job that I won.

19  Okay.   She knew the money was coming in.   It was

20  $155,000.   She come up to Washington to reconcile for

21  the purpose of taking the money.   I put her on the

22  checking account.   She went to the bank and took

23  $110,000 and came back to California under the ruse --

24  all this time under the ruse that she had cancer when

25  she didn't have cancer playing on my sympathies, and

26  she came back to California with my money.   It's in the

27  statement, the defendant's statement, okay.   After she

46

1    came back to California, we went to court and

2    everything become settled. She took hers and I took

3    mine. She was entitled to half, but I gave her more

4    than half. I gave her $90,000.

5         PRESIDING COMMISSIONER ENG: So the $110,000 was

6    not part of the divorce settlement? Is that what

7    you're saying?

8         INMATE HILL: No, it was not part of the divorce

9    settlement. We went to court. When we were in divorce

10   court, the judge said that the money would be split

11   evenly, but she came up there -- which would have been

12   $75,000 or $78,000 is what she had coming, but she came

13   up there to reconcile our marriage and took $110,000.

14        DEPUTY COMMISSIONER STAR: $110,000. Well, did

15   you bring that up during court, during the divorce

16   proceedings and say she actually took the more than she

17   was entitled to and we need to split this evenly? Did

18   that come up?

19        INMATE HILL: It did come up during the

20   settlement, but I agreed to go ahead and give her

21   $90,000.

22        DEPUTY COMMISSIONER STAR: Okay.

23        PRESIDING COMMISSIONER ENG: Okay.

24        INMATE HILL: Then it was all done. It was over

25   with. Everything was settled.

26        PRESIDING COMMISSIONER ENG: Okay. So but --

27   okay. The board report states that you acknowledge

47

1    drinking alcohol daily prior to your incarceration?

2            INMATE HILL:  It was about two weeks then I

3    packed it up and moved down to southern California.

4            PRESIDING COMMISSIONER ENG:  What were you

5    drinking back then?

6            INMATE HILL:  Beer.

7            PRESIDING COMMISSIONER ENG:  Mostly beer?

8            INMATE HILL:  Just beer.

9            PRESIDING COMMISSIONER ENG:  Okay.  What type of

10   relationship do you have with your two children?

11           INMATE HILL:  Well, my son lives in San Jose,

12   and I hear from him periodically and he sends a little

13   bit of money now and then.  My daughter, I don't hear

14   from her at all.

15           PRESIDING COMMISSIONER ENG:  Have you tried to

16   reach her?

17           INMATE HILL:  Well, I wrote to her, but I never

18   heard back.

19           PRESIDING COMMISSIONER ENG:  Okay.

20           INMATE HILL:  We talked -- we wrote back and

21   forth for a while, and we talked on the phone two or

22   three times, four or five times, and she was telling me

23   that she was in college and going to be a social worker

24   and getting her degree, and then it just ended.

25           PRESIDING COMMISSIONER ENG:  Do you have

26   grandchildren?

27           INMATE HILL:  I have six.

48

1        PRESIDING COMMISSIONER ENG:  Six grandchildren,

2   okay.  Is that split between your daughter --

3        INMATE HILL:  And my son.

4        PRESIDING COMMISSIONER ENG:  Okay.

5        DEPUTY COMMISSIONER STAR:  Ms. Eng, can I ask a

6   question?

7        PRESIDING COMMISSIONER ENG:  Yes.

8        DEPUTY COMMISSIONER STAR:  This is the daughter

9   who you believe lied in court; is that correct, sir?

10       INMATE HILL:  Yes, I know she lied in court.

11       DEPUTY COMMISSIONER STAR:  And you wrote to her.

12   What is your feeling in relationship about that if she

13   lied in court and has caused you a life term, but

14   you've said that you've tried to write to her?  Do you

15   have a feeling one way or another?

16       INMATE HILL:  As I stated earlier, I'm a very

17   family oriented man.  I believe in family.

18       DEPUTY COMMISSIONER STAR:  So you forgive for

19   what she's done?

20       INMATE HILL:  Oh, absolutely.

21       DEPUTY COMMISSIONER STAR:  Okay.

22       INMATE HILL:  I blame myself.  This is my fault.

23       DEPUTY COMMISSIONER STAR:  In what way is it

24   your fault, sir?

25       INMATE HILL:  I could have stopped it, but I

26   didn't.  I'm totally to blame for this.

27       PRESIDING COMMISSIONER ENG:  Going back on that,

49

1   let me ask you something.  After the first explosive

2   incident, okay, how did you respond to that?

3        INMATE HILL:  I didn't know about the first

4   explosive incident until after the second one.

5        PRESIDING COMMISSIONER ENG:  So you weren't in

6   contact with your daughter at all?

7        INMATE HILL:  Yeah, we were on the phone a lot

8   and talking and so on like that, but she never said

9   anything about it.

10       PRESIDING COMMISSIONER ENG:  Okay.  Sir, have I

11  missed anything in terms of your personal background

12  that you'd like me to add?

13       INMATE HILL:  Well, I went to college.  I've

14  been in college for a while at the Weaver State

15  University.  I went to East LA College.

16       PRESIDING COMMISSIONER ENG:  Did you get a

17  degree or an AA or a bachelors degree?

18       INMATE HILL:  No, I almost did.

19       PRESIDING COMMISSIONER ENG:  Okay.

20       INMATE HILL:  Then I started college here, and

21  in my age I can't keep up.

22       PRESIDING COMMISSIONER ENG:  Okay.

23       INMATE HILL:  I have too many other things

24  going, my painting.  I'm doing an enormous amount of

25  painting now and an enormous amount of writing.  Well,

26  I mean I created a writing class.  I've written two

27  books since I've been in prison as well.