# EXHIBIT 3
# PART 2 OF 2

50

1    **PRESIDING COMMISSIONER ENG:**  Are you in constant

2    contact with your brothers?

3    **INMATE HILL:**  Yes.

4    **PRESIDING COMMISSIONER ENG:**  Do you ever get to

5    see them?

6    **INMATE HILL:**  No, that's a big concern of mine.

7    I'd really like to go home before they pass.

8    **PRESIDING COMMISSIONER ENG:**  Have they ever made

9    an attempt to come to California to see you?

10    **INMATE HILL:**  Oh, they used to.

11    **PRESIDING COMMISSIONER ENG:**  Okay.

12    **INMATE HILL:**  But they can't travel anymore.

13    **PRESIDING COMMISSIONER ENG:**  Commissioner, do

14    you have any further questions?

15    **DEPUTY COMMISSIONER STAR:**  No, not at this

16    point.

17    **PRESIDING COMMISSIONER ENG:**  Okay.  I'm going to

18    go ahead and have Commissioner Star go over your post-

19    conviction factors right now.

20    **DEPUTY COMMISSIONER STAR:**  Okay.  Mr. Hill, the

21    last time you appeared before the Board was in October

22    of 2005.  That was called your subsequent number one

23    hearing, and you received a one-year denial.  At that

24    hearing the Board said get self-help if available, stay

25    disciplinary free, get therapy and earn positive

26    chronos and ordered a new psych evaluation.  So keeping

27    that in mind, I'm going to be taking a look at your

51

1    behavior and adjustment since that last hearing,

2    focusing primarily on that.  Your current

3    classification score is 19, which is the mandatory

4    minimum score for lifers.  Your custody level is

5    Medium-A.  Reviewing your disciplinary record and

6    referring to your counselor's report for most of what

7    I'm about to review, and your counselor prepared a

8    report dated December 2006, counselor I. Tate, T-A-T-E.

9    Your counselor summarizes any disciplinary records, and

10    it says there's been no disciplinaries since this last

11    hearing, and in fact, your entire period of your life

12    term you've had no 115s, which is certainly

13    commendable.  In terms of any 128 counseling chronos,

14    you've had none since the last hearing and only one

15    during your entire life term, and that was a failure to

16    follow instructions back in 1989.  In terms of vocation

17    and education, we've already pretty much covered that

18    you're a high school graduate in 1956, and you attended

19    and took some college courses.  I wasn't clear if you

20    took those college courses prior to your life term or

21    during your incarceration or both.

22          INMATE HILL:  Both.

23          DEPUTY COMMISSIONER STAR:  Okay.  And you

24    never -- but you never got an AA degree.  Is that

25    correct?

26          INMATE HILL:  That's correct.

27          DEPUTY COMMISSIONER STAR:  Okay.  And where were

1    you when you were taking the prison college courses,

2    here at San Quentin?

3             INMATE HILL:  Here at San Quentin, yes.

4             DEPUTY COMMISSIONER STAR:  Do you know how many

5    units towards an AA you have?

6             INMATE HILL:  I don't know.

7             DEPUTY COMMISSIONER STAR:  Okay.  Do you know

8    how many college courses you took in totality?

9             INMATE HILL:  Well, I took Spanish, English,

10   several English, and two or three different Spanish,

11   geology, and math, and I don't know -- I can't --

12            DEPUTY COMMISSIONER STAR:  Okay.  Now, prior to

13   coming to prison, you told Commissioner Eng you worked

14   in the construction field, and have you -- and

15   currently you're assigned to vocational plumbing, PIA?

16            INMATE HILL:  PIA plumbing, yes, ma'am.

17            DEPUTY COMMISSIONER STAR:  How long have you

18   been in that position?

19            INMATE HILL:  I've been there three years.

20            DEPUTY COMMISSIONER STAR:  Three years, okay.

21   And the Board takes note that you continue to get, and

22   I see chronos, work supervisor chronos, that show

23   exceptional ratings in that assignment.  Did you ever

24   participate -- there is some evidence that you took

25   some drafting courses and you worked in landscaping

26   while you were incarcerated?

27            INMATE HILL:  I was assigned to landscaping for

53

1    a short period of time.

2         DEPUTY COMMISSIONER STAR:  Short, okay.

3         INMATE HILL:  Very short.

4         DEPUTY COMMISSIONER STAR:  How about the

5    drafting courses?

6         INMATE HILL:  I received a certificate of

7    completion in mechanical drafting.

8         DEPUTY COMMISSIONER STAR:  You took this through

9    a college, or did you take it --

10        INMATE HILL:  Down at Soledad State Prison.

11   They taught it down there.

12        DEPUTY COMMISSIONER STAR:  As part of their

13   vocational program?

14        INMATE HILL:  Yeah, part of their vocational

15   program.

16        DEPUTY COMMISSIONER STAR:  So you didn't finish

17   a vocation, you just became certified in various

18   drafting courses?  Would that be accurate?

19        INMATE HILL:  Well, there's two different

20   drafting courses down there.

21        DEPUTY COMMISSIONER STAR:  Uh-huh.

22        INMATE HILL:  One is architectural drafting.

23   The other one is mechanical drafting course.  I

24   graduated from the mechanical drafting course.

25        DEPUTY COMMISSIONER STAR:  Okay.  And how many

26   courses did that comprise of; do you remember?

27        INMATE HILL:  20 some.

54

1       DEPUTY COMMISSIONER STAR:  Okay.

2       INMATE HILL:  I don't remember the number.

3       DEPUTY COMMISSIONER STAR:  Okay.

4       INMATE HILL:  In my file there should be a

5  certificate of completion on it.

6       DEPUTY COMMISSIONER STAR:  I do see it on a

7  prior hearing decision.  I'll just verify that.  Any

8  other vocations then other than completing the

9  mechanical drafting course certification course, any

10  other vocations that you completed?

11      INMATE HILL:  I graduated from the plumbing

12  vocation also.

13      DEPUTY COMMISSIONER STAR:  And you're just

14  working PIA now?

15      INMATE HILL:  I'm working PIA now.

16      DEPUTY COMMISSIONER STAR:  Okay.  What year did

17  you finish your vocational plumbing?

18      INMATE HILL:  Well, the three years I told you

19  about was in totality.

20      DEPUTY COMMISSIONER STAR:  Okay.

21      INMATE HILL:  Between the vocational and the

22  plumbing -- I mean, PIA plumbing, and that was --

23      DEPUTY COMMISSIONER STAR:  Three years?

24      INMATE HILL:  -- a total of three years.

25      DEPUTY COMMISSIONER STAR:  All right.  And in

26  terms of self-help, I'll refer to your counselor's

27  report, and of course focusing on activities since the

55

1    last hearing.   I see that you've been participating in

2    Vietnam Vets and developing a positive attitude, and

3    you've given -- your attorney has provided us some

4    updated chronos to the counselor's report that also

5    includes a December '06 participation in the annual toy

6    drive, an update to the counselor's report, that you're

7    continuing to participate in developing a positive

8    attitude, in addition to the dates in the counselor's

9    report, and the latest one for the developing a

10    positive attitude was October 2nd of 2006.   There's an

11    update to your participation in AA, in addition to the

12    various chronos cited in the counselor's report.   We

13    now have one -- an update for September 30th, '06, and

14    then we also have an update for your Vietnam Vets group

15    participation -- no, actually this is in the

16    counselor's report.   It's the same.   The last chrono

17    for that, general chrono, is September 13th, so we

18    already had that one, and we have the July 3rd one of

19    the Vietnam Vets.   We have the April 3rd one.   Your

20    counselor cited that one as well, and we have the

21    February 6.

22              INMATE HILL:   Okay.

23              DEPUTY COMMISSIONER STAR:   So a couple new ones

24    there.   And I think we're going to see some reference

25    letters for your participation in the arts and

26    corrections program, so I'll save that when Ms. Eng

27    gets to the arts and corrections.   Any other programs,

56

1    particularly since your last hearing, programming

2    activities you want to tell the Board about that I may

3    not have highlighted?

4          INMATE HILL:  Well, you mentioned everything but

5    the positive attitude.  I've been participating in that

6    for three and a half years now.

7          DEPUTY COMMISSIONER STAR:  Let me ask you, sir,

8    you -- in response to the Commissioner Eng's questions

9    regarding this, you said you went on this two-week beer

10   drinking binge but you been participating in AA.  Do

11   you feel you have a substance abuse issue or alcohol?

12         INMATE HILL:  No, I do not, but AA is good

13   for -- not just for alcohol.  It's good for self-help

14   as well.

15         DEPUTY COMMISSIONER STAR:  Okay.

16         INMATE HILL:  It's a good program.  It's a great

17   program, in fact.

18         DEPUTY COMMISSIONER STAR:  And why did you elect

19   to participate in the Vietnam Vets program?

20         INMATE HILL:  I'm a Veteran.

21         DEPUTY COMMISSIONER STAR:  Of that war?

22         INMATE HILL:  No, no.

23         DEPUTY COMMISSIONER STAR:  Okay.

24         INMATE HILL:  You don't have to be a Veteran of

25   the Vietnam Vets to belong to the program.  All you

26   have to do is be a Veteran, and I'm a Veteran, and I

27   wanted to help other people and do the best I could.

57

1   And that program helps an enormous amount of people.

2   We have a college program through our food sales where

3   we give scholarship money to people.  We package up

4   food and hygiene products and all that stuff and send

5   them to Iraq and Afghanistan and so on and so on.  It's

6   really a good program.

7           DEPUTY COMMISSIONER STAR:  Any other programs

8   that you're participating in that I may not have

9   highlighted on?

10          INMATE HILL:  Presently?

11          DEPUTY COMMISSIONER STAR:  Yeah.

12          INMATE HILL:  No, ma'am.

13          DEPUTY COMMISSIONER STAR:  Or since your last

14  hearing.

15          INMATE HILL:  No, ma'am.

16          DEPUTY COMMISSIONER STAR:  Okay.  I'm going to

17  go now to -- at the last hearing the Board requested a

18  new psych report and asked that the report address the

19  prisoner's violence potential in the community, the

20  prisoner's psychosexual problem, the extent to which

21  the prisoner has explored the commitment offense and

22  come to terms with the underlying causes, the need for

23  further therapy and insulate into his crime, even

24  though Mr. Hill denies it.  So a psych report was

25  prepared for today's hearing, and I'm going to refer to

26  a report by Ph.D. psychologist Richard Starrett, S-T-A-

27  R-R-E-T-T.  And in reviewing that report -- the psych

58

1    reports are required to give a diagnosis.  On Axis I

2    the psychologist states, and I'm referring to page five

3    of that report, that alcohol abuse in remission since

4    incarceration in 1987 and in treatment over the last

5    three years.  So apparently the psychologist sees it as

6    an issue, the extent of which we'll discuss a little

7    bit more.  Axis II diagnosis was deferred.  Axis III is

8    glaucoma, which we spoke about earlier.  Axis IV is

9    just the psychosocial stressors of incarceration.  And

10    Axis V, his GAF score is 80.  The Board read the

11    report.  I'm going to now refer to page seven of that

12    report where there was a discussion with the

13    psychologist regarding the crime, as that was one of

14    the issues at the last Board hearing.  And in the

15    second paragraph the inmate was asked in the current

16    interview:

17           "When asking the inmate why this crime

18           occurred, he said that his ex-wife loaded

19           a shotgun and gave it to his son and told

20           his son that everyone hated him and that

21           he should just kill himself.  When he told

22           the sister, Ms. Lopes, about this she went

23           over the roof.  And later on when she

24           found out the ex-wife had stolen a large

25           amount of money from the father, the

26           inmate states that she went off the deep

27           end.  The son and daughter are by his

1      first marriage.  The inmate states, as in
2      the file account, that the daughter
3      actually committed this offense, as the
4      signed affidavit from his wife to that
5      effect.  When asking the inmate his role
6      in the crime, he said that he was in
7      southern California at the time and did
8      not know any of this was taking place.  He
9      states that his daughter had called him
10     several times and was very upset.  She was
11     telling him that something had to be done,
12     and he was telling her to leave it alone.
13     It was none of her business.  The inmate
14     goes on to say, 'I feel responsible.  I
15     could have stopped it by flying home and
16     talking to my daughter.  During the trial
17     she blamed me and stated that she has to
18     raise my grandchildren.'  The inmate
19     states he was found guilty in a trial.  He
20     tried to appeal but lost the appeals.  The
21     inmate goes on to say, 'I had a difficult
22     time admitting to something that I did not
23     do.'  The inmate goes on to express
24     remorse over the death of his ex-wife and
25     how he feels responsible for what
26     happened."
27     I believe you addressed this in terms of

60

1    earlier -- in terms of, Mr. Hill, how you feel

2    responsible, and if I heard you correct, you're saying

3    it was because you're saying that you should have

4    stopped it?

5         INMATE HILL:  Yes.

6         DEPUTY COMMISSIONER STAR:  Okay.  Now, earlier

7    this statement refers to his sister, but that is your

8    daughter.  That was an error?

9         INMATE HILL:  Right, that was an error, and

10   there's another error in here.

11        DEPUTY COMMISSIONER STAR:  Go ahead.

12        INMATE HILL:  His wife -- his ex-wife's death.

13        DEPUTY COMMISSIONER STAR:  She's not --

14        INMATE HILL:  She's alive.

15        DEPUTY COMMISSIONER STAR:  Exactly.

16        INMATE HILL:  In prison.

17        DEPUTY COMMISSIONER STAR:  Okay.  She's in

18   prison for what?

19        INMATE HILL:  Aggravated manslaughter.

20        DEPUTY COMMISSIONER STAR:  Okay.

21        INMATE HILL:  She shot her husband in the head

22   while he was sleeping.

23        DEPUTY COMMISSIONER STAR:  This is the -- this

24   is the victim -- alleged victim of your commitment

25   offense is in prison now for aggravated manslaughter?

26        INMATE HILL:  Yes, ma'am.

27        DEPUTY COMMISSIONER STAR:  Okay.  And then

61

1   moving on to the psychologist's assessment of

2   dangerousness, and I'm at the bottom of page seven and

3   onto page eight.  The psychologist says that:

4            "According to the probation officer's

5            report and prior records, the inmate's

6            criminal history would be a mitigating

7            factor in rating this individual.  On

8            historical factors he would rate in the

9            low range in terms of likelihood to commit

10           future violent acts when compared to other

11           inmates with similar crimes.  His only

12           elevations would be relationship

13           instability, prior domestic violence,

14           possible assault and battery charges and

15           some use of alcohol."

16           So again he refers to prior domestic violence.

17  Do you want to comment on that, Mr. Hill?

18           INMATE HILL:  We never discussed prior

19  domestic --

20           ATTORNEY STRINGER:  There's nothing in the

21  record that would indicate there's ever been any prior

22  domestic violence.  I think that's a caveat by the

23  doctor.

24           DEPUTY COMMISSIONER STAR:  Okay.  And Mr. Hill,

25  why does he state relationship instability?

26           INMATE HILL:  I don't know.  I have no idea.  We

27  never talked about that at all.

62

1          DEPUTY COMMISSIONER STAR:  Okay.  Do you believe

2    you had --

3          PRESIDING COMMISSIONER ENG:  Excuse me, one

4    second, Commissioner?

5          DEPUTY COMMISSIONER STAR:  Yes, go ahead.

6          PRESIDING COMMISSIONER ENG:  On top of page

7    seven of the psychological this states, "Regarding his

8    adult history, the inmate states that the reason why he

9    was getting into trouble as a young man was

10   relationship problems."

11         INMATE HILL:  We never discussed that.  In fact,

12   I made a note right here about that.  I wanted to talk

13   about that.

14         PRESIDING COMMISSIONER ENG:  Okay.

15         INMATE HILL:  Paragraph one.  I wrote it down

16   right there.

17         PRESIDING COMMISSIONER ENG:  Okay.

18         INMATE HILL:  I have no idea why that's in

19   there.

20         DEPUTY COMMISSIONER STAR:  Let's use this as a

21   break to change the tape if we may.

22         PRESIDING COMMISSIONER ENG:  Okay.

23              (Off the Record)

24         DEPUTY COMMISSIONER STAR:  We're on Tape Two

25   Side One for the subsequent number two hearing for

26   Tharon Hill, H-I-L-L, D-87967.  We're back on record.

27   Did you have more questions, Ms. Eng?

1      **PRESIDING COMMISSIONER ENG:**  No.

2      **DEPUTY COMMISSIONER STAR:**  Okay.  I'm going to

3   go on to page eight of the psych report, and one of the

4   issues that the Board had asked to be addressed last

5   time was his insight.  And referring to the clinical

6   insight paragraph on page eight.

7              "The inmate claims that he is innocent but

8              does accept some responsibility for what

9              he failed to do.  There is some insight.

10             His insight into his interpersonal

11             relationship problems with women is

12             limited.  The inmate does continue to

13             claim his innocence.  This makes his

14             rating on this factor difficult."

15             And then under environmental risks and

16   management -- the excuse me, going to the summary at

17   the bottom of page eight, he says:

18             "In summary, this individual overall

19             appears to rate in the low range in his

20             propensity to commit violence in the

21             future when compared to similar violent

22             inmates.  The inmate's crime is a crime of

23             passion or an affective crime, which does

24             not reoccur, and inmate's age is another

25             factor."

26             It's clear this doctor feels there's some

27   relationship issues, and you have no idea what he based

64

1    that on?

2            **INMATE HILL**:  I have no idea.  We didn't talk

3    about anything like that at all.

4            **DEPUTY COMMISSIONER STAR**:  Okay.  I'm going to

5    refer back to the prior psychologist's report because

6    the interview there -- and I want to make sure --

7    there's more information in that prior report, and I'd

8    like to ask Mr. Hill maybe where he believes that came

9    from.  And sir, I'm going back to a psychologist's

10   report prepared by Dr. Maryann Chiurazzi, C-H-I-U-R-A-

11   Z-Z-I.  This was prepared at Corcoran State Prison in

12   March of 2003.  And during that interview, I guess, for

13   that report she states on page two in the middle of her

14   report that:

15           "Mr. Hill has been divorced three times,

16            and his fourth wife died of cancer.

17            Together his marital history reflects a

18            pattern of interpersonal instability and

19            includes elements of domestic violence.

20            He admitted to incidences of physical

21            violence in both his second and third

22            marriage."

23           I'm not going to read the whole thing, but she

24   speaks about the issue of money in these relationships

25   that were causing arguments.  Under criminal history in

26   that report on page three it says, "At age 33 he was

27   charged with assault and battery in a domestic

1    situation, and just weeks prior to the instant offense

2    he was charged with regarding harassing with his wife."

3    So I understand there's no disposition here, but I'm

4    going to ask you, in your interview with the doctor,

5    did you discuss that there was an arrest for harassing

6    this wife?

7            ATTORNEY STRINGER:  Again, I'm going to object.

8    This is predisposing the Board to denying Mr. Hill on

9    the basis of non-convicted crimes.  That is exactly

10   where this is going, and it's the -- the Board is not

11   allowed to do it under Title XV.

12           DEPUTY COMMISSIONER STAR:  Okay.  I'm just going

13   to -- I think we've already answered that, but I'm

14   asking about his interview with the doctor.  Did you

15   have a discussion?

16           ATTORNEY STRINGER:  But if the Board uses it as

17   a reason for denial tumultuous and unstable

18   relationships based on non-convicted criminal acts,

19   that's clearly legal error in my view.

20           DEPUTY COMMISSIONER STAR:  Well --

21           DEPUTY DISTRICT ATTORNEY ZARATE:  You're talking

22   about history being provided to a psychologist.

23           DEPUTY COMMISSIONER STAR:  I have two

24   psychologists' reports that reference --

25           PRESIDING COMMISSIONER ENG:  Domestic violence.

26           DEPUTY COMMISSIONER STAR:  And unstable

27   relationships.

66

1          **PRESIDING COMMISSIONER ENG:**  That's correct.

2          **DEPUTY COMMISSIONER STAR:**  And I think we

3    certainly can proceed to ask any questions we want

4    about those psychologists' comments.

5          **ATTORNEY STRINGER:**  Then the end result of the

6    Board is predetermined in my view because there's

7    nothing in the psychological reports that has any

8    historical reference to it.  In other words, they

9    didn't go back to the courts and pull the records and

10   say this is what happened because it's very easy, and I

11   do a great amount of family law, it's very easy to have

12   one person come in and make an accusation against

13   another person, especially during a divorce proceeding,

14   and it proves to be false, but in this setting it is

15   taken as gospel.

16         **PRESIDING COMMISSIONER ENG:**  Excuse me, it is

17   our responsibility as the Panel that given the

18   information that we have if it raises any questions --

19   this is why we're asking you, Mr. Hill, to elaborate

20   one way or the other because these documents state that

21   according to you, so we are inquiring.  We are not

22   making decisions based on what we're reading here.

23   What we're doing is trying to discuss this and ask you

24   why, you know, did something happen, why, give us the

25   circumstances.  We are not assuming that because of

26   divorce proceedings that these people made these

27   accusations.  Mr. Hill has every opportunity to explain

1    what these statements mean to the Panel.  Does that

2    make sense?  Are you in agreement, Commissioner?

3            DEPUTY COMMISSIONER STAR:  I'm reviewing the

4    psychologist's report, and I'm asking Mr. Hill if he

5    wants to comment on the doctor reports, clarify,

6    elaborate, and this is your opportunity to do that.

7            PRESIDING COMMISSIONER ENG:  Does that make

8    sense to you, Mr. Hill?

9            INMATE HILL:  Well, I'm confused here because I

10   keep looking at the Title XV, which states that

11   anything over five years old you can't even discuss, so

12   I don't know --

13           DEPUTY COMMISSIONER STAR:  The Board --

14           INMATE HILL:  You're speaking about something

15   that's 30 some years ago.

16           DEPUTY COMMISSIONER STAR:  I'm referring to a

17   recent psychologist report and a 2003 --

18           PRESIDING COMMISSIONER ENG:  2003 psychological

19   evaluation.

20           DEPUTY COMMISSIONER STAR:  Now, I agree, sir,

21   that the psychological refers to the arrest, but they

22   also refer to other information that goes beyond the

23   arrest that apparently was obtained in an interview,

24   and I just -- and you don't have to comment, sir, if

25   you don't wish to.

26           INMATE HILL:  Right.

27           DEPUTY COMMISSIONER STAR:  But I'd just like to

68

1    provide any kind of opportunity if wish to for you to

2    clarify.

3           **PRESIDING COMMISSIONER ENG:**  For you to clarify,

4    give you every chance because these are in here.

5    They're part of the record, so again, like I stated

6    earlier, you don't have to make any comments one way or

7    the other.

8           **DEPUTY COMMISSIONER STAR:**  Okay.  I'm going to

9    move on --

10           **PRESIDING COMMISSIONER ENG:**  Okay.

11           **DEPUTY COMMISSIONER STAR:**  -- I think, Ms. Eng.

12    Page four of the psychological --

13           **INMATE HILL:**  You want me to clarify?

14           **DEPUTY COMMISSIONER STAR:**  If you'd like to.

15           **INMATE HILL:**  All right.  As I recall, it was in

16    1973.

17           **ATTORNEY STRINGER:**  Can we have another minute?

18           **DEPUTY COMMISSIONER STAR:**  Okay.  We're going

19    off the record.  We're taking a brief recess for

20    counsel to meet with his client.

21           **DEPUTY DISTRICT ATTORNEY ZARATE:**  Very good.

22                       (Off the Record)

23           **DEPUTY COMMISSIONER STAR:**  Okay.  We're back on

24    record.  I'll go ahead.

25           **PRESIDING COMMISSIONER ENG:**  Okay.  All parties

26    have returned, so okay, Mr. Stringer.

27           **ATTORNEY STRINGER:**  We're ready to move on.

1    **PRESIDING COMMISSIONER ENG:** All right.  Did

2  your client want to comment or make a response to what

3  Commissioner Star was discussing regarding the 2003

4  psychological evaluation?

5    **ATTORNEY STRINGER:**  No, Commissioner, I'll

6  address that in closing.

7    **PRESIDING COMMISSIONER ENG:**  Okay.

8    **DEPUTY COMMISSIONER STAR:**  Okay.  Just a couple

9  other comments from that then I'll wrap it up, Ms. Eng.

10  On page four on the report, on the prior psych report,

11  in the middle the doctor says:

12          "He believes that he has changed for the

13           better, stating he has continued to

14           educate himself, taught himself to play

15           the guitar and has written two or three

16           books.  He added that he has analyzed his

17           ways.  However, he was unable to identify

18           relationship patterns and resisted the

19           suggestion that there may be a problem.

20           He admitted to impulsive behavior earlier

21           in his life and that this at times

22           interfered with his relationships, as well

23           as work, but he thought he had become less

24           impulsive.  It is this examiner's opinion

25           that he lacks insight into the severity of

26           the problematic nature of his

27           relationships and the dynamics behind

1 them, and that Mr. Hill has a signature

2 blind spot about this issue. He evidenced

3 a strong tendency to blame -- to place

4 blame on others when things went badly and

5 resisted taking responsibility for painful

6 or destructive events in his life. While

7 it is beyond the scope and purpose of this

8 evaluation to make judgments about his

9 guilt or innocence, it is likely not an

10 either/or situation. Mr. Hill failed to

11 address his responsibility in terms of the

12 degree to which he may have contributed to

13 the events that took place over a period

14 of time."

15 And the last thing I want to read is from page

16 five of that prior report, number five, and it says:

17 "His level of dangerousness within the

18 structured setting of a correctional

19 institution is very low. Based on his

20 institutional history and his level of

21 function, he is unlikely to be involved in

22 a violent situation. It is difficult to

23 generalize behavior from a correctional

24 setting to that of free society,

25 particularly when the individual in

26 question denies culpability. However, his

27 risk of recidivism outside of prison is

1          estimated to be low.  Factors in his favor

2          include his commitment offense, commitment

3          to a nonviolent response style and ability

4          to do so, absence of substance dependence,

5          extensive family support, especially if he

6          could parole to Utah, marketable skills

7          and a feasible parole plan.  Continuing

8          risk factors are not extensive but are

9          expected to have an impact on any future

10         domestic relationships and impaired

11         insight into the destructive nature of

12         past relationships.  Any future

13         relationships are likely to show signs of

14         stress related to these factors, and any

15         potential risk for violence, even if

16         small, is related to this."

17         And under number seven of that last prior

18    doctor's report I'll just take note he says, "He may

19    benefit from domestic violence classes and programs

20    that address communication skills, anger management and

21    problem resolution."  So in reviewing -- the reason I

22    read that on the record is -- and the Board -- the

23    prior Board's concern is I was looking for the more

24    recent psychological report to address these in depth,

25    and I didn't see a great deal of depth of that kind of

26    discussion, these relationship issues, and kind have

27    found it moot on that issue.  With that I'll just

72

1    say -- I'll ask Mr. Hill, any comments you want to make

2    on either of those psych reports or anything else about

3    your adjustment and behavior here in the institution

4    since your last hearing?

5        INMATE HILL:  No, I don't agree with the second

6    psych report at all.  I don't know where she came up

7    with this stuff, and I've been kind of perplexed over

8    it ever since she wrote it, these impairment in insight

9    and destructive nature about any past relationships and

10   all that stuff.  It's beyond me.

11       DEPUTY COMMISSIONER STAR:  Okay.  Do you think

12   you had money disagreements?

13       INMATE HILL:  We had money disagreements and

14   stuff like that, but there was no violence involved in

15   that, so I can't -- the arrest that happened, happened

16   over circumstances I'd rather not talk about, and

17   that's the reason there was no adjudication on it.

18       DEPUTY COMMISSIONER STAR:  Okay.

19       INMATE HILL:  Because they were not serious, and

20   the charges were dismissed because there was nothing

21   serious to it.

22       DEPUTY COMMISSIONER STAR:  You agree with what

23   the one doctor said that you might benefit from anger

24   management or problem resolution skills or

25   communication skills in your relationships?

26       INMATE HILL:  No, not really, but I will tell

27   you this.  I've been going to that self-help program,

73

1    that positive attitude, and it addresses it. I think

2    if you read those letters you'll find that that's

3    already been handled and taken care of.

4        **DEPUTY COMMISSIONER STAR:** Okay. Thank you.

5    I'll turn it back over to the Commissioner.

6        **PRESIDING COMMISSIONER ENG:** Before we get into

7    parole plans, let me ask you something because I know

8    that I see a lot of support letters, etcetera, and you

9    stated that you have gone to self-help. What have

10   you -- specifically, what have you gotten out of the

11   self-help that you've been to?

12       **INMATE HILL:** They had a saying in there that we

13   can control what going on inside regardless of what's

14   going on outside. We can control our emotions and our

15   feelings at all times no matter what's happening around

16   us, and that's one of the important things that I have

17   found, especially being here in prison. That's why

18   I've never had any write-ups. That's why I've stayed

19   away from all the bad things that go on in prison, all

20   the drugs the and the Pruno and these shot callers and

21   all that kind of stuff, these people that are going

22   around ordering other people to do things and so on and

23   so forth like that and causing problems for themselves.

24   I can control what's going on inside regardless of

25   what's going on outside, and that's one of the main

26   principals of that positive attitude program.

27       **PRESIDING COMMISSIONER ENG:** What specifically

74

1  do you do yourself?  How have you incorporated that in

2  your everyday living?

3      **INMATE HILL:**  My everyday living?  I study a

4  lot.  I write a lot.  I write a chapter for my books,

5  one a week, and I work diligently at that, and at

6  nighttimes I go paint in the arts and corrections.  On

7  Saturdays I paint all day long, and I paint in my cell,

8  as well, and I study constantly.

9      **PRESIDING COMMISSIONER ENG:**  However, what I'm

10  trying to get at is that the self-help and anger

11  management and conflict resolution, if you find

12  yourself in the situation before it escalated, what

13  have you personally -- what have you gotten from all

14  those classes that you will actually practice to avoid

15  having situations escalate to a point of violence.

16  Does that make sense to you?

17      **INMATE HILL:**  Yeah, first off you stay calm, and

18  then you walk away from it.  You don't let it escalate.

19      **PRESIDING COMMISSIONER ENG:**  Okay.  Let me ask

20  you something else.  You've been in this institution

21  for 18 years approximately, and you're surrounded by

22  well, men, okay.  Everything that I've read in here in

23  terms of any issues has been with women, so how would

24  you utilize what you've learned in your self-help in

25  dealing with women?

26      **ATTORNEY STRINGER:**  I think it's fair to state

27  there are women correctional officers.

75

1         **PRESIDING COMMISSIONER ENG:**  Exactly, but I'm

2   more concerned with his personal relationships because,

3   you know, you have a string of marriages?

4         **INMATE HILL:**  Okay.

5         **PRESIDING COMMISSIONER ENG:**  Okay.  The

6   situation with your daughter, okay, and what have you

7   learned through going through the self-help to improve,

8   shall we say, relationships with women?

9         **INMATE HILL:**  I hold women in high regard.  I

10  always have.  What you read, what you see in there is

11  not the truth of the matter, everything that's going on

12  in my life.  Women are to be cherished.  They've the

13  always been cherished in my mind.  My father has always

14  taught me that you have to treat women with respect,

15  and that's what I've done, always.

16        **PRESIDING COMMISSIONER ENG:**  So are you saying

17  that everything that we've been reading and all these

18  documents are an unfair depiction?

19        **INMATE HILL:**  I would think so, yes, they are.

20        **PRESIDING COMMISSIONER ENG:**  And same goes for

21  the life commitment, that you also feel that that was

22  an unfair --

23        **INMATE HILL:**  Yes, it was unfair, absolutely

24  unfair.

25        **PRESIDING COMMISSIONER ENG:**  Okay.

26        **INMATE HILL:**  Although I do take responsibility,

27  complete responsibility.

1          PRESIDING COMMISSIONER ENG:  Okay.  I'll get

2    back to that.  Let's go over your parole plans.  Okay.

3    I see based -- again, the December 2006 board report

4    that this states that you would -- you plan to obtain

5    an out-of-state parole to the state of Utah.  Is that

6    correct, sir?

7          INMATE HILL:  If I can.  I have parole plans --

8    two parole plans for the state of California and two

9    for the state of Utah.

10          PRESIDING COMMISSIONER ENG:  Right.  We're going

11    to go through those because I have these support

12    letters.  The first one I have is dated December 8th,

13    2006, from your older brother Max Hill, and he states

14    in this, I believe, he lives in Sunset, Utah?

15          INMATE HILL:  Yes, ma'am.

16          PRESIDING COMMISSIONER ENG:  Okay.

17          INMATE HILL:  Just outside of Ogden.

18          PRESIDING COMMISSIONER ENG:  Outside of Ogden.

19    And your older brother states that -- he says, "I will

20    accept him into my home to live with me as long as he

21    wishes."  How large of a home does your brother have?

22          INMATE HILL:  four bedrooms.

23          PRESIDING COMMISSIONER ENG:  four bedrooms.  And

24    who is living in the home?

25          INMATE HILL:  Just he and his wife.

26          PRESIDING COMMISSIONER ENG:  So you would have

27    your own room?

77

1          INMATE HILL:  Yes, ma'am.

2          PRESIDING COMMISSIONER ENG:  And how old is this

3    brother?

4          INMATE HILL:  73.

5          PRESIDING COMMISSIONER ENG:  He's 73?

6          INMATE HILL:  Yes, ma'am.

7          PRESIDING COMMISSIONER ENG:  Does he drive?

8          INMATE HILL:  Yes.

9          PRESIDING COMMISSIONER ENG:  Still drives?

10         INMATE HILL:  Yes, just around the area.

11         PRESIDING COMMISSIONER ENG:  Okay.  So would he

12   provide transportation for you?

13         INMATE HILL:  He has vehicles.  I suspect he

14   would give me a vehicle.  They've made that perfectly

15   clear to me that they would provide me with a vehicle.

16         PRESIDING COMMISSIONER ENG:  How about financial

17   support?

18         INMATE HILL:  I think you'll find that under

19   Thayne Hill.

20         PRESIDING COMMISSIONER ENG:  Yes, that's the

21   next support letter September 8th, 2006, from Thayne,

22   T-H-A-Y-N-E, Hill who resides in Roy, R-O-Y, Utah.  Is

23   that also a suburb of Ogden?

24         INMATE HILL:  Yes, ma'am.

25         PRESIDING COMMISSIONER ENG:  This is your

26   nephew?

27         INMATE HILL:  Yes, ma'am.

1          PRESIDING COMMISSIONER ENG:  He states that he's

2     traveled here to California to see you on several

3     occasions, and he states that you're welcome to live in

4     his home for as long as he chooses.  The majority of

5     your remaining family members reside in the state of

6     Utah.  Okay.  "I have the desire and financial ability

7     to assist Tharon with establishing a residence,

8     residing with me temporarily and helping with his

9     reintroduction into society."  So does that mean he

10    will help you find another residence?

11         INMATE HILL:  It means he will do anything he

12    can to help me get reestablished.  He's quite well to

13    do.

14         PRESIDING COMMISSIONER ENG:  All right.  How old

15    is your nephew?

16         INMATE HILL:  46.

17         PRESIDING COMMISSIONER ENG:  And what does he

18    do?

19         INMATE HILL:  He's a computer expert.  He's only

20    one of six in the United States that's graduated from

21    Carnegie Mellon and Computer with a computer degree in

22    their specialty field.  He flies all over the United

23    States and works.  He goes down to (inaudible) at $500

24    an hour and spends two weeks at a time there and other

25    places in Florida and throughout the United States.

26         PRESIDING COMMISSIONER ENG:  Is he married with

27    a family?

1          INMATE HILL:  He just recently got married.

2          PRESIDING COMMISSIONER ENG:  So how large is his

3     home?

4          INMATE HILL:  He just built a new house.  It's a

5     huge home.

6          PRESIDING COMMISSIONER ENG:  All right.  Then we

7     have an October 3rd, 2006, letter signed by Kyle, K-Y-

8     L-E, Terzian, T-E-R-Z-I-A-N, program manager, certified

9     addiction treatment specialist.  His agency has been in

10    touch with you.  They're located in Menlo Park on the

11    VA grounds, and their agency -- what's the name of the

12    agency?  What's the name of this agency, sir?

13         ATTORNEY STRINGER:  It's Homeless Veteran

14    Emergency Housing.

15         PRESIDING COMMISSIONER ENG:  Okay.  The agency

16    provides a number of services to the Veterans who had

17    an honorable discharge, which you have.  They help vets

18    get back on track through transitional housing and

19    whatever treatment is necessary, including vocational

20    training, job placement support and substance abuse.

21    So they provide transportation to 12 step meeting,

22    which is good.  Okay.  So they're located on the

23    grounds of the VA services.  "So if and when Mr. Hill

24    is released, he will have housing through our program

25    along with the rest of the services we offer."  What do

26    you know about this organization, sir?

27         INMATE HILL:  I know that they -- they're an

80

1    upstanding organization.  They have assisted other

2    people who are paroling.  The parole agents have gone

3    there and have to check out their facilities, and

4    accepted -- wholeheartedly accepted it.

5         PRESIDING COMMISSIONER ENG:  So do you know

6    approximately how many people -- I mean, do they

7    have --

8         INMATE HILL:  They have 400 beds.

9         PRESIDING COMMISSIONER ENG:  Room and houses or

10   something?

11        INMATE HILL:  They have 400 beds with two

12   occupancy per room.

13        PRESIDING COMMISSIONER ENG:  Okay.  Are they

14   usually at full capacity, 50 percent capacity?

15        INMATE HILL:  They're about 80 percent right

16   now.

17        PRESIDING COMMISSIONER ENG:  Okay.  So at least

18   this would -- this is in Menlo Park?

19        INMATE HILL:  Yes, ma'am.

20        PRESIDING COMMISSIONER ENG:  Okay.  Is that it

21   for the residency letters?

22        INMATE HILL:  No, there's one from Nona R.

23   Stewart.

24        PRESIDING COMMISSIONER ENG:  Okay.  Let's see.

25   I tried to loop them together.  That's all I have.

26   Okay.  So Mr. Hill just provided the Panel with a

27   letter dated June 20th of 2006 from Nona, N-O-N-A,

1    Stewart, S-T-E-W-A-R-T, whose address is in Moreno

2    Valley, California.

3        **ATTORNEY STRINGER:**  That is my file by the way,

4    Commissioner.

5        **PRESIDING COMMISSIONER ENG:**  It could be back

6    here, but I just went with the new letters.  You're

7    right.  It's probably here.  Yeah, I do have it.  Okay.

8    That's good.  That she states that -- I guess your

9    family has been close friends for a long time.  Is that

10   true?

11       **INMATE HILL:**  Yes, ma'am.

12       **PRESIDING COMMISSIONER ENG:**  Okay.

13       **INMATE HILL:**  My brother is married to her

14   sister.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

16   "So he will have my home to live in for as long as he

17   desires."  Okay.  "This offer is open to Tharon for as

18   long as we live."  How old are -- is she?

19       **INMATE HILL:**  She's 69.

20       **PRESIDING COMMISSIONER ENG:**  Okay.  She have

21   children or a large family or --

22       **INMATE HILL:**  Yes, she has three or four

23   children who do not reside with her.  She has

24   grandchildren as well, and her brother and I grew up

25   together.  We were very close friends.

26       **PRESIDING COMMISSIONER ENG:**  Where's Moreno

27   Valley?

82

1          INMATE HILL:  That's in San Bernardino County.

2          PRESIDING COMMISSIONER ENG:  Okay.  So if you

3    ended up living there would your nephew Thayne provide

4    financial support for you?

5          INMATE HILL:  Yes.

6          PRESIDING COMMISSIONER ENG:  Okay.  So then

7    these other letters of support, I want to make sure

8    that we don't double them.  I've got -- okay.  October

9    30th, 2006, from a Reverend David Martin in San Rafael.

10    He's a co-facilitator of developing a positive attitude

11    support group and states that, "Mr. Hill has been a

12    regular participant in this group for more than three

13    years."  And this is a general support letter.  We've

14    got a letter dated September 25th of '06 from the

15    Reverend Rebecca Morehouse, M-O-R-E-H-O-U-S-E,

16    Episcopal Church of the Nativity in San Rafael, and --

17    okay.  Also, I guess she knows you from that same

18    program developing a positive attitude, and this is a

19    general support of your parole.  Got a letter dated

20    December 4th, 2006, from a Steven Emerick, E-M-E-R-I-C-

21    K, arts and corrections, artist facilitator, and he's

22    known you for the past three and a half years with your

23    participation in the program, and this is a general

24    support letter.  August -- oh, this must be a mistake.

25    I have a letter dated August 8th, 2003, which --

26          INMATE HILL:  No, that's supposed to be 2006.

27          PRESIDING COMMISSIONER ENG:  Yeah, that's in the

83

1    Board packet too.

2              INMATE HILL:  Yeah.

3              PRESIDING COMMISSIONER ENG:  This is from W.

4    Carmichael, C-A-R-M-I-C-H-A-E-L, correctional officer.

5    I'm guessing here at San Quentin?

6              INMATE HILL:  Yes, ma'am.

7              PRESIDING COMMISSIONER ENG:  Okay.  States that

8    he's known you for over a year and a half, and it's a

9    general letter of support.  September 24th, 2006, from

10   Patrick Maloney, M-A-L-O-N-E-Y.  He's a professional

11   artist who also works in the arts and corrections at

12   San Quentin.  He states that he's worked with you for

13   the last three years, and it's a general support

14   letter.  I want to make sure I've covered all of them.

15   I believe that is it.  Oh, wait a minute.

16             INMATE HILL:  Yeah.

17             PRESIDING COMMISSIONER ENG:  Then we have these

18   two that I was given a little earlier.  We have a

19   December 11th, 2006, letter from Yun, Y-U-N, Cheng, C-

20   H-E-N-G, who is a vocational plumbing instructor, and

21   he states that you have an outstanding demeanor and an

22   ability to show compassion on those he deals with on a

23   daily basis.  He states that in his opinion Inmate Hill

24   would be a positive and productive citizen if allowed

25   to return to society, so this is a general support

26   letter from Mr. Cheng.  And then you also presented to

27   the Board this Christmas card, and it's from --

84

1          **INMATE HILL:**  Zoe Mollory (phonetic).

2          **PRESIDING COMMISSIONER ENG:**  Zoe, Z-O-E, okay,

3     and she basically writes in here that -- I guess she

4     knows you from a class?

5          **INMATE HILL:**  Creative writing class.

6          **PRESIDING COMMISSIONER ENG:**  Creative writing,

7     and I think she's been very impressed with your

8     writing, and I thought I read something about your

9     artistic abilities too, yes.  "You really are a

10    talented person, painting writing, what else can you

11    do?"  Okay.  "That's wonderful that you continue to

12    push yourself and grow in these areas."  Okay.  She

13    says, "What a struggle it must be not to give yourself

14    over to bitterness.  I am glad you are not choosing

15    that and are choosing to care for people and offer your

16    many gifts for other's enjoyment."  So it's a very nice

17    support and Christmas card.  Okay.  Have I missed

18    anything?  Have I covered it all?

19         **INMATE HILL:**  Yes.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

21    Well, we send out Penal Code Section 3042 notices, and

22    those notices go to agencies having a direct interest

23    in your case.  I don't believe that we received any

24    written notices in the files.  We didn't receive

25    anything, but we do have a representative of the Butte

26    County, sir, Butte County?

27         **DEPUTY DISTRICT ATTORNEY ZARATE:**  Right.

85

1        **PRESIDING COMMISSIONER ENG:** District Attorney's

2   office who is present via video, who I'm sure will be

3   making a statement regarding your parole suitability

4   prior to us deliberating -- to our recess for

5   deliberations. So I think at this point I'm going to

6   open it up to the Panel, both Deputy Commissioners, to

7   see if anyone has any follow-up questions that they

8   would like to pose to Mr. Hill at this point?

9        **ATTORNEY STRINGER:** Commissioner, I would call

10  your attention to a November 6, 2006, letter from the

11  honorable Steven Howell who is a presiding judge. It

12  must be in Butte County.

13       **PRESIDING COMMISSIONER ENG:** Oh, I'm sorry.

14  Okay. I wasn't sure what that was. All right.

15  There's a letter dated November 6, 2006. It states,

16  "Thank you for the opportunity to make a recommendation

17  or comment regarding this issue. I do not wish to make

18  a recommendation or comment at this time. Court will

19  forward the" --

20       **DEPUTY DISTRICT ATTORNEY ZARATE:** Judge

21  Howell --

22       **PRESIDING COMMISSIONER ENG:** Judge Howell.

23       **DEPUTY DISTRICT ATTORNEY ZARATE:** -- is a local

24  judge, and that has been his position on all cases

25  where prisoners are appearing for parole consideration,

26  and that's his standard response to those cases.

27       **PRESIDING COMMISSIONER ENG:** All right. I

86

1    didn't read this in because we had just received it,

2    also, even though it's dated, so that you brought it

3    up, that's fine.  Okay.  But we do have the letter from

4    the Honorable Steven Howell, H-O-W-E-L-L, presiding

5    judge.  And again, the letter is dated November 6,

6    2006, but all of us received it this morning.  Okay.

7    Anything else?

8            **ATTORNEY STRINGER:**  No, Commissioner.

9            **PRESIDING COMMISSIONER ENG:**  Okay.

10           **ATTORNEY STRINGER:**  Thank you.

11           **PRESIDING COMMISSIONER ENG:**  Any questions from

12   the Panel?

13           **DEPUTY COMMISSIONER STAR:**  Two short ones for

14   Mr. Hill.  You indicated that you've written two books.

15   Have you had any of them published, sir?

16           **INMATE HILL:**  No, I haven't tried as yet.

17   Actually, I've written a lot more than that at prior

18   prisons, other prisons I've written.  I had one book --

19   my wife when she was alive sent it to a publishing

20   company, and they wrote back and said it in the genera

21   with that of Louis Lamour; however, that type of book

22   wasn't being published at this time, but maybe at a

23   later date.

24           **DEPUTY COMMISSIONER STAR:**  Okay.  And

25   Commissioner Eng read the letters of support from your

26   brother and nephew.  If their situation is such that

27   they can't provide you financial support, how would you

87

1    support yourself?

2         INMATE HILL:  Well, I can collect retirement for

3    one thing.

4         DEPUTY COMMISSIONER STAR:  From?

5         INMATE HILL:  From the United States government.

6         DEPUTY COMMISSIONER STAR:  Okay.

7         INMATE HILL:  And I think that's a --

8         DEPUTY COMMISSIONER STAR:  Social security?

9         INMATE HILL:  Yeah, social security.  That's

10    $1500 a month.  I can also go back into the

11    construction field as a contract estimator or heavy

12    equipment operator, which pays $50 or $60 an hour now.

13    I also plan on opening up a construction estimating

14    school, and if I teach two six-month classes I can

15    retire off of that alone.

16         DEPUTY COMMISSIONER STAR:  Were you licensed in

17    the construction field?

18         INMATE HILL:  Yes, ma'am.

19         DEPUTY COMMISSIONER STAR:  Okay.  I think that's

20    all my questions, Commissioner.

21         INMATE HILL:  Incidentally, I've been in touch

22    with the VA, the Veteran Administration, and they

23    have -- and I've filled out what's known as a 1010

24    Form, and they came here and visited with me and told

25    me any medical needs that I need, any at all, that the

26    VA will cover them totally.

27         DEPUTY COMMISSIONER STAR:  Okay.

88

1          **PRESIDING COMMISSIONER ENG:**  But you don't have

2    anything, any documentation regarding employment or

3    financial support.  Is that correct?

4          **INMATE HILL:**  Well, I'm at retirement age, okay,

5    but no, I don't have any at all, but I was planning on

6    going home and retiring and maybe doing a little work

7    on the side.

8          **PRESIDING COMMISSIONER ENG:**  But it also helps

9    to provide a Panel with documentation showing that you

10   have made applications or you have some sort of

11   letters, either from Social Security or this retirement

12   that you're claiming, okay, to show the Board --

13         **INMATE HILL:**  I understand.

14         **PRESIDING COMMISSIONER ENG:**  -- that you have

15   already looked at that and this how much you expect to

16   receive.

17         **INMATE HILL:**  Oh, I understand.

18         **PRESIDING COMMISSIONER ENG:**  Okay.

19         **DEPUTY COMMISSIONER STAR:**  You have a social

20   security statement.  The Social Security

21   Administration, you know how they give you a once-a-

22   year statement?

23         **INMATE HILL:**  Well, they were sending that to my

24   wife and then she passed away, and I don't know what's

25   become of those letters.

26         **DEPUTY COMMISSIONER STAR:**  Okay.  Okay.

27         **INMATE HILL:**  But I thought of contacting them

89

1    or having my brother contacting them, but then I was

2    told that I can't do that while I'm in prison.  There's

3    no way to the collect social security or whatever, but

4    I can get the statement, right?

5              **DEPUTY COMMISSIONER STAR:**  Well, you can inquire

6    and find out.

7              **PRESIDING COMMISSIONER ENG:**  A notice of your

8    benefits.

9              **DEPUTY COMMISSIONER STAR:**  Right.

10             **INMATE HILL:**  Okay.

11             **PRESIDING COMMISSIONER ENG:**  I just have a

12    couple questions to ask you, and I'm going to be very

13    direct with you.

14             **INMATE HILL:**  All right.

15             **PRESIDING COMMISSIONER ENG:**  Okay.  Have you hit

16    a woman?

17             **INMATE HILL:**  Yes, I have.

18             **PRESIDING COMMISSIONER ENG:**  Okay.

19             **INMATE HILL:**  It was a reaction.

20             **PRESIDING COMMISSIONER ENG:**  Okay.  Do you

21    believe you have anger issues?

22             **INMATE HILL:**  No, I do not.

23             **PRESIDING COMMISSIONER ENG:**  Do you believe that

24    you might have control issues?

25             **INMATE HILL:**  No, I have no control issues

26    whatsoever.  If I had control issues, I would be in

27    trouble.  I would have 115s and lots of them.

1          PRESIDING COMMISSIONER ENG:  Do you like

2     controlling others?

3          INMATE HILL:  No.  I don't control anybody

4     except myself, and even that's difficult sometimes in

5     this environment.

6          PRESIDING COMMISSIONER ENG:  Have you hit a man?

7          INMATE HILL:  Well, when I was a kid I got in a

8     wrestling match one time.

9          PRESIDING COMMISSIONER ENG:  Okay.  You also

10    stated that you would get a retirement from the

11    Veterans Administration?

12         INMATE HILL:  Well, they told me to apply for

13    some loss in my left ear, okay.  There's also social

14    security from my wife's passing that I will acquire.

15         PRESIDING COMMISSIONER ENG:  Okay.  Okay.  Any

16    other follow-up?

17         DEPUTY COMMISSIONER STAR:  No.

18         PRESIDING COMMISSIONER ENG:  No.  Okay.  So I

19    will ask right now if the District Attorney's

20    representative has any question to pose to Mr. Hill

21    through the Chair.

22         DEPUTY DISTRICT ATTORNEY ZARATE:  No.

23         PRESIDING COMMISSIONER ENG:  Okay.  Mr.

24    Stringer, do you have any questions that you would like

25    to ask your client?

26         ATTORNEY STRINGER:  I do, Commissioner.  Mr.

27    Hill, if the Board was to grant you a parole date and

91

1    imposed on you a number of conditions, you attend anger

2    management, you attend AA, you enroll in other types of

3    programs, would you comply with each and every one of

4    those conditions?

5         INMATE HILL:  Yes, sir.

6         ATTORNEY STRINGER:  And it's true, is it not,

7    you got an honorable discharge from the Navy?

8         INMATE HILL:  Yes, sir.

9         ATTORNEY STRINGER:  And as far as your

10   marketable skills, you indicated you could --

11        DEPUTY COMMISSIONER STAR:  Can you hang on a

12   second?

13        ATTORNEY STRINGER:  Yes.

14                  (Off the Record)

15        DEPUTY COMMISSIONER STAR:  Okay.  Side Two of

16   Tape Two for the hearing for Mr. Hill, D-87967.  We're

17   back on record.  Go ahead, Mr. Stringer.

18        ATTORNEY STRINGER:  Thank you.  And Mr. Hill,

19   you had indicated that you had marketable skills

20   operating heavy equipment.  What equipment can you

21   operate?

22        INMATE HILL:  Bulldozers, scrapers, border

23   graders, backhoes.

24        ATTORNEY STRINGER:  And do you feel your skills

25   are current?

26        INMATE HILL:  Oh, yes, absolutely.  That's

27   something you never lose.

92

1      ATTORNEY STRINGER:  So even at your age you

2   could get the necessary licenses, certificates updated?

3      INMATE HILL:  Oh, yes, I belong to two different

4   unions, Operating and Engineers Union at one time, and

5   there's also what's known as grade checkers.  You walk

6   along the ground and you check the grade for the

7   equipment and so on like that.  And I was a foreman,

8   superintendent, an estimator.

9      ATTORNEY STRINGER:  And what exactly is an

10  estimator?

11      INMATE HILL:  Estimator compiles cost analysis

12  for bidding jobs.  As a general contract estimator I

13  used to receive up to a hundred different bids from

14  subcontractors and decide which was the low bid for

15  each one and then compile my costs and then bid the

16  job.

17      ATTORNEY STRINGER:  And despite the fact that

18  you're 67, could you still engage in that type of

19  activity?

20      INMATE HILL:  Yes, sir.  Estimators are in

21  demand, in fact, throughout the United States.

22      ATTORNEY STRINGER:  And finally, your arts and

23  corrections, you paint in acrylics.  Is that right?

24      INMATE HILL:  I paint in acrylics, which is

25  almost the same as oil.

26      ATTORNEY STRINGER:  Have you thought of

27  marketing that say on the internet or on eBay?

93

1        INMATE HILL:  Yes, sir, I'm going to do that.

2        ATTORNEY STRINGER:  So you have plans for that?

3        INMATE HILL:  Yes, sir.

4        ATTORNEY STRINGER:  So then upon your release

5    you'll have several sources of income?

6        INMATE HILL:  Yes, sir.  In fact, I have on

7    display right now three or four pieces at a mall here

8    in San Rafael.

9        ATTORNEY STRINGER:  Thank you.  Thank you,

10   Commissioner.

11       PRESIDING COMMISSIONER ENG:  You're welcome.

12   We'll move into closing statements.  Okay.  Mr. -- I

13   hate to mispronounce your name.

14       DEPUTY COMMISSIONER STAR:  Zarate.

15       DEPUTY DISTRICT ATTORNEY ZARATE:  Zarate.

16       PRESIDING COMMISSIONER ENG:  Zarate.

17       DEPUTY DISTRICT ATTORNEY ZARATE:  Zarate.

18       PRESIDING COMMISSIONER ENG:  Mr. Zarate, go

19   ahead.

20       DEPUTY DISTRICT ATTORNEY ZARATE:  Thank you.

21   The People do oppose a finding of suitability for

22   parole with this prisoner.  That's based upon the

23   matters that have been presented at this hearing, the

24   records that have been provided, as well as the fact

25   that the commitment offense and the psychological

26   reports at this point clearly outweigh any finding of

27   suitability.  First of all, if you look at the

94

1    commitment offense, it was carried out in a --

2    definitely in a manner that exhibited callous disregard

3    for the life and the suffering of another.  As you are

4    well aware, the victim lived in a mobile home in a

5    mobile home park and explosives were being used in the

6    form of a revenge that the prisoner had towards the

7    victim, obviously disregarding any potential danger

8    that could have been caused to the other -- or damage

9    to the other people or injury to other people in this

10   mobile home park.  In fact, the night that five pounds

11   of explosives were attached to the mobile home by Mr.

12   Hoskison, who was subsequently killed by the victim,

13   easily could have resulted in disaster for the other

14   individuals, not just the victim in that particular

15   instance.  Also, the offense was carried out in a

16   dispassionate and calculated manner.  It's so confusing

17   as to the prisoner's version of the events, the

18   prisoner's explanation.  It seems that this -- the

19   prisoner was involved in the extramarital affair that

20   caused the victim to then want to separate from the

21   prisoner.  The prisoner insisted that they try to

22   reconcile, and they got together.  He maintains that

23   the reason they reconciled is so that the victim could

24   take $110,000 from him, yet it's explained that this

25   was her settlement.  It's really confusing, and I don't

26   think that the Board is being completely -- that the

27   prisoner is being completely honest with the Board

1    about the events and circumstances surrounding the

2    commitment offense.  If you look at the probation

3    officer's report, Ms. Lopes, the daughter of the

4    prisoner, stated, referring to the prisoner, "He was

5    miserable, miserable.  He wanted all of us to go to

6    Alaska and he wanted to forget about Vicky.  He was

7    drunk constantly.  He slept.  He cried.  That's all he

8    ever did, and yes, he did talk about killing her."  And

9    continuing on in the report, a bargain was apparently

10   struck between Mr. Hill and a friend of Ms. Lopes, John

11   Keefe.  Mr. Keefe, after being granted immunity, told

12   investigators he was the individual that threw a piece

13   of dynamite, a stick of dynamite given to him by the

14   defendant, the prisoner, at Mrs. Hill's mobile home on

15   May 29th, 1987.  Apparently the dynamite was supposed

16   to roll under her vehicle; however, it landed near a

17   porch and did the aforementioned damage.  Later --

18   further on in the report, specifically at page seven

19   beginning on page six, it is noted that Mr. Hill had

20   moved to Los Angeles just prior to this incident in

21   order to live and work.  And investigative reports

22   indicated that the defendant called Ms. Lopes and asked

23   what happened and what was the damage.  Ms. Lopes

24   informed him that the damage included a door blown open

25   and a blown out air-conditioning unit, after which she

26   stated, "Are you done now?"  At which point Mr.

27   Replied, "No, I'm not."  Ms. Lopes stated at that

1    point, she stated to her father, "Why do you have so

2    much hate in you?  Why can't you just count your losses

3    and go on with your life?  You were with the other

4    woman?  What did you expect her to do?  Five times and

5    she caught you, what did you want?"  And he would keep

6    saying, "You don't understand.  I don't hate her, and

7    I'm not obsessed with her.  She's just got to die.

8    That's all there is to it."  So those -- that's the

9    type of mentality that was exhibited by this prisoner

10   at the time of the commitment offense, and the People

11   submit it continues to be a concern at this particular

12   instance.  The psychological reports are not supportive

13   of release either.  The current psychological report

14   refers to concern that the inmate claims that he is

15   innocence but does not accept responsibility for what

16   he failed to do.  There is some insight.  His insight

17   into -- into his interpersonal relationship problems

18   with women is limited.  The inmate does not -- does

19   continue to claim his innocence.  This makes his rating

20   on this factor difficult.  Although the prisoner has

21   been attending self-help, we've recognized that, the

22   People ask this question, what -- how is he benefiting

23   from this particular attendance?  If he hasn't gained

24   insight with his relationship with women, he certainly

25   has not offered how he has gained insight with the

26   relationships he's had with his previous wives.  In the

27   psychological report that was dated 2003 authored by

1    Dr. Chiurazzi, C-H-I-U-R-A-Z-Z-I, expresses concern,

2    not only of the history of domestic violence in the

3    relationships that the prisoner has had, but also the

4    fact that he, the prisoner, is unable to identify

5    relationship patterns and resisted the suggestion that

6    there may be a problem.  "He admitted to impulse

7    behavior earlier in life and that this at times

8    interfered with his relationship and work, but he

9    thought he had become less impulsive.  In this

10   examiner's opinion, he lacks insight into the severity

11   of the problematic nature of the relationships and the

12   dynamics behind them and that Mr. Hill has a

13   significant blind spot about this issue.  He has

14   evidenced a strong tendency to place blame on others

15   when things went badly and resisted taking

16   responsibility for painful or destructive events in his

17   life."  That was evident in this hearing today.  Even

18   the prisoner has suggested that the comments that were

19   made by these respective psychologists were taken

20   either out of context or not addressed but somehow they

21   are not true.  Again, consistent with what he's been

22   maintaining all along about his involvement in the

23   particular crime, that it was his daughter that

24   supposedly was the one that was upset with Mrs. Hill,

25   and it was his daughter that was planning to kill Mrs.

26   Hill.  He had nothing to do with it except that he

27   could have prevented it when his daughter communicated

1   to the prisoner that she had these thoughts, these
2   intentions, that he didn't do anything to prevent it.
3   That's the extent of his remorse, the extent of his
4   empathy for this particular crime.  I understand he has
5   a number of letters of support.  The difficulty that
6   the People have with those letters of support is that
7   none of them really address or acknowledge the
8   commitment offense.  Do they really know what -- why
9   the prisoner is deserving of this life term?  We can't
10  assume that they know that he's in here for a
11  conspiracy to commit murder, that he wanted to kill the
12  victim.  We can't assume that, and that's a concern
13  that the People have with the letters of support.  They
14  don't seem to acknowledge or address those particular
15  issues.  For these reasons and the entire information
16  before the Board, the People would ask the Board to
17  find the prisoner is unsuitable, that he still does
18  pose an unreasonable risk to the public, and that a
19  multi-year denial is warranted.  Additional time of
20  observation is necessary for the prisoner to address
21  those issues, particularly his relationship with women.
22  Thank you.
23          PRESIDING COMMISSIONER ENG:  Thank you, Mr.
24  Zarate.  Mr. Stringer, closing statement.
25          ATTORNEY STRINGER:  Thank you, Commissioner.  Of
26  course the question the Board and the state of
27  California has to address is if Mr. Hill is granted a

```
 1    parole date would he pose an unreasonable risk of
 2    danger to society or a threat to public safety, and
 3    there must be some evidence before the Board that would
 4    demonstrate that that risk, if any, would be
 5    unreasonable.  Outside some sort of extensive touchy-
 6    feely relationship discussion about marriage, there is
 7    no evidence at all before this Panel to support such a
 8    conclusion.  Has Mr. Hill ever been convicted of a
 9    domestic violence related crime?  No.  Are there any
10    divorce proceeding papers before this Panel that would
11    indicate that was an issue during any one of these
12    divorces?  No.  Has any one of the alleged participants
13    in this crime ever written a letter to the Board
14    stating there was any kind of domestic violence?  No.
15    In short, there is absolutely no evidence before this
16    Panel whatsoever, credible evidence, that my client was
17    ever involved in any type of domestic abuse that would
18    rise to the level of ordinary give-and-take
19    relationships in a marriage that occur every day and
20    are best left for the Oprah Winfrey show, not this
21    particular Panel.  Now, the District Attorney argues
22    that the two psychological evaluations conducted
23    regarding Mr. Hill are not supportive of release.
24    Well, my goodness, the conclusions after both
25    psychologists go through their development of the case
26    history are both the same.  Dr. Chiurazzi in March of
27    2003 states, "His risk of recidivism outside of prison
```

1    is estimated to be low." She also indicates he has had

2    exemplary programming. She also says, "He should not

3    require more than standard supervision, and his chances

4    for successfully completing parole are moderately

5    good." Dr. Starrett in the most recent psychological

6    evaluation again goes through all of the same factors

7    that Dr. Chiurazzi included in her report and says,

8    "The inmate would rate in the low range in terms of his

9    risk management for a future violence." He also says

10   there is some insight. So despite the fact that you

11   could cherry pick each and every one of these

12   psychological evaluations to conform to whatever

13   conclusion you want to make, the conclusion that the

14   doctors could make is that he would make a good

15   candidate for parole. So what support is there for

16   that conclusion? Number one, he's never had a 115

17   within the institutions. One of the doctors talked

18   about personal relationships and confrontations. Well,

19   those occur every day within the walls of these

20   institutions, and people who can resolve those without

21   ever incurring a 115 or a 128 as it relates to any type

22   of violence are remarkable people and have learned how

23   to adapt in a very dangerous and explosive society.

24   Prior to coming to prison, Mr. Hill had no significant

25   criminal record at all. Now, he had four, or three

26   divorces, and unfortunately his fourth wife passed

27   away. That certainly doesn't mark him as a criminal;

1    otherwise, these prisons would be loaded with people

2    that have divorces.  That cannot be a factor in the

3    Board's considerations.  While in prison he's become a

4    very accomplished artist.  He has the opportunity to

5    market his work through eBay and other internet

6    outlets.  He certainly has marketable skills in the

7    meaning of Title XV.  He's a construction estimator,

8    construction worker, has had a construction company,

9    knows how to operate construction machinery, and also

10   of course, he's going to have social security benefits

11   coming to him because he's 67 years old.  The Board

12   would know that he has substantial income upon his

13   release.  The parole department through its agents can

14   investigate whatever Mr. Hill's parole plans are and

15   ask that he attend an anger management course and place

16   all kinds of conditions upon him through the five years

17   of parole, if that's what the state of California

18   wants.  As to the commitment offense, I want to point

19   out that Mr. Hill was not the person who put the

20   dynamite under this lady's trailer.  It was a person

21   that Mr. Hill had never met, and so evidently the state

22   at that time made its case through people that had a

23   lot more to lose than certainly Mr. Hill did, but of

24   course, he's here.  He's convicted, but I -- he's not

25   responsible for anybody's death.  He didn't pull a

26   trigger on anybody.  This lady Vicky Hill is now in

27   prison, and it's my understanding that in addition to

102

1    shooting her, I guess, third husband in the head, she

2    also bludgeoned the second one with some sort of weapon

3    and shot the man that evidently put this dynamite under

4    her trailer.  I would think that that would lend her

5    whatever testimony she had.  You'd almost have to take

6    that with a real grain of salt.  But all that having

7    been said, Mr. Hill has served almost 20 years within

8    the institutions.  He's way beyond the matrix that's

9    been recognized at every hearing in the last few years.

10   He is now here with more time than a person that has

11   committed a second-degree murder.  I think the federal

12   courts have ruled, especially in Biggs that, "Should an

13   inmate continue to demonstrate exemplary behavior and

14   evidence of rehabilitation, denying him a parole date

15   simply because of the nature of the commitment offense

16   and prior conduct would raise serious questions

17   involving his liberty and interest on parole."  That's

18   a decision authored by Terry J. Hatter Jr., Senior

19   United States District Judge in the case of Kunkler v.

20   Nunes (phonetic) in the United States District Court

21   Central District of California Western Division and

22   reference CVO 56473.  In short, there is no evidence

23   before this Board that Mr. Hill would pose an

24   unreasonable risk of danger to society.  The evidence

25   presented is the exact opposite.  If released, he would

26   continue to be a viable member, a productive member,

27   and someone that would be a contributor to society upon

1    his release.  He's earned his way out.  We ask and

2    request that date.  Thank you.

3            **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you,

4    Mr. Stringer.  Mr. Hill, this is your opportunity, if

5    you choose to, to make a final statement regarding your

6    parole suitability.

7            **INMATE HILL:**  Okay.  I've done everything that

8    I'm supposed to do to earn my freedom.  Every time I've

9    gone to the Board they've required me to do certain

10   things.  I've done those things.  They required me to

11   get vocational skills, even though I had prior skills

12   in contracting and contractor's licenses and so on.

13   Mr. Zarate I can't compete with in reading from the

14   documents that are before this Board, documents that

15   were there as a result of the District Attorney's

16   office giving immunity to four people who were involved

17   in the crime.  They even gave immunity to Vicky Hill,

18   the victim.  And why they did that, I don't know.  She

19   wouldn't testify unless they did because she shot a man

20   in the back, and she deliberately shot somebody in the

21   back, and I can prove that.  Beyond a reasonable doubt

22   I can prove that.  These reports are in my favor, the

23   psychological reports.  You can go through, anybody can

24   go through and pick out something that took place 30

25   years ago and hammer on it, keep hammering on it, but

26   that's what you can't change.  What's happened

27   happened.  What's happened in the past, 30 years ago

104

1    can never be changed.  What this Board should do is

2    look at what I have done to change myself, what I've

3    done while I've been in prison and determine my

4    suitability on what I have done, not on what I did.  I

5    deserve parole, and I appreciate your consideration.

6    Thank you.

7          PRESIDING COMMISSIONER ENG:  Okay.  Thank you.

8    The time is now 11:19 and we are in recess.

9                    R E C E S S

10                   --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

105

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    DEPUTY COMMISSIONER STAR: Okay. We're back on

4    record, Commissioner Eng.

5    PRESIDING COMMISSIONER ENG: Okay. The time is

6    12:57.

7    DEPUTY DISTRICT ATTORNEY ZARATE: 11:57.

8    PRESIDING COMMISSIONER ENG: I'm sorry, 11:57.

9    I'm ahead of myself. And for the record, everyone who

10   was in the room prior to deliberation has since

11   returned. In the matter of Tharon Hill, CDC number D-

12   87967, the Panel has reviewed all the information

13   received and relied on the following circumstances in

14   concluding that the prisoner is not suitable for parole

15   and would pose an unreasonable risk of danger to

16   society or a threat to public safety if released from

17   prison. The Panel finds that the commitment offense

18   was carried out in a very cruel and callous manner. It

19   was carried out in a dispassionate and calculated

20   manner, in that it was definitely planned out in

21   advance two times actually. The offense was carried

22   out in a manner that demonstrates an exceptionally

23   callous disregard for human suffering, in that in the

24   second attempt to kill Mrs. Hill, if that explosion had

25   occurred, many people could have been injured if not

26   killed. The motive for the crime is inexplicable,

27   THARON HILL  D-87967  DECISION PAGE 1  12/19/06

1    and we find very trivial in relation to the offense.

2    It appears to be somewhat based on revenge.  These

3    conclusions are drawn from the statement of facts,

4    wherein Mr. Hill bought six or seven sticks of

5    dynamite, several blasting caps and a fuse cord from

6    Mr. Dalton Moss.  Mr. Hill formulated a plan to kill

7    his former wife, Vicky Hill, by blowing up her vehicle

8    or mobile home.  He shared his plan with Ms. Lopes, his

9    daughter, who had recommended a Mr. John Keefe to

10   complete the task.  So on May of 1987 Mr. Keefe had

11   agreed to receive a $1,000 to dynamite Mrs. Hill's home

12   while she was inside.  While tossing the dynamite at

13   Mrs. Hill's mobile home, the explosive rolled under her

14   unoccupied truck and exploded causing damage to the

15   vehicle and to her front porch.  Mr. Hill procured four

16   more sticks for Mr. Dalton Moss, who then gave them to

17   Shanna Lopes, who then arranged for Mike Hoskison to

18   dynamite Mrs. Hill's home.  On July 25th of 1987 Mrs.

19   Hill was awakened by her dog around 1:00 a.m.  She went

20   to her bedroom window and observed a prowler outside.

21   She observed a prowler with what appeared to be a

22   lighted object in his hand.  She armed herself with an

23   automatic pistol, placed the weapon against the inside

24   window, and fired at what she thought was the general

25   area of the prowler so that she would scare him off.

26   It was found -- the Butte County sheriff deputies found

27   **THARON HILL  D-87967  DECISION PAGE 2  12/19/06**

1    approximately five pounds of explosive material taped

2    against the outside bedroom wall of the mobile home.

3    There were two separate bundles with a fuse and a cap,

4    and the fuses appeared to be charred as if a flame had

5    been applied to the ends of the fuses.  The following

6    day the police found the body of Mike Hoskison in the

7    nearby yard.  The cause of death was a gunshot wound.

8    Okay.  Regarding Mr. Hill's institutional behavior, we

9    just want to note that only misconduct while

10   incarcerated includes just one 128(a) counseling chrono

11   that dates back to 1989 and was failure to follow

12   instructions.  The psychological evaluation dated

13   November 17th of 2006 and authored by R. Starrett, S-T-

14   A-R-R-E-T-T, the Panel finds is not totally supportive

15   of release, and the Panel finds that it is not thorough

16   in addressing the issues of the previous Board's

17   evaluation request, specifically the insight into the

18   inmate's role in the life crime.  The parole plans, Mr.

19   Hill does have viable residential plans, but the Panel

20   feels that they do need to be stronger and have some

21   backup for Butte County or county of commitment and/or

22   additional information for the San Mateo County, which

23   is where you lived, I think, it was an organization to

24   do with Veteran Administration and the housing.  We

25   also recommend -- we did find that in terms of your

26   employment and financial support was not strong enough

27   **THARON HILL   D-87967   DECISION PAGE 3   12/19/06**

108

1    and feel that you need better documentation and

2    verifiable sources of financial support, as the

3    Commissioner has stated to you previously.  Okay.  The

4    Hearing Panel notes that responses to 3042 notices

5    indicate opposition to a finding of parole suitability,

6    specifically from the District Attorney of Butte

7    County.  Mr. Zarate had stated that the District

8    Attorney's office is opposed to parole at this time.

9    The Panel makes the following findings, that the

10   prisoner needs therapy if available in order to face,

11   discuss, understand, and cope with stress in a

12   nondestructive manner.  More specifically, we feel that

13   you, sir, you really need to understand and get in

14   touch with the causative factors that led you up to the

15   life crime.  Until progress is made, the prisoner

16   continues to be unpredictable and a threat to others.

17   Nevertheless, the prisoner should be commended for his

18   participation in developing a positive attitude and the

19   Vietnam Veterans and in Alcoholics Anonymous.  And we

20   also want to note that you do have exceptional ratings

21   in your vocational plumbing.  However, these positive

22   aspects of his behavior do not outweigh the factors of

23   unsuitability.  Sir, we're giving you a two-year

24   denial.  In a separate decision, the Hearing Panel

25   finds that it's not reasonable to expect that parole

26   would be granted at a hearing during the following

27   **THARON HILL  D-87967  DECISION PAGE 4  12/19/06**

1   two years. Specific reasons for this finding are as
2   follows. Again, the prisoner committed the offense in
3   a very cruel manner. Specifically you, sir, the
4   inmate, hired a hit man and actually had two different
5   ones, to the try to kill his ex-wife Vicky Hill with
6   the use of explosives. The offense was carried out in
7   a very dispassionate and calculated manner, and
8   obviously it was calculated because it had been planned
9   out in advance two times. It was carried out in a
10   manner which demonstrates a very callous disregard for
11   human suffering. There was no thought given that with
12   five pounds of explosives attached to a mobile home
13   that had that gone off could have severely injured
14   many, many people besides the intended victim, and the
15   motive for the crime is inexplicable or trivial in
16   relation to the offense. We had the feeling that it
17   was money motivated but also revenge motivated. Okay.
18   The recent psychological report dated November 17th of
19   2006 and authored by Dr. Starrett, again, we state was
20   not thorough or conclusive, particularly in reference
21   to the life crime, and I'm going to read into this what
22   caused us to really question. "The inmate claims that
23   he is innocent and does not accept responsibility for
24   what he failed to do. There is some insight. His
25   insight into his interpersonal relationship problems
26   with women is limited. The inmate does continue to
27   **THARON HILL   D-87967   DECISION PAGE 5   12/19/06**

1    claim his innocence.  This makes his rating on this the
2    factor difficult."  Therefore, we find a longer period
3    of observation and evaluation of this prisoner is
4    required before the Board should find that the prisoner
5    is suitable for parole.  Sir, the Panel recommends the
6    following, that you remain disciplinary free.  You've
7    done a very, very good job all these years of doing
8    that.  It's very difficult.  That if available you
9    participate, or you should continue to participate, in
10    self-help, and if available get some therapy
11    programming.  Again, you gave this Panel the impression
12    that almost, and I hate to use this term, almost like
13    there's a conspiracy theory going on all against you.
14    That all the people involved in the life crime somehow
15    worked against you, and that you were claiming your
16    innocence.  And likewise, with all the documentation
17    that previous Panels and this Panel had to refer to,
18    you basically stated you felt that they were very, very
19    unfair to you.  We really recommend that you try to
20    seek out some additional therapy to really understand
21    what's driving that feeling in you so that you can come
22    to terms with what brought you to the point of the life
23    crime and then the taking the responsibility for it.
24    We're asking -- we can continue to go.
25          DEPUTY COMMISSIONER STAR:  Go ahead.
26          PRESIDING COMMISSIONER ENG:  We ask that you
27    THARON HILL  D-87967  DECISION PAGE 6  12/19/06

111

1   cooperate with clinicians in completion of a clinical

2   evaluation. Sir, we are ordering a new psychological

3   evaluation. We have done the paperwork for it, and

4   again, because we found that the previous Panel's

5   request in ordering the other psych were not adequately

6   met by this current psych. Okay. So that basically

7   concludes this hearing. Have I missed anything,

8   Commissioner?

9        DEPUTY COMMISSIONER STAR:  No, you haven't.

10       PRESIDING COMMISSIONER ENG:  That basically

11  concludes the reading of the decision. I'm going to

12  ask if my two fellow Commissioners have any additional

13  comments they would like to make.

14       DEPUTY COMMISSIONER STAR:  No, I think you

15  really covered it well.

16       DEPUTY COMMISSIONER HERRON:  No.

17       PRESIDING COMMISSIONER ENG:  Okay. Sir, we wish

18  you the best of luck. The time is now 12:07.

19                A D J O U R N M E N T

20                    --oOo--

21

22

23  PAROLE DENIED TWO YEARS.

24  THIS DECISION WILL BE FINAL ON: ___APR 1 8 2007___

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  THARON HILL   D-87967   DECISION PAGE 7   12/19/06

112

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated transcriber, HOUSE OF SCRIBES do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 111, and which recording was duly recorded at SAN QUENTIN STATE PRISON at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of THARON HILL, CDC No. D-87967, on DECEMBER 19, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated March 7, 2007, at Sacramento County, California.

_____
Stacy Wegner
Transcriber
**House of Scribes**

EXHIBIT    B    PAROLE PLANS

From: Max C. Hill
1992 North 300 West
Sunset, UT 84015

Date: Sept 8, 2006                                    RE: Tharon B. Hill, D87967

To: Board of Prison Terms
San Quentin State Prison
San Quentin, CA. 94974


Dear Board Members,

I am the elder brother of Tharon B. Hill.

It is my understanding that Tharon will again be evaluated for Parole. I live within the
State of Utah along with the majority of his family members and if paroled, I will accept
him into my home to live with me for as long as he wishes. I believe it is important for
him to rejoin his family members here in Utah to aid in his adjustment into private life.

I pray this honorable board will find Tharon eligible and acceptable for parole.

If the board has any questions, please feel free to contact me at (801) 825-8095.

Sincerely,

Max C. Hill


Public Notary, State of Utah

To:      Board of Paroles                             Date: Sept 8, 2006
           San Quentin State Prison
           San Quentin, CA 94974

From:    Thayne M. Hill
           2162 West 5700 South
           Roy, Utah. 84067
           801-644-3836

Subject:  Parole of Tharon Hill, D87967

Dear Board Members:

I am a Nephew of Tharon B. Hill. Although I am a resident of Utah, I have traveled to California to see him on several occasions since his incarceration. It is my understanding that he will be evaluated for the possibility of parole within the next few months.

I would like to inform the Parole Board, that if paroled, Tharon is welcome to live in my home for as long as he chooses. Since I and the majority of his remaining family members reside in the State of Utah, I would request immediate assistance to have his parole transferred to this state.

However, when initially paroled into the State of California, I have the desire and financial ability to assist Tharon with the establishment a residence, residing with him temporarily and helping with his reintroduction into society.

I am hopeful this board will come to the conclusion that his continued incarceration serve no further purpose and you will release Tharon for the remaining years of his life, allowing him the dignity and respect of a free man.

I would greatly appreciate your consideration of this request.

Sincerely,

*Thayne M. Hill*

Thayne M. Hill

Public Notary, State of Utah



795 Willow Rd. Bldg. 323B
Menlo Park, CA 94025
650-493-5000 x22044
650-614-9821 – Fax

October 3, 2006

To: Executive Officer of the California State Prison Board

Re: Tharon B. Hill (D-87967)

This letter is being written to let you know of our Agency and to inform you of our contact with Mr. Hill. We are located in Menlo Park on the V.A. grounds; our Agency provides a number of services to Veterans who have an honorable discharge, which Mr. Hill does have. Our main function is to help Vets. Get their lives back on track through transitional housing and whatever treatment is necessary including vocational training, job placement, and support with substance abuse including transportation to 12-step meetings. What is unique about our Agency is that we are located on the same grounds the Veterans Administration Services are and do referrals on a daily basis.

If and when Mr. Hill is released he will have housing through our Program along with the rest of the services we offer. It would be an honor for me to help a Veteran, who has been honorably discharged, return to becoming a productive member of society once again.

If there is any further information needed or any questions feel free to call me at (650) 493-5000 ex 24208

Sincerely,

*Kyle Terzian*

Kyle Terzian
Program Manager
Certified Addiction Treatment Specialist

**"Changing Lives One Vet At A Time"**

Nona I. Stewart                                    June 20, 2006
14627 Grandview Drive
Moreno Valley, Ca. 92555

RE: Tharon B. Hill   D87967

To:  Parole Board Members
     San Quentin State Prison
     San Quentin, Ca. 94974

Dear Board Members;

Once again I am writing to this honorable board to express my gratitude to you for considering the wishes of my family and close friends in the release of Tharon Hill. Our friendship goes back over fifty years and I know him to be a good man.

If Tharon is granted parole, he will have my home to live in for as long as he desires . This offer is open to Tharon for as long as we live.

It is my greatest wish that you will find Tharon as fine a man as I know him to be and parole him into the care of his loving family.

You may contact me at my home at any time should you have any questions for me.

(951) 486-0161

Respectfully,

*Nona I. Stewart*
Nona I. Stewart

EXHIBIT  C    PSYCHOLOGICAL REPORTS

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

August 1991 Calendar
Richard J. Donovan Correctional Facility
August 1, 1991

a.   This is the first report to the Board on this inmate

b.   This writer has had an interview with this inmate and has reviewed his medical file.

c.   This inmate is a 52 year old, Married Caucasian male with two grown children  He is in prison for conspiracy to commit murder.  He states that his daughter sent her boyfriend to his ex-wife's home to dynamite it. However, the boyfriend was shot and killed by the ex-wife he was charged with murder and conspiracy to commit murder and sentenced to 25 years to Life prior to episode resulting in the death of this man, the inmate had filed for divorced and had moved to Washington and was working as a construction superintendent.  He states that his wife called him up there and went up there to see him and they decided to reestablished their relationship..  In that process they returned to Los Angeles.  Sum of money was taken by the wife from the inmate's account and the inmate felt that at the end that his wife was entitled to this amount.  He and his wife divorced.  He graduated high school and had two years of college.  He worked in construction and various capacities for thirty years he was born in Idaho and came to California in 1961.  He has three brothers, there is no family history of mental illness or alcoholism.  He has no history of mental illness, he has no history of drug or alcohol abuse.  He has never made a suicide attempt.
Mental Status Examination - He is alert and oriented x3 He is neat and clean in appearance, he denies auditory or visual hallucinations and denies suicide or homicidal ideation.

d.   No Psychiatric Diagnosis

e.   Psychiatric Conclusion:

     General Conclusion:

     A.   No diagnosed psychopathology.

HILL THARON     D87967     RJDCF-SD     (jb)          8-1-91

8-2-91

Page 2

        B.    During observation in the institution, he was psychiatrically showed no significant change.

        C.    In a less controlled setting, such as returned to the community, this inmate is likely to hold present gains.

2.        Suggested Actions.  This inmate should be removed from special calendar because psychopathology is not significantly related to future criminal behavior, and psychiatric opinion will not contribute to a release decision.

f.    I have no further recommendations to the Classification Committee

*S. J. Falkenstein*

S.J. FALKENSTEIN, M.D.
Staff Psychiatrist

HILL, THARON    D87967   RJDCF-SD   (jb)    8-1-91

Richard J. Donovan Correctional Facility

# BOARD OF PRISON TERMS PSYCHIATRIC EVALUATION

### JUNE CALENDAR 1997

May 13, 1997

Mr. Hill is 58-years-old. He continues to work as a clerk in Mr. Reitz's office. He has had good work evaluations and has been there for four (4) years. In his free time, he helps other inmates with legal work. He likes to draw and enjoys walking at night. He states he has written some books which have not been published. He has had no CDC-115's. He completed Hands of Peace in 1994. His wife visits every week and calls him. He is presently taking Paxil, 20 mg, a day which is working well for him. He is not experiencing any depression at this time. He maintains that he is innocent of the crime for which he was convicted and he is currently appealing his case. Mr. Hill is a high functioning man of above average intelligence and clearly is able to provide for himself if he were to be released to the community. It is very doubtful that he would be involved in criminal activity in the community if he were to be released.

SHELDON FALKENSTEIN, M.D.
**Staff Psychiatrist**

HILL, THARON     D-87967     RJDCF     SF/gdj  05-14-97     F1-02-119L

Copy sent to inmate 5-20-97

**Cynthia E. Harris, LCSW**
**510-798-4637**

December 09, 2004

To: Board of Prison Terms
    San Quentin State Prison
    San Quentin, California
Re: Mr. T. Hill

I would like to take this opportunity to recommend Inmate Hill for consideration and release with supervision.
I provided CCCMS and counseling to Mr. Hill during my time working at San Quentin. During the course of treatment the inmate was very open and honest about his crime and it's effects on the victim and the rest of his family.
He expressed considerable insight as to his problems at the time, the circumstances that led to the abuse he inflicted on loved ones, and how his incarnation and rehabilitation has totally changed the person that he was. He continues to feel remorse, shame and deep regret about the tragic turn of events that he was responsible for. In my opinion Mr Hill has learned the social skills required and ability to cope with lifes stresses during his time served; he has grown into a better person during these years. This inmate is unlike others in that he has strong professional background and will certainly be able to sustain himself as a productive member of society.

I have no hesitation what so ever in asking you to consider him for release. I would have no hesitation in receiving him as a member of my community. I believe that he will find a way to give back and help others; perhaps through the church.

Please contact me if you require any additional information.

Respectfully submitted,

Cynthia E. Harris, LCSW

## Life-Term Inmate Evaluation for the Board of Parole Hearings
### MENTAL HEALTH EVALUATION

### SAN QUENTIN STATE PRISON

### PSYCHOSOCIAL ASSESSMENT

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| NAME: | Hill, Theron |
| CDC #: | D-87967 |
| AGE: | 67 years |
| DOB: | 03/22/39 |
| MARITAL STATUS: | Widowed |
| RACE: | Caucasian |
| SEX: | Male |
| RELIGION: | Latter Day Saints |
| DATE OF REPORT: | 11/17/06 |

This report is based on review of the inmate's medical file, review of his C-File, prior Board of Prison Terms reports, prior psychological evaluations, current classification information and probation officer's report. The current interview with the inmate and the report are limited by the amount of information given to this examiner by the inmate at the time of the interview. The following information is accurate to the extent that the records and the inmate's self-report are accurate. As a result, the absolute accuracy cannot be assured. The primary purpose of this report is to provide the Board of Prison Terms psychological data, psychiatric diagnostic information and an assessment of dangerousness in regard to his possible release to the community. This evaluator is not responsible for any inaccurate statements or changed opinions expressed by the inmate at a later date. The inmate was interviewed for approximately 60 minutes, the initial medical file and C-File were reviewed for the interview for 1 hour, the inmate's C-File file was reviewed for approximately 4 to 6 hours and dictating, report writing and editing took 4 hours.

The inmate was informed that the interview was not confidential and a report with the results of the evaluation would be submitted to the Board of Prison Terms to assist in determining his eligibility for parole. The inmate was informed that any disagreement with the substantive conclusion could be most appropriately address at the inmate's Board hearing. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition which may qualify under the American's with Disabilities Act, the evaluation was conducted by a licensed clinical psychologist.

This information is based on the inmate's statements during the time of the interview. The inmate's crime occurred on April 20, 1987. He was received into California Department of Corrections on September 21, 1988. He was 48 years old at the time of the crime. He was convicted of PC §187 Conspiracy to Commit Murder in the First Degree with Explosives. He received a 25 years to life sentence. His minimum eligible parole date was April 6, 2004. He has served almost 20 years. His initial Board was in 2003 and this is his third subsequent. His last Board was in 2005.

This information is based on the inmate's statements during the time of the interview. The inmate has no CDC 115's. He has none for alcohol or drugs and none for violence. The inmate has had one 128, which was in 1988. His points are 19.

The inmate has taken some college courses while incarcerated. He has trades in plumbing and drafting. He is currently in PIA plumbing. He plans to be retired upon release. The inmate has been active in AA for the last three years. He is in Positive Attitude class for the last almost four years. The inmate states that he has been involved in other self-help groups and Vietnam Veterans group since September of 2003. He has laudatory Chronos over the last three to four years. The inmate states he plans to be active in self-help, his religion and AA and NA upon release.

## II. DEVELOPMENTAL HISTORY:

This information is based on the inmate's statements during the time of the interview. The inmate was born in Bloomington, Idaho. He denies any prenatal or birth complications, or birth defects growing up. He states that his development in terms of speech, language, and motor skills were within normal limits. He denies any enuresis, speech problems and emotional problems. He did have some learning difficulties but was never diagnosed or treated. He denies any health problems in childhood. He denies any traumas or abuse in childhood. There were no disruptions to childhood.

## III. EDUCATION:

The inmate graduated from high school and went into the Navy for four years and then returned to complete two years of community college. He denies any diagnosed learning problems, grade failures, or ever being in special education classes. He denies any behavioral problems in school. He was never suspended or expelled, never got into fights.

The inmate has had educational upgrades while incarcerated.

## IV. FAMILY HISTORY:

The inmate was born in Idaho and raised in Utah. He was raised by his parents. He is the youngest of five children. The family has lived in two residences. His father worked for the forest department and was a civilian in the Army. His mother also was a civilian in the Army depot. He had a wonderful relationship with both of them growing up. There is no family history of health problems. There was no use of alcohol or drugs in the home, no mental health problems, and no one else was ever arrested. There was no spousal abuse, there was no emotional, physical or sexual abuse of the children.

The inmate states his family is still very supportive of him and he has letters of support.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He describes his sexual orientation as heterosexual in nature. He denies any crimes against children or any sex related crimes. He has had domestic violence behavior toward women and his current crime. He denies high risk behavior, such as prostitutes, intravenous drug use or exposure to HIV.

## VI. MARITAL HISTORY:

The inmate has been married four times. The inmate's first marriage lasted 14 years and he has two children. He has an off-and-on relationship with them. The next marriage was for 2 years with no children. The next marriage was for 9 years with no children and the last marriage was for 11 years with no children.

## VII. MILITARY HISTORY:

The inmate was in the military for four years and nine months and had an honorable discharge.

## VIII. EMPLOYMENT/INCOME HISTORY:

The inmate states that his longest job was as a general contractor for 30 years. He denies ever receiving public assistance or Social Security Disability.

## IX. SUBSTANCE ABUSE HISTORY:

The inmate drank some beer. He states that his daughter got upset with his drinking when he was going through a divorce. Beer was involved in his controlling case.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Medical:

The inmate denies any allergies, asthma, cardiac, respiratory, vision, or hearing orthopedic problems. He does have glaucoma, which is going to affect his vision. He has had laser surgery to his right eye. He has no head injuries. He denies any seizures, thyroid, diabetes or venereal diseases. He sees his current health as fair.

Mental Health:

The inmate states that he was in the mental health system while incarcerated in the 1990's when he was dealing with depression around his ex-wife. He was out of the mental health system and then back in the late 1990's when his wife passed away. The inmate has no current mental health problems and is not in the mental health. He is not being treated with psychiatric medication.

## XI. PLANS IF GRANTED RELEASE:

The inmate would like to parole to Utah and that has been approved. He also has plans for Southern California in the Veterans' Administration in San Mateo. The inmate plans on retiring. He has made contact with the Veterans' Administration to help him in transition.

## CLINICAL ASSESSMENT

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

The inmate was oriented by person, place and time. He was alert and cooperative. His simple registration was intact along with short-term memory. He could do simple math in his head. His simple abstract thinking was intact but complex problem solving abilities were impaired.

At the current time, he denies any problems with depression, anxiety, mood swings or mood disorder. He denies any auditory or visual hallucinations. He denies any delusional or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

## DIAGNOSTIC IMPRESSIONS DSM-IV:

**AXIS I**      Alcohol Abuse, in remission since incarceration in 1987 and in treatment over the last three years.

**AXIS II**     Deferred.

**AXIS III**    Glaucoma.

**AXIS IV**     Psychosocial Stressors: Incarceration.

**AXIS V**      Global Assessment of Functioning (GAF): 80.

The inmate is currently in the General Population and has never been a member of the MHSDS system while incarcerated. He is active in AA and in self-help groups along with his religion.

## XIII. REVIEW OF LIFE CRIME:

The inmate was convicted of PC §187 Conspiracy to Commit Murder in the First Degree with Explosives. He received a 25 years to life sentence. His minimum eligible parole date was April 6, 2004. He has served almost 20 years.

Summary of the Crime: In 1978, the inmate and Vicky Hill married. In late 1984, Hill had an affair with another woman and Mrs. Hill sought a divorce. However, the Hills reconciled and subsequently moved to Washington State. They eventually broke up again and Mrs. Hill moved to Chino, California while Hill remained in Washington. In 1984, Hill returned to California. He explained to his daughter, Shannon Lopes, from his previous marriage, that Mrs. Hill had taken with her to California $110,000 of his money. Ms. Lopes stated that Mrs. Hill should be killed for stealing his money and leaving him.

On April 20, 1987, the Hills had a violent argument. Shortly thereafter, the inmate bought six or seven sticks of dynamite, several plastic caps and a fuse cord from Mr. Dalton Mosk. Hill had formulated a plan to kill his former wife by blowing up her vehicle or mobile home. Hill shared this plan with Ms. Lopes, who recommended Mr. Keith to complete the task. In May 1987, Mr. Keith agreed to receive $1,000 to dynamite Mrs. Hill's home while she was inside. In contradictory accounts, Mr. Keith either changed or botched the plan. While tossing dynamite at Mrs. Hill's mobile home, the explosive rolled underneath her unoccupied truck and exploded, causing damage to the vehicle and to her front porch. Hill procured four more sticks from Mosk, who gave them to Lopes. Lopes then arranged for Mike Hoskison to dynamite Mrs. Hill's home.

On July 24, 1987, Mrs. Hill was awakened by her dog at approximately 1:00 A.M. Mrs. Hill went to her bedroom window and observed a prowler outside. She also observed the prowler with what appeared to be lighted object in his hand. Mrs. Hill, armed with an automatic pistol, placed her weapon against the inside window and fired at what she thought the general area of the prowler so that she would scare him off. Upon responding to Mrs. Hill's telephone call for help, Butte County sheriff's deputy found approximately five pounds of explosive material taped against the outside bedroom wall of the mobile home. There were two separate bundles with a fuse and a cap and fuses appeared to be charred as if a flame had been applied to the ends of the fuses.

At approximately 8:30 A.M. the following morning, the body of Peter Hoskison was found in a nearby yard. Cause of death was a gunshot wound and clutched in his hand was a cigarette lighter. Police learned that Hoskison was living with Shannon Lopez just prior to the incident. Following the investigation Hill, his daughter, Dalton Mosk and John Keith were all arrested and charged in the instant offense.

Hill was convicted on April 22, 1988 of conspiracy to commit murder in the first degree. He was acquitted of a second charge of PC §187 Murder in the First Degree in the death of Peter Hoskison. It should be noted that Shannon Lopes, John Keith and Dalton Mosk all testified at trial against Hill in exchange of immunity from prosecution.

Inmate's Version: After Hill's arrest, Hill provided the statement, which documented in pages 11 to 13 in the Butte County Probation Officer's Report dated May 11, 1988. During a personal interview with his assigned correctional counselor on September 13, 2005, Hill had the aforementioned statement read to him. He acknowledged this statement as recorded in the Probation Officer's Report is still fully accurate and reflect his version of the events. In addition to that statement, Hill also would like for the Board of Prison Terms to recognize the notarized affidavit dated January 12, 1993 from his first wife, Karen Medley. In the affidavit, Mrs. Medley states Hill's daughter, Shannon Lopes, articulated to her, she, Ms. Lopes, was solely responsible for the instant offense and Hill had nothing to do with it. The affidavit can be located in the BPT section of the central file.

Aggravating Factors: The victim was particularly vulnerable. Hill had the opportunity to cease, but continued with the crime. Circumstances of the crime created the potential for serious injury to others.

Mitigating Factors: Hill had a minimum or no criminal history. Another mitigating factor in this individual's case is his age.

Juvenile Arrest History: The inmate had no juvenile arrest history.

Adult Arrest History: January 28, 1961, Ogden, Utah, petty larceny; February 13, 1978, Santa Ana Police Department, assault and battery, no disposition; June 15, 1987, assault, battery and disturbing the peace, charges dismissed.

Regarding his juvenile history, the inmate states there is none. Regarding his adult history, the inmate states that the reason why he was getting into trouble as a young man was relationship problems. His family was supportive of him.

In the current interview, when asking the inmate why this crime occurred, he said that his ex-wife loaded a shotgun and gave it to his son and told his son that everyone hated him and that he should just kill himself. When he told his sister, Ms. Lopes about this, she went through the roof. Then later one, when she found out that the ex-wife had stolen a large amount of money from her father, the inmate states that she went off the deep end. His son and daughter by his first marriage. The inmate states as in the file account, that the daughter actually committed this offense and that he has this signed affidavit from his wife to that affect.

When asking the inmate his role in this crime, he said that he was in Southern California at the time and did not know any of this was taking place. He states that his daughter had called him several times and was very upset. She was telling him that something had to be done and he was telling her to leave it alone. It was none of her business. The inmate goes on to say that "I feel responsible. I could have stopped it by flying home and talking to my daughter. During the trial, she blamed me and stated that she has to raise my grandchildren." The inmate states that he was found guilty in a trial. He tried to appeal, but lost the appeals. The inmate goes on to say "I have a difficult time admitting to something that I did not do." The inmate goes on to express remorse over the death of his ex-wife, how he does feel responsible for what happened.

When asking the inmate what has changed about him, he says living in prison every day is self therapy. You have to deal with it moment-by-moment and "I've had no write-ups."

## XIV. ASSESSMENT OF DANGEROUSNESS:

In order to determine the inmate's risk of representing a substantial danger of physical harm to others, he was assessed on a number of research derived risk factors that are associated with an increased risk for future violence.

History of Violence:

According to the Probation Officer's Report and prior records, the inmate's criminal history would be a mitigating factor. In rating this individual on the historical factors, he would rate in the low range in terms of his likelihood to commit future violent acts when compared to other inmates with similar crimes. His only elevations would be relationship instability, prior domestic violence, possible assault and battery charges, and some use of alcohol.

Prior Performance on Supervised Release:

This would be a mitigating factor.

Inmate's Compliance with Board Requests and Treatment:

The inmate has never had any 115's and his last 128 was in 1988. He has upgraded himself educationally and vocationally. He has been active in AA, his religion and self-help.

Substance Abuse:

Relapsing in the use of alcohol and drugs may be a concern. However, he has been clean and sober for 20 years and been in treatment for at least the last three.

Mental Health Issues:

The inmate, at the current time, is placed in the general population and is not in the mental health system. He does not appear to have any complicating mental health problems.

Clinical/Insight:

The inmate claims that he is innocent but does accept some responsibility for what he failed to do. There is some insight. His insight into his interpersonal relationship problems with women is limited. The inmate does continue to claim his innocence. This makes his rating on this factor difficult.

Environmental Risks/Risk Management:

The inmate's parole plans seem to be adequate. The inmate has handled compliance, stress and destabilizers well in the institutional setting. The inmate would rate in the low range in terms of his risk management for the future.

In summary, this individual overall appears to rate in the low range in his propensity to commit violence the future when compared to similar violent inmates. The inmate's crime is a crime of passion, or an affective crime, which do not reoccur and inmate's age is another factor.

It is recommended th   he inmate continue to program positive

Thank you for the opportunity to assist in this interesting consultation.

_____        __11-17-6__
RICHARD STARRETT, Ph.D., Ph.D.              Date
Contract Psychologist, CA License PSY 13628
San Quentin State Prison

RS/ls/cam

Hill, Theron                    PAGE 9            MENTAL HEALTH EVALUATION

September 25, 2006

Lifer Board Desk
San Quentin State Prison
San Quentin, California 94964

Dear San Quentin and the Board of Prison Terms,

I am writing this letter on behalf of Mr. Tharon Hill, D-87967, 1N262, and to express my belief in his suitability for parole. Mr. Hill has been attending the weekly support group called "Developing a Positive Attitude" that is sponsored by the Center for Attitudinal Healing and Marin AIDS Interfaith Network for the past few years. The group helps participants take responsibility for their emotions and actions by non-judgmental listening to and support of each other. The basic tenets of Attitudinal Healing can be summed up by the following: "Attitudinal Healing affirms that we are responsible for our thoughts and whatever feelings we experience and encourages us to re-examine our relationships, bringing them into the present by releasing past judgments and grievances."

A quiet but attentive presence in the group, Mr. Hill's strength is in his listening skill. He is well respected by others in the group and they often turn to him for research and help in legal matters. Besides being a gifted artist, Tharon is obviously a man of great intelligence and has a rather wry sense of humor. One of the basic principles of a Positive Attitude is that " We can choose and direct ourselves to be peaceful inside regardless of what is happening outside." Tharon has practiced incorporating this principle by using his sense of humor, intelligence, art, and practice of living in the present to meet the many inevitable stressful situations encountered in the prison environment with equanimity.

I urge you to consider Mr. Hill for parole. In my opinion he does not constitute a threat to society in any way. And with the support of his family and friends, he would not only fulfill the terms of his parole, but also be a respectable and conscientious member of society.

Sincerely,

*Rebecca Morehouse*

The Rev. Rebecca Morehouse
The Episcopal Church of the Nativity
333 Ellen Drive
San Rafael, CA 94903

October 30, 2006

Board of Prison Terms,

I am writing this letter in support of the parole of Mr. Tharon Hill, D-87967.

Mr. Hill has been a regular participant in the weekly support group "Developing A Positive Attitude" for more than three years.  In this self-help group, Tharon has demonstrated that he has dealt with stress in a non-destructive manner. He also exhibits positive ways to express his thoughts and feelings and to relate to others in constructive ways.  He is a consistent positive contributor to the group and encourages others to better themselves in many ways.

I do not perceive Mr. Hill to be a threat to society and I would welcome him into my own neighborhood. He has much to contribute to society and I am sure he will do so if granted parole by this Board of Prison Terms.

Thank you for your consideration on his behalf.

Sincerely,

Rev. David Martin
San Rafael, California
Co-Facilitator, "Developing A Positive Attitude" weekly support group

PATRICK MALONEY
San Quentin Prison
Arts In Corrections


September 24, 2006                    RE: Tharon Hill   D87967


BOARD OF PRISON HEARINGS
San Quentin State Prison
San Quentin, CA. 94964

To Whom It May Concern:

I am a professional artist who works in Arts In Corrections
here at San Quentin.  I have worked with Tharon Hill for the
past three years, and  he is a dedicated artist, who is quiet,
congenial, and hard working.

Mr. Hill has on numerous occasions contributed art to be sold,
which helps to maintain the arts program.   Art is an important
part of his life, and if found suitable for parole, he hopes
to continue in this profession as a free man.

I sincerely hope you will be able to give him this opportunity.


Patrick Maloney

*Patrick Maloney*

STEVEN EMRICK
Art Facilitator
Arts in Corrections
San Quentin State Prison

December 4, 2006                              RE: HILL, T., D-87967

BOARD OF PRISON TERMS
San Quentin State Prison
San Quentin, Ca. 94964

Dear Board Members,

I presently work as the Arts in Corrections Artist Facilitator, and I have known Inmate Hill, D-87967 for the past three and a half years. During his participation in this program, he has contributed to the class by way of donating his paintings to art exhibits at the Marin Community Foundation in Novato at Hamilton Field, and presently has several pieces of work on display at MarinLink in the mall at Northgate, San Rafael.

Inmate Hill participates in the Creative Writing program, and has written two books and is presently working on his third. He also contributed his writing to an "Anthology," which is for sale on the internet with proceeds benefiting the Williams James Association, a non-profit organization, which provides art materials for youth and prison programs.

Inmate Hill is a serious artist and plans to continue his painting when released from prison. He also gets along well with staff and inmates alike. I am also impressed with his demeanor, courtesy and creativity. Moreover, he gives without asking for anything in return.

As a long standing employee of the state, I can say without reservation that Mr. Hill has been an asset to the program and community through his involvement in Arts in Corrections.

Steven Emrick
Arts in Corrections
Artist Facilitator
Ext: 6021

To The Board of Prison Hearings
San Quentin State Prison

August 08, 2003                              RE: Tharon B. Hill, D87967

To Whom It May Concern:

I am writing this letter of support on behalf of Inmate HILL,
D-87967. I've known Inmate HILL for over one-and-a-half years
(1½), to which I have had the opportunity to observe his
demeanor. Since my acquaintance with Inmate HILL, I have found
him to be diligent and sincere, to which he has maintained a
positive attitude, always taking into consideration his peers
and staff alike. Through our continued communication it has
become evident that Inmate HILL has set goals and conditions
to achieve a good life style within the community.

During my many years of correctional experience, and being able
to observe all types of inmate behavior, it is apparent how
stressful and volatile the prison environment can be. However,
Inmate HILL has not let himself become subjected to the everyday
stresses and volatility that occurs within the prison system,
and I commend him for being able to manage his time in a positive
and productive manner.

I, therefore, ask this Board to seriously consider Inmate HILL
for release, for I believe he will be an asset to the community.

Sincerely,

W. Carmichael
Correctional Officer

66

1   participating in AA and the 'Hands for Peace'

2   group, as well as the Vietnam Veterans therapy

3   group and remains disciplinary free; which

4   again, is indeed a commendable accomplishment.

5        However, these positive aspects to his

6   behavior do not outweigh the factors of

7   unsuitability.  Commissioner do you have any

8   comments?

9        **DEPUTY COMMISSIONER ARMENTA:** Right, yes.

10  Mr. Hill, you've done a lot of time.  You've

11  been in CDC seventeen years.

12       **INMATE HILL:** Eighteen years total.

13       **DEPUTY COMMISSIONER ARMENTA:** Eighteen

14  with total.  Seventeen years (indiscernible).

15  If I look at the chart on first degree and the

16  fact that someone did not die, or even a first

17  degree, you cut that in half and that is fifteen

18  years.  You already done – your conduct has been

19  good so you get all your credit.  You've already

20  done your time and more.  Nevertheless, there is

21  still some issues that hopefully can be resolved

22  in the next hearing or two, and hopefully you'll

23  be a free man at some point.

24       **INMATE HILL:** Am I allowed to ask a question?  I

25  have – some place in here – the factors for

26  suitability for parole under –

27  **THARON HILL D-87967  DECISION PAGE 4  10/04/05**

EXHIBIT   F



Butte County
Superior Court

JUN 04 2007

Sharol Strickland Clerk

By _____ Deputy

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF BUTTE

In the Matter of the Application  )
)
of  )
)
**Tharon Hill**  )
)
For Writ of Habeas Corpus  )
)

CASE NO.: **096061**

Order Denying Petition Or
Transferring Petition

The Petition for Writ of Habeas Corpus filed **May 21, 2007** has been read
and considered.

_✓_ (1) The Writ of Habeas Corpus is denied for the following reason:

____ The vague, unsupported, and conclusionary allegations contained in the Petition
are insufficient to allow for intelligent consideration of the issues which petitioner
had attempted to raise. (In re: Swain (1949) 34 Cal.2D 300; In re Patton 1918)
178 Cal. 629).

_✓_ Petitioner has failed to establish a prima facie case for relief on habeas corpus (In
re Lawler 23 Cal. 3rd 190,194).

____ Petitioner is required to exhaust administrative remedies before seeking relief in
the courts. (In re Muszalski (1975) 52 Cal. App. 3D 500).

____ Petitioner has available remedies at law that have not been exhausted.

CC: Dept

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, state bar number, and address):*<br><br>THARON B. HILL<br>D87967, 1N26L<br>SAN QUENTIN STATE PRISON<br>SAN QUENTIN, CA  94974<br><br>TELEPHONE NO.:          FAX NO.:<br>ATTORNEY FOR *(Name):* | **FOR COURT USE ONLY** |

| | |
|---|---|
| **COURT**        THIRD DISTRICT COURT OF APPEALS<br>STREET ADDRESS:  900 N. STREET, 4TH FLOOR<br>MAILING ADDRESS:  SACRAMENTO, CA 95814<br>CITY AND ZIP CODE:<br>BRANCH NAME: | |
| **PETITIONER/PLAINTIFF:**  THARON B. HILL<br><br>**RESPONDENT/DEFENDANT:**  BUTTE COUNTY SUPERIOR COURT | |
| **PROOF OF SERVICE BY MAIL** | CASE NUMBER: |

1. I am at least 18 years of age, not a party to this action, and I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:    SAN QUENTIN STATE PRISON 94974

3. I served a copy of the following documents *(specify)*:
   ☒ Petition for Writ of Habeas Corpus          [ ] _____

by enclosing them in an envelope AND
   a. ☒☒ **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. [  ]  **placing** the envelope for collection and mailing on the date and at the place shown in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4. The envelope was addressed and mailed as follows:
   a. Name of person served:  CLERK OF THE COURT          ☒ STATE ATTORNEY GENERAL
   b. Address:        900 N. ST.                                    P. O. BOX 944255
                      SACRAMENTO, CA                               Sacramento, CA 94244
   c. Date mailed:  June 11, 2007
   d. Place of mailing *(city and state)*:

5. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

THARON B. HILL                              ► *Tharon B. Hill*
_____                      _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PERSON COMPLETING THIS FORM)

**PROOF OF SERVICE BY MAIL**