# EXHIBIT 5

**DUPLICATE**

IN THE STATE SUPREME COURT

IN AND FOR THE STATE OF CALIFORNIA

**S154561**

| | | |
|---|---|---|
| Tharon Hill | ) | CASE NO. |
| Petitioner | ) | |
| | ) | |
| v. | ) | CHARGED OFFENSE NUMBER IN THE |
| | ) | SUPERIOR COURT OF BUTTE COUNTY |
| Board of Prison Hearings | ) | #96061 (1987) |
| Respondent | ) | THIRD DISTRICT COURT OF APPEAL |
| | | CASE NO. # |

PETITION FOR REVIEW

ON

WRIT OF HABEAS CORPUS

SUPREME COURT
FILED

JUL 1 0 2007

Frederick K. Ohlrich Clerk

Deputy

Tharon Hill
D-87967, 1-N-26L
San Quentin Prison
San Quentin, CA.
94974

## VERIFICATION

STATE OF CALIFORNIA  )
                     )
COUNTY OF MARIN      )

(C.C.P. section 446 & 2015.5; 28 U.S.C. section 1746)

I, THARON HILL, declare under penalty of perjury that:

I am a party in the above-entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my own knowledge, except as to matters stated therein upon information and belief, and as to those matters I believe they are true.

Executed this _16_ th day of _July_ 2007, at San Quentin State Prison, San Quentin, California 94974.

S/S _Tharon Hill_
Tharon Hill

i.

TABLE OF CONTENTS

VERIFICATION                                              i.

TABLE OF CONTENTS                                        ii.

TABLE OF AUTHORITIES                                 iii-iv.

MEMORANDUM OF POINTS AND AUTHORITIES                   1-24
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

CONSTITUTIONAL QUESTIONS                                  1

INTRODUCTION                                           1-5

ARGUMENT I – PREPONDERANCE OF EVIDENCE                 6-9

ARGUMENT  II –  SOME EVIDENCE                         9-20

        a. Consequences of actions and magnitude        10
        1. Especially atrocioius dispassionate & calculated   12
        2. Inexplicable and Trivial                     15
        3. Parole plans                                 16
        4. Self-help and therapy                        17
        5. Psychological report doesn't support parole  18

CONCLUSION                                            20-24

EXHIBITS

PROOF OF SERVICE

ii.

# TABLE OF CONTENTS

VERIFICATION                                                    i.

TABLE OF CONTENTS                                               ii.

TABLE OF AUTHORITIES                                           iii-iv.

MEMORANDUM OF POINTS AND AUTHORITIES                           1-25
IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

INTRODUCTION                                                   1-6

ARGUMENT I — PREPONDERANCE OF EVIDENCE                         6-9

ARGUMENT II — SOME EVIDENCE                                    10-21

    a. Consequences of actions and magnitude             11
    1. Especially atrocious dispassionate & calculated    12
    2. Inexplicable and Trivial                          16
    3. Parole plans                                      17
    4. Self-help and therapy                             18
    5. Psychological report doesn't support parole       19

ARGUMENT III — THE BOARD VIOLATED PETITIONER'S                 21
    DUE PROCESS RIGHTS PURSUANT TO
    PENAL CODE § 3041

CONCLUSION                                                     20-25

EXHIBITS

PROOF OF SERVICE

TABLE OF AUTHORITIES

| Cases | Pages |
|---|---|
| Anderson v. Smith, 97 F.2d 239 | 7 |
| Armstrong v. Davis, 275 F.3d 849 | 9 |
| Biggs v. Terhune (9th Cir.2003) 334 F.3d 910 | 9,11,21 |
| Bolani v. Immigrations, 9 F.2d 1157 | 7 |
| Caldwell v. Miller, 790 F.2d 589 | 6 |
| Carson v. Block, 790 F.2d 562 | 6 |
| Envil.Def.Ctr. Inc. v. EPA (2003) 344 F.3d 832 | 11 |
| Greenholtz v. Inmates, (1979) 442 U.S. 1 | 9 |
| In re Capistran (2003) 107 Cal.App.4th 1299 | 10 |
| In re Dannenberg (2005) 34 Cal.4th 1061 | 13,16,17 |
| In re DeLuna (2005) 126 Cal.App.4th 585 | 11 |
| In re Elkins, 144 Cal.App.4th 475 | 2 |
| In re Lowe, 130 Cal.App.4th 1405 | 14 |
| In re Ramirez (2001) 94 Cal.4th 549 | 210 |
| In re Rosenkrantz (2002) 29 Cal.4th 616 | 2,8,9,11,12,13,21 |
| In re Rosenkrantz, (2000) 80 Cal.App.4th | 6 |
| In re Scott, 119 Cal.App.4th 871 | 14 |
| In re Scott, 133, Cal.App.4th 573 | 10,11,13 |
| In re Smith, 109 Cal.App.4th 503 | 9 |
| In re Van Houten, 11 Cal.App.4th 329 | 14 |
| Jancsek, 833 F.3d 1390 | 11 |
| McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895 | 10 |
| McBee v. Bonner, 296 F.2d 235 | 7 |
| Michelson v. United States, 335 U.S. 469 | 3 |

Morse v. Texas, 691 F.2d 770                                         3

Morton . Ruiz, 415 U.S. 199                                         6

North Carolina v. Alford, 400 U.S. 25                               3

Pearce v. Director, 647 F.2d 716                                    6

People v. Burnick, 14 Cal.3d 306                                    19

People v. Neol (2005) Cal.App. Lexis 711, 148                      11

Rosenkrantz v. Marshall, 444 F.Supp 2d 1063              2,14,21

Superintendent v. Hill (1985) 472 U.S. 445             1,8,9,15

Services v. Dulles, 354 U,.S. 363                                  7

Taylor v. U.S., 734 F.2d 1152                                      7

Turner v. Kenman, 829 F.2d 612                                     6

United States v. Beechum, 582 F.2d 898                             3

United States v. Davila, 698 F.2d 715                              3

VanderMolen v. Stetson, 571 F.2d 617                               6

Vitarelli v. Seaton, 359 U.S. 535                                  7

Wolff v. McDonell, 418 U.S. 539                                    6

---

STATE STATUTES

Evid.Code 210                                                      4

Penal  Code § 3003                                                17
Penal Code § 3041                                               7,10
Penal Code § 5011                                                 19
Penal Code § 5079                                                 20
Penal  Code § 11177                                               17
Cal.Code of Regs., tit. 15 § 2000                          1,7,8,9,24
Cal.Code of Regs., tit. 15 § 2281                               9,23
Cal.Code of Regs. tit. 15 § 2236                                 19
Cal.Code Regs, tit. 15 §2402         2,9,10,11,12,13,16,17,18,23

FEDERAL STATUTES

United States Constitution § 4218                                 6
Fed.R.Evid. 404(b)                                                3

iv.

# IN THE STATE SUPREME COURT

## IN AND FOR THE STATE OF CALIFORNIA

Tharon Hill                )
        Petitioner         )
                           )        Case No.
    v.                     )
                           )
Board of Prison Hearings   )
        Respondent         )

To the Honorable Justices of the California State Supreme Court:

## CONSTITUTIONAL QUESTIONS

(1) Is it a Constitutional violation to use case law not applicable to the crime, to find "some evidence" to deny a writ? (Cal.Ev.Code 210; Fed.R.Ev. 404(b); <u>Superintendent v. Hill</u> (1985) 472 U.S. 445.)

(2) Is it a Constitutional violation pursuant to mandated legislation when the Board of Prison Hearings fails to uphold their own rules and regulations? (California Code of Regulations title 15 § 2000(50).)

## INTRODUCTION

Petitioner appeared before the California Board of Hearing on December 19, 2006 and was denied parole, to which the Board's decision is not in accord with a proper

1.

reading of the relevant statutes, regulations and case law. The "some evidence" standard of review provides broad discretion to the Board, however, it is in fact bound by three requirements: (1) the evidence must be drawn from the factors enumerated in the statutory and regulatory framework; (2) the evidence must be deemed relevant and reliable; and (3) the evidence must reasonably speak to whether the inmate poses a current public safety threat.

As important is that the Board must show the crime is beyond the minimum elements necessary to sustain a conviction for the offense in order to satisfy the California Code of Regulation title 15 § 2402, and to meet the especially heinous, atrocious or cruel manner set forth therein. As will be shown, the Board's findings were not in accord with In re Rosenkrantz, 29 Cal.4th 616; Ronsenkrantz v. Marshall, 444 F.Supp.2d 1063; In re Elkins, (2006) 144 Cal.App.4th 475; In re Scott, 119 Cal.App.4th 871, and In re Ramirez, 94 Cal.App.4th at p. 569. (The offense must be found on "all ... relevant factors." Rosenkrantz, supra, 29 Cal.4th at pp. 660, 677.)

In that the foregoing citations are not relevant, and petitioner's committment offense does not meet the "minimum elements necessary to sustain a conviction for the offense" pursuant to the Cal.Code of Regs., tit., 15 § 2402, there is no evidence, not a modicum of evidence, to deny parole.

Although there is no question that in most cases the statutory "committment offense" factor is relevant pursuant

to Rosenkrantz and Dannenberg, and at times may be enough to deny parole, it will be shown Rosenkrantz and Dannenberg, do not apply in petitioner's case. Both Rosenkrantz and Dannenberg address commitment offenses in relation to murder, to which this petitioner did not commit murder. In other words, it courts use a crime on the basis of conduct (Ronsenkrantz and Dannenberg) which do not constitute the crime, it offends the basic notions of justice and fair play embodied in the Constitution. <u>North Carolina v. Alford</u>, 400 U.S. 25; <u>United States v. Davila</u>, 698 F.2d 715 723; <u>Morse v. Texas</u>, 691 F.2d 770, 773. Further, evidence of the commission of a wholly separate and independent crime that is not on point with petitioner's conviction is inadmissible. (<u>Michelson v. United States</u>, 335 U.S. 469, 475-76, 69 S.Ct. 213, 218, 93 L.Ed. 168, the evidence cannot possess probative valve which is outweighed by undue prejudice. <u>United States v. Beechum</u>, 582 F.2d 898, 911, cert denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472.)

When a court uses citations in relation to a crime where murder was committed to deny a writ where no murder occurred, it is tantamount to extrinsic evidence. It is required that the physical elements of the extrinsic offense include the essential physical elements of the offense for which petitioner was convicted. According to the Fed.R.Evid. 404(b): Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show

3.

that he acted in conformity therewith.

The probative value of Rosenkrantz and Dannenberg's offenses are deemed insufficient to outweigh the inherent prejudice caused to petitioner. Therefore, as a predicate to a determination that extrinsic offenses are relevant, the Court must offer proof demonstrating that petitioner committed murder. The Court must demonstrate relevance.

According to California Evidence Code section 210, "relevant evidence" means evidence that has a tendency to prove or disprove any disputed fact that is of consequence to the determination of the action.

Evidence Code section 210 encompasses a broad concept of relevance. That concept comprehends both the probative value of evidence and its relationship to a matter which is provable in the action. Thus, as broadly defined by Evidence Code section 210, "relevant evidence" has two distinct dimensions: (1) probative value, i.e., the "tendency [of the evidence] in reason to prove or disprove" the proposition for which it is offered and (2) relationship to a matter which is provable in the action, i.e., the "tendency [of the evidence] in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Under the broad definition of "relevant evidence" in Evidence Code section 210, evidence which has no "tendency in reason to prove or disprove any disputed fact of consequence to the determination of the action" is irrelevant. So also is evidence which does

4.

have "any tendency in reason to prove or disprove any ..." fact which is not of consequence to the determination of the action. Therefore, the Court's use of Rosenkrantz and Dannenberg, or any other case where murder was committed, to deny petitioner's writ of habeas corpus, is tantamount to using extrinsic evidence, and violates petitioner's due process rights.

Moreover, in that there are no cases in relation to conspiracy to commit murder, where murder occurred, that can be considered "beyond the minimum necessary," there is no evidence to deny petitioner's parole.

Even though the foregoing was presented to the Butte County Superior Court and Third District Court of Appeals, a summary denial was issued. (See Exh. F.)

## THE BPH IS REQUIRED TO USE THE
## PREPONDERANCE OF EVIDENCE STANDARD
## DURING A PAROLE HEARING

Failure on behalf of the California Board of Hearings to follow its procedures is fundamentally unfair, and a violation of the Fifth Amendment.

The United States Constitution requires states and their agencies to comply with all the procedures they establish. Carson v. Block, 790 F.2d 562, 565-6. A violation of the BPH's rules authorizes relief in this proceeding if the rules are themselves essential components of due process of law — that is, if the procedures used by the BPH violates the Constitution. Under 18 U.S.C. § 4218, a parole board's failure to follow administrative rules and regulations violates constitutional provisions. Turner v. Henman, 829 F.2d 612.

Numerous federal courts, including the United States Supreme Court have found "an inmate is entitled to expect the Bureau of prisons to follow its own policies." Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2925, 41 L.Ed.2d 935. In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-425 also found the Board must determine parole suitability by following its own rules and regulations.

Caldwell v. Miller, 790 F.2d 589, 09, ruled that "An agency must conform its actions to the procedures that it has adopted." See Pearce v. Director, Office of Workers' Compensation, 647 F.2d 716; VanderMolen v. Stetson, 571 F.2d 617, 624; see also Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct.

6.

1055, 1074, 39 L.Ed.2d 270 (Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.) Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; Services v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. "An inmate, too, has the right to expect prison officials to follow its policies and regulations." Anderson v. Smith, 697 F.2d 239. Here the proper procedure for the BPH and courts to follow is the "preponderance of evidence" standard within the Cal.Code of Regs. tit. 15 § 2000(50).

Section 2000(a) states: "The following rules of construction apply to the regulations contained in this division..." At the end of § 2000 reference is made to Penal Code § 3041 — thus all prison inmates have a liberty interest pursuant to Cal.Code of Regs. tit. 15 § 2000(50) preponderance of evidence, and not the more stringent "some evidence" standard, which is not mandated by the California State Legislature.

Whenever an abuse of discretion is made by an administrative agency, reviewing courts cannot set it aside unless the court has a definite and firm conviction that a clear violation in judgment has not taken place. Taylor v. United States Parole Commission, 734 F.2d 1152, 1154; Bolani v Immigration & Naturalization Service, 669 F.2d 1157, 1160; McBee v. Bonner, 296 F.2d 235, 237.

Although numerous courts are using the "some evidence"

7.

standard as set forth in <u>Superintendent v. Hill</u>, supra, 472 U.S. 445, and <u>In re Rosenkrantz</u> supra, 29 Cal.4th 616, the "some evidence" standard is in direct conflict with the Cal.Code of Regs. tit. 15 § 2000(50). The fact is, the law is what it is, and the "some evidence" standard should not be allowed to supersede the mandated preponderance of evidence within the Cal.Code of Regs. title 15 § 2000.

If the Legislature intended for the "some evidence" to be the applicable standard, the Cal.Code of Regs. tit. 15 § 2000(50) would have been repealed.

Cal.Code of Regs. title 15 § 2402 sets forth six (6) factors in finding an inmate unsuitable for parole: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors and (6) Institutional Behavior. § 2402 mandates nine (9) "Circumstances Tending to Show Suitability" which are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for Future and (9) Institutional Behavior.

There are a total of fifteen factors the Board must use to find suitability or unsuitability. If the Board implements the Cal.Code of Regs. title 15 § 2000(50) and uses the preponderance of evidence standard, eight of the above mentioned factors is required to find petitioner unsuitable

8.

for parole, not five unsubstantiated factors as was done in petitioner's hearing.

According to the Cal.Code of Regs. title 15 § 2281(d)(7) the parole suitability determination process requires that part one, or part two of § 2402 be satisfied, which is in conflict with the "some evidence" policy of using one factor to deny parole.

### THE BOARD OF PRISON HEARINGS FAILED TO UPHOLD THE SOME EVIDENCE REQUIREMENTS RESULTING IN A VIOLATION OF PETITIONER'S DUE PROCESS

While there is no federal constitutional right to parole, (Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1, 11-12) both federal and state courts have recognized that California's parole scheme bestows on prisoners a cognizable liberty interest in parole that is protected by due process. Biggs v. Terhune (9th Cir. 2004) 334 F.3d 910, 914; Armstrong v. Davis (9th Cir. 2001) 275 F.3d 849, 864; McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 903; and In re Rosenkrantz (2002) 29 Cal.4th 616, 655-659 [prisoner's have a liberty interest in parole protected by due process.]

Within the context of parole consideration in California, due process requires that "some evidence" support a decision by the Board to deny parole. (Superintendent v. Hill (1985) 472 U.S. 445, 456; Biggs, supra, 334 F.3d at 915; Rosenkrantz, supra, 29 Cal.4th at 667; In re Smith, 109

9.

Cal.App.4th at 501-503; In re Capistran (2003) 107 Cal.App.4th 1299, 1305; In re Ramirez (2001) 94 Cal.4th 549, 564; In re George Scott (2005) 133 Cal.App.4th (#).

Accordingly, this Court must undertake a fact specific inquiry of whether there is evidence to deny parole under California law. (McQuillion, supra, 306, F.3d at 904-906; Biggs, supra, 334 F.3d at 915.) Specifically, the Court must determine whether there is some evidence that petitioner would currently present an "unreasonable risk of danger to society" if released on parole. (Cal.Code Regs., tit. 15 §2402(a); Penal Code, §3041(b).

## THE BPH HEARING RECORD

### a. Consequences of actions and magnitude

Rosenkrantz held the "some evidence" standard is not met when the Board minimizes culpability. It did so after (1) delving into the entire record before the Board as to the relevant issue in question; (2) specifically reviewing evidence that the Board had omitted in making its determination; and (3) assessing the reasonableness of the Board's interpretation of the entirety of there circumstances.

After reviewing all the evidence before the Board on this issue, the court will find no reasonable interpretation of the circumstances would justify finding "some evidence." Indeed, the Board's failure to consider all relevant evidence is consistently deemed, in a variety of contexts, to be arbitrary and capricious and abuse of discretion. See e.g.,

10.

Envil. Def. Ctr, Inc. v. EPA (2003) 344 F.3d 832, 858 n.35 (holding federal agency has acted in arbitrary and capricious fashion if the agency has "entirely failed to consider an important aspect... [or] its decision... runs counter to the evidence.") According to People v. Neol (2005) Cal.App. Lexis 711, at 148, "The trial Court was not permitted to substitute its conclusion... under circumstances where it could not explain how this... bit of evidence trumped the otherwise overwhelming counterrailing credible evidence..." This is the same as the Board has done in petitioner's case.

Evidence relied on by the Board must be "reliable," (Regs.. §§ 2402, subd. (b), 2281, subd. (b)); it must have "'"some indicia of reliability."'" (In re Scott (2005) 133 Cal.App.4th 573, 591, 34 Cal.Rptr.3d 905; Biggs, 334 F.3d at 915; McQuillon, 306 F.3d at 904; Jancsek, 833 F.3d at 1390.), Additionally, the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the discretionary authority of the Board. (In re Rosenkrantz (2002) 29 Cal.4th 585, 655. A prisoner is entitled to "an individualized consideration of all relevant factors.") (In re DeLuna, 126 Cal.App.4th at p. 591.) The Board's decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious," The forgoing requirement was not accomplished during petitioner's hearing. There is nowhere in the record that shows the Board used the California

11.

Code of Regulations, title 15 § 2402, and individually cited each factor in relation to their findings. In order for the Board to meet procedural due process embodied in the California Constitution it must address all fifteen (15) factors, and not give five (5) turgid reasons without implementing the applicable factors for each one.

Petitioner will now address each in numerical order:

**(1) Especially atrocious dispassionate and calculated**

California courts implemented what is known as the "beyond the minimum necessary" in relation to the death of a victim. (In re Rosenkrantz, 29 Cal.4th at 683.) In other words, what evidence indicates the commitment offense was "especially atrocious, dispassionate and calculated," given that there typically must be a finding of some level of heinousness, in order for anyone to have been convicted in the first place? Cal.Code Regs tit. 15 § 2402(c)(1); Smith 114 Cal.App.4th at 366-67 (noting that "all second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others."

In order for a crime to be "atrocious, dispassionate and calculated" and meet the "minimum necessary to sustain a conviction" pursuant to the Cal.Code of Regs., tit. 15 § 2402, the offense must have been carried out execution-style. Rosenkrantz, supra, 29 Cal.4th at p. 683.

12.

The Rosenkrantz requirement cannot possibly apply to petitioner's case, because petitioner did not commit murder. (Petitioner incorporates pages 3-5 into this argument.) Moreover, there had to be multiple victims attacked, injured or killed in the same or separate incidents. ( See Cal.Code Regs, tit. 15 § 2402(a)(1)(A).) In re George Scott, 133 Cal.App.4th (#) (Oct. 18, 2005) held "[it] is necessary to remember that denial of parole based upon the nature of the offense may rise to the level of a due process violation, as where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (Rosenkrantz, supra, 29 Cal.4th at p.683.) Therefore an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances went beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (In re Dannenberg, supra, 34 Cal.4th at p. 1098.) The Scott court went on to explain comparisons, "[in] Rosenkrantz... a full week of careful preparation, rehearsal and execution" took place, "[the] prisoner, fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement, carried out the crime with planning, sophistication or professionalism," is more aggravated or violent, and meets the "minimum necessary."

13.

(<u>Rosenkrantz</u>, at p.678.)   Similarly, there was evidence of
premeditation in <u>In re Lowe</u> (2005) 130 Cal.App.4th 1405, which
also involved a second degree murder conviction.   There the
prisoner purchased the gun shortly before the murder, entered
his victim's bedroom in the middle of the night while he was
asleep, unsuspecting, and in a special relationship of
confidence and trust with his killer, 'shot him five times
in the head and chest, execution style.' (Id. at p. 1414.)
As this court stated, this evidence showed the murder 'was
a cold-blooded execution' and that the prisoner's 'egregious
acts [were] far more aggravated than the minimum necessary
to sustain a second degree murder conviction.'" (<u>In re Scott</u>,
119 Cal.App.4th 871, 889-892; <u>In re Van Houten</u> (2004) 116
Cal.App.4th 339; <u>Rosenkrantz v. Marshall</u>, 444 F. Supp.2d 1063;
<u>In re Dannenberg</u>, 34 Cal.4th at p. 1098.))

     The circumstances of petitioner's crime do not meet
the foregoing requirements.   The fact is, petitioner's crime
is significantly less egregious than those in other cases in
which the nature of the offense was found to support a finding
of suitability. (See <u>Rosenkrantz v. Marshall</u>, supra, 444 F.
Supp.2d 1063.)

     There is no evidence petitioner "terrorized, or
injured his victim before ... or that he gratuitously increased
or unnecessarily prolonged pain and suffering." (See <u>In re
Scott</u>, 119 Cal.App.4th 871, 892.)  Because the relevant evidence
shows no more callous disregard for human suffering than is

14.

shown by most offenses, the Board's use of this factor to conclude that petitioner committed his offense in an "especially atrocious dispassionate and calculated manner" is arbitrary and capricious. (In re Rosenkrantz, supra, 29 Cal.4th at 655.) Thus the Board's denial does not meet the "minimum necessary" standard as set forth in Rosenkrantz, or the "some evidence" standard in <u>Superintendent v. Hill</u>, supra, (1985) 472 U.S. 445.

Under the regulations applicable to evaluating an inmate's current dangerousness, the viciousness of the commitment offense must be balanced against the passage of time and any evidence of an inmate's rehabilitation. Among the indicators of parole suitability are: "(7) Age. The prisoner's present age (68) reduces the probability of recidivism. ¶ (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. ¶ (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd.(d).)

(2) Inexplicable and trivial

The Scott court found "To fit the description of inexplicable and trivial in relation to the offense requires comparisons; the motive must be materially less significant (or more "trivial") than those which drive people to commit

15.

the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented." (119 Cal.App.4th at 894.)   If the Scott court's reasoning is correct, the "inexplicable and trivial" standard does not meet the "some evidence" criteria in the Board's findings — for the victim's actions were directly related to petitioner's conduct.   (Exh. A. pp.20,24,59.)

More importantly, to meet the "inexplicable and trivial" standard within the Cal.Code of Regs, tit., 15 § 2402, inexplicable and trivial must be tied in with expectionally heinous and callous pursuant to § 2402, subd. (c)(1), which requires a murder. (In re Dannenberg, supra, 34 Cal.4th at p. 1098.)   As previously stated, petitioner did not commit murder, therefore, the inexplicable and trivial standard does not apply.

## (3) Petitioner needs parole plans

One of the factors (Cal.Code Regs, tit. 15. § 2404(d)(8).) in finding a prisoner suitable for parole is "the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (Emphasis added.) It is not required to have both, one is sufficient.

The record is indisputable, petitioner received certification in Mechanical Drafting and Voctional Plumbing. (Exh. A. p.108.)   It is also shown within the record that

16.

petitioner was a general contractor. (Exh. A. p.39.)

As to parole plans, the Court will find letters of support from his brother in Utah, the Veteran's Administration in San Mateo, a long standing friend in San Bernadino County, and from a nephew, who is willing to give financial support. (Exh. A. pp.76-81. Also see Exh. B.) The Board, however, refused to accept the parole plans, indicating a need to have "some backup for Butte County." (Exh. A. p.107.)

The United States Congress in 1934 (Penal Code § 11177) set forth an act granting the consent to any two or more states to enter into agreements of compacts. Penal Code § 11177(c) states: "That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called "sending state"), to permit any person convicted of an offense... and placed on... parole to reside in any other state party to this compact... (a) [If] such person is in fact a resident or has his family residing within the receiving state..." Also see Penal Code § 3003(b)(i) "An inmate may be paroled to another state pursuant to any law."

As previously mentioned, title 15 § 2402 subd.(d)(8) only requires to have parole plans or a marketable skill. Not both. Therefore, the some evidence standard is not met.

**4) Petitioner's need for therapy**

According to the Cal.Code of Regs., tit. 15 § 17.

2402(c)(5) it is made clear "The prisoner [must have] a lengthy history of severe mental problems related to the offense." There is nowhere within the record showing petitioner has a mental history related to the offense.    Nor is there anywhere within the title 15 § 2402, requiring a prisoner to attend therapy.    Nor does the psychological report recommend therapy; to which the Board Commissioner realizes therapy may not be available    (Exh. A. p.110.),

More importantly, there is a letter in petitioner's file from Cynthia E. Harris, a Licensed Clinical Social Worker, who was supervised by a psychiatrist; and    petitioner's case worker.    Ms. Harris found this petitioner has insight into the crime    and control over lifes stresses.    Ms. Harris also recommended petitioner's release. (Exh. C.)

How    is    it    then,    that the    2006    Board    can    find petitioner unsuitable for parole for failing to acquire therapy?

---

**(5) The Board found the Psychological report is not supportive of release**

The Court is directed to petitioner's psychological evaluation, where Doctor Starrett states on page 8: "In summary, this individual overall appears to rate in the low range in his propensity to commit violence in the future when compared to similar violent inmates.    The inmate's crime is a crime of passion, or an affective crime, which do not reoccur and inmate's age is another factor."    How much more is needed?

18.

The psychologist did not state petitioner was a risk to society.

The Board goes on to find petitioner needs more insight into the crime, and fails to recognize that petitioner on numerous occasions expressed remorse and responsibility for the crime. (Exh. A. pp.24,48,60. Also see Exh. C.)

Moreover, Penal Code § 5011(b) and the Cal.Code of Regs., title 15 section 2236 were invoked, (Exh. A. p.11.) and as such it was a violation of petitioner's rights for the Board to find a need for more insight into the crime, notwithstanding, ordering another psycholoical evaluation to specifically address petitioner's insight. (Exh. A. p.110.)

As far as being a risk to society, the State Supreme Court in People v. Burnick, 14 Cal.3d 306, 327; 121 Cal.Rptr. 488; 535 P.2d 352, found "The evidence, as well as the consensus of opinion by responsible scientific authorities, is now unequivocal." (Diamond, the Psychiatric Prediction of Dangerousness (1975) 123 U.Pa. L.Rev. 439, 451.) In the words of spokesmen for the psychiatric profession itself, "Unfortunately, this is the state of art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or 'dangerousness.' Neither has any special psychiatric 'expertise' in this area been established." (Task Force Report, Clinical Aspects of the Violent Individual (American Psychiatric Assn., 1974) p.28) And the same studies which proved the inaccuracy of psychiatric predications have demonstrated beyond dispute the no less disturbing manner in

19.

which such prophecies consistently err; they predict acts of violence which will not in fact take place ("false positives"), thus bringing as "dangerous" many persons who are in reality totally harmless. (See generally id. at pp.23-30.)

What may be of further interest to the Court is that psychiatric evaluations and, "The recommendation shall be submitted to the Director of Corrections and shall not be effective until approved by the director." Penal Code § 5079. In that this is the case, petitioner's psychological evaluations are invalid — for the Director of Corrections did not review and approve the recommendations.

In summing up this issue, the Court is directed to Exh. C. where Doctor Falkenstein's psychiatric evaluation made it clear that "This inmate should be removed from special calendar because psychopathology is not significantly related to future criminal behavior, psychiatric opinion will not contribute to a release decision." Yet, the Board of Prison Hearings, and psychologists have ignored the professional opinion of a psychiatrist, who is more qualified, and chosen to use whatever means possible to deny parole.

## CONCLUSION

The Board during petitioner's parole consideration hearing failed to support is findings with applicable regulations when it based its unsuitable parole findings upon the gravity of the crime. (Cal.Code of Regs., tit. 15 § 2402.)

20.

Moreover, the Ninth Circuit and California Supreme Court made it clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 917; Rosenkrantz, supra, 29 Cal.4th at 689.)

In the circumstances of this case, the Board's reliance upon the facts of petitioner's crime and his commitment offense as a reason to deny parole after 20 years of incarceration, violates due process. First, a continued reliance upon unchanging factors makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Second, the circumstances of the crime and petitioner's criminal history do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released.

As the Central District Court in Rosenkrantz v. Marshall, 444 F. Supp.2d 1063, 1081 stated:

> Whether the facts of the crime of conviction or other unchanged criteria, affect the parole eligibility decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally deposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole — a sentence given with the facts of the crime fresh in the mind

21.

of the judge. While it would not be a constitutional violation to forego parole altogether for certain crimes, what the state cannot constitutionally do is have a sham system where the judge promises the possibility of parole, but because of the nature of the crime, the BPT effectively deletes such from the system. Nor can a parole system, where parole is mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the BPT commissioners revulsion towards the crime itself, or some other unchanged circumstance, constitutes the alpha and omega of the decision. Nobody elected the BPT commissioners as sentencing judges. Rather, in some realistic way, the facts of the unchanged circumstance must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events. (Bair v. Folsom State Prison, 2005 WL 2219220, *12 n.3 (E.D.Cal. 2005), report and recommendation adopted by, 2005 WL 3081634 (E.D.Cal. 2005).)

A review of petitioner's parole suitability hearings reveals each board commissioner used the same factors to deny parole as the previous Board; and failed to realize that the commitment offense will never change. Does this constitute that the jury's findings were a sham? What is there about the Penal Code pursuant to "Double Jeopary" the Board doesn't understand when continuing to retry petitioner's case over and over, from his first parole consideration hearing to the present?

The previous Board found, petitioner completed his life term pursuant to the matrix after 15 years of

22.

incarceration. (Exh. E.) Taking the matrix into consideration, along with "good time credits," petitioner has now been incarcerated equivalent to 25 years. The question must be asked, is petitioner sentenced to life in prison without the possibility of parole?

When the Board cites the same factors over and over to deny parole without taking into consideration Cal.Code of Regs., tit. 15 § 2402 and the 15 factors therein, which determines suitability or unsuitability, petitioner's due process rights are violated.

As stated earlier, the evidence relied on by the Board must be "reliable," (Regs., §§ 2402, subd. (b), 2281, subd. (b)); it must have "some indicia of reliability." It must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious.

During the hearing, the Board was accused of having made up its mind to deny parole prior to holding the hearing. This accusation was not disputed by the Board Commissioners, which constitutes an addmission of bias. (Exh. A. pp. 65-66.). Moreover, the issue at dispute during the foregoing was taken from a psychological evaluation in 2003, (Exh. A. p.69, 70.) and not from the most recent evaluation in 2006. As important is that the Board used the 2003 evaluation to deny parole, then stated, "we are ordering a new psychological evaluation. We have done the paperwork for it, and again, because we found that the previous Panel's request in ordering

23.

the other psych were not adequately met by this current psych." (Exh. A. p.111)

To show further bais against petitioner, several letters were acquired from prison staff for the Board's review. Two of those letters were from therapy groups. However, the Board deliberately neglected to read them into the record. This failure is tantamont to the Board using the "need for therapy" to deny parole. If the letters had have been acknowledged, the Board would have found that petitioner has been participating in therapy groups for the past four years. (Exh D.)

It is, therefore, respectfully requested that this Honorable Court find that the Board of Prison Hearings violated petitioner's due process right when it failed to uphold the Cal.Code of Regs., tit. 15 § 2000(50) in relation to using the preponderance of evidence standard as mandated by the State Legislature. It is further requested that this Honornable Court find there is no evidence to support "an unreasonable risk to society," and order petitioner's release.

Respectfully submitted;

Dated: July 16, 2007

*Tharon Hill*
Tharon Hill
Litigant Pro-se

24.

DUPLICATE

# S154561

EXHIBITS

RECEIVED

JUL 1 9 2007

CLERK SUPREME COURT

EXHIBIT A    HEARING TRANSCRIPTS

1      PRESIDING COMMISSIONER ENG:  Support letter?

2      ATTORNEY STRINGER:  Yeah.

3      PRESIDING COMMISSIONER ENG:  Okay.

4      ATTORNEY STRINGER:  I have a letter -- actually,

5   it's a card, a Christmas card attesting to my client's

6   good character from someone that met him in the

7   institution, so I would like the Board to consider

8   that.

9      PRESIDING COMMISSIONER ENG:  Okay.

10      ATTORNEY STRINGER:  And I do have an additional

11   letter from a Cynthia Harris, LCSW.  It is dated

12   December 4th, 2004, but I believe I will reserve that

13   for my closing.

14      PRESIDING COMMISSIONER ENG:  All right.  Okay.

15   Sir, do you have any preliminary objections?

16      ATTORNEY STRINGER:  Not at this time,

17   Commissioner.

18      PRESIDING COMMISSIONER ENG:  Okay.  And will

19   your client be speaking with the Panel today?

20      ATTORNEY STRINGER:  Commissioner, the facts of

21   the life crime are well known.  I am going to invoke my

22   client's limited right under 5011(b) in Title XV

23   Section 2236 not to discuss the life crime because he

24   maintains his innocence; however, if the Board has

25   questions for him, I am going to instruct him to answer

26   those questions.

27      PRESIDING COMMISSIONER ENG:  All right.  All

20

1          INMATE HILL:  Well, there was two reasons.

2    Unbeknownst to me, my son, he was 16 years old, and he

3    moved in with Vicky and myself when we were living in

4    Salt Lake City.  And he got himself a job and was

5    working and doing quite well for himself during the

6    summer, and for some reason Vicky took a dislike to

7    him, which I never did figure out.  In fact, I didn't

8    know about it until years later.  And she loaded a

9    shotgun, handed it to him and told him that I hated

10   him, that his uncles hated him, that his whole family

11   hated him, and he needed to put that gun in his mouth

12   and pull the trigger, and walked out of the house and

13.  left him alone with it.  He -- I came home from work,

14   and he said he wanted to leave.  He wanted to go back

15   to live with his mother.  I asked him what if problem

16   was, why, because he was doing so well, and he wouldn't

17   talk to me about it.  I didn't find out about it, like

18   I say, until several years later, but my daughter knew

19   about it because they were close.  He had told her all

20   about it, and then when she came up claiming to have

21   cancer and was playing on my sympathies with cancer and

22   moved up to Washington, and I put her on my checking

23   account and she took $110,000 of my money and then left

24   and came back to California.  I called my daughter and

25   I says, "Well, do you have any idea where she's at?"

26   And she says, "Well, I know where she works and I'll go

27   by and see if she's there."  And she did, and she comes

1   and he burned it up because it was starting to sweat.

2   The dynamite was starting to sweat.

3   　　　　PRESIDING COMMISSIONER ENG:   This states in 1987

4   that Mr. Moss gave you dynamite.

5   　　　　INMATE HILL:   That didn't happen, ma'am.

6   　　　　PRESIDING COMMISSIONER ENG:   Did your daughter,

7   Ms. Lopes, did she know Mr. Moss?

8   　　　　INMATE HILL:   Yes, ma'am, she did.

9   　　　　PRESIDING COMMISSIONER ENG:   And how so?

10   　　　　INMATE HILL:   Well, he used to go in and get his

11   hair cut by her.   He knew that we worked -- she knew

12   that we worked together, and she had talked with him on

13   numerous occasions and knew what he did and what his

14   livelihood was.   She knew we were friends.

15   　　　　PRESIDING COMMISSIONER ENG:   How do you know Mr.

16   Keefe?

17   　　　　INMATE HILL:   That was her friend.

18   　　　　PRESIDING COMMISSIONER ENG:   But you did know

19   him?

20   　　　　INMATE HILL:   I met him once or twice, I think.

21   　　　　PRESIDING COMMISSIONER ENG:   How about Mr.

22   Hoskison?

23   　　　　INMATE HILL:   I never heard of him.   I never

24   knew he existed.

25   　　　　PRESIDING COMMISSIONER ENG:   I want to go ahead

26   and let my fellow Commissioners here intervene, if they

27   would like, if they've got other questions to ask

24

1    regarding the life crime.

2           DEPUTY COMMISSIONER STAR:  Mr. Hill -- thank

3    you, Commissioner.  Did you ever discuss with your

4    daughter her idea of blowing up your wife?

5           INMATE HILL:  No.  No.  She wanted to do damage

6    to my ex-wife and told me she was going to do damage,

7    and I kept telling her to leave it alone, okay, and she

8    just kept harping on it and harping on it.  And I

9    finally I said well, go ahead and do what you want to

10   do, and for that, I am extremely sorry.  That to me

11   puts full responsibility on my shoulders because I

12   could have said to her you just stop right now or I

13   could have got on an airplane and went up and sat down

14   and talked with her and said look, you know, you need

15   to leave this alone and let's get on with our live, but

16   I didn't, and that's my fault, completely my fault.

17          DEPUTY COMMISSIONER STAR:  Did she tell you the

18   details of how she was going to do it?

19          INMATE HILL:  No.

20          DEPUTY COMMISSIONER STAR:  She tell you who was

21   going to do it?

22          INMATE HILL:  No.

23          DEPUTY COMMISSIONER STAR:  You were upset with

24   your wife because she took $110,000?

25          INMATE HILL:  Yes, ma'am, I was.

26          DEPUTY COMMISSIONER STAR:  You were still

27   married?

1          INMATE HILL:  Yes.

2          DEPUTY COMMISSIONER STAR:  And this was -- you

3   were living in California?

4          INMATE HILL:  No, I was living in Washington.

5          DEPUTY COMMISSIONER STAR:  Okay.

6          INMATE HILL:  She was living in California and

7   told me she had cancer.

8          DEPUTY COMMISSIONER STAR:  Okay.  Did you have a

9   divorce pending?

10          INMATE HILL:  Yes.

11          DEPUTY COMMISSIONER STAR:  Or settlement?

12          INMATE HILL:  Yes, ma'am.  I had a divorce and a

13   settlement pending.

14          DEPUTY COMMISSIONER STAR:  Okay.

15          INMATE HILL:  And the settlement was finalized.

16          DEPUTY COMMISSIONER STAR:  So you knew you were

17   going to get some of this money back or had you -- was

18   that part of the settlement?

19          INMATE HILL:  Everything was settled completely.

20   We went to court.

21          DEPUTY COMMISSIONER STAR:  Okay.

22          INMATE HILL:  The judge settled everything.

23          DEPUTY COMMISSIONER STAR:  So --

24          INMATE HILL:  She took hers.  I took mine.

25          DEPUTY COMMISSIONER STAR:  And did that include

26   or exclude the $110,000?

27          INMATE HILL:  No.  The $110,000 was included in

1    the settlement.

2             DEPUTY COMMISSIONER STAR:  Okay.

3             INMATE HILL:  Okay.  And the Court ordered her

4    to have an X amount of dollars and for me to have X

5    amount of dollars, and the whole thing was settled.

6    And we went to the bank and settled everything up, and

7    she went her way and I went my way and it was over.

8             DEPUTY COMMISSIONER STAR:  Did you tell your

9    daughter this?

10            INMATE HILL:  Yes, yes.

11            DEPUTY COMMISSIONER STAR:  Well, then I'm going

12   to repeat a question from the same --

13            INMATE HILL:  Okay.

14            DEPUTY COMMISSIONER STAR:  Is why if you told

15   your daughter that you had a divorce and a settlement

16   that included an agreed upon decision on the $110,000,

17   why was your daughter continuing to be concerned about

18   the money that was taken from you?

19            INMATE HILL:  Because she figured that that was

20   her money, you know.  I'm her father and she was

21   entitled to a share of that money.  It was her money.

22   If the money was being taken from me, it was being

23   taken from her as well.

24            DEPUTY COMMISSIONER STAR:  If you should pass,

25   it would go to her, or did she feel some entitlement to

26   have it immediately?  Had you promised her some money?

27            INMATE HILL:  No, I did not.

1    PRESIDING COMMISSIONER ENG:  I'm going to

2    intervene here one second.  On that note, because I

3    thought that I'd also read that you had given up

4    somewhere near a quarter million dollars to a previous

5    wife?

6        INMATE HILL:  She cost me about a quarter

7.   million dollars.

8        PRESIDING COMMISSIONER ENG:  So how did your

9    daughter respond to that?

10       INMATE HILL:  She was too young at the time.

11   She was only 12 years old, 13 years old.  She had no

12   idea what was going on.

13       DEPUTY COMMISSIONER STAR:  Am I correct then

14   that you say you had a divorce settlement that included

15   an agreed upon decision on the $110,000?  Did you

16   explain this to your daughter that this is what I got

17   out of the settlement and I'm satisfied with it?

18       INMATE HILL:  Yes, I did.

19       DEPUTY COMMISSIONER STAR:  But she continued?

20       INMATE HILL:  Yes.

21       DEPUTY COMMISSIONER STAR:  Why do you believe

22   that your daughter then ended up, and these other

23   parties because it wasn't just your daughter testifying

24   against you.

25       INMATE HILL:  Because they committed a crime,

26   and the District Attorney offered all of them immunity

27   to testify against me.  And they were all facing 25

1    years to life for the crime, and they took that

2    immunity to save their own souls, save themselves.

3            DEPUTY COMMISSIONER STAR:  Did you ever give

4    your daughter any money to finance any part of this?

5            INMATE HILL:  I did not.

6            DEPUTY COMMISSIONER STAR:  The purchase of the

7    dynamite or the payment of $1,000?

8            INMATE HILL:  I did not.

9            DEPUTY COMMISSIONER STAR:  Mr. Herron, do you

10   have any questions?

11           DEPUTY COMMISSIONER HERRON:  I do not.  Thank

12   you.

13           DEPUTY COMMISSIONER STAR:  Okay.  Ms. Eng, I

14   think that's all the questions I have.

15           PRESIDING COMMISSIONER ENG:  Okay.  Let me ask

16   you something else about your marriage to Vicky Hill.

17   Was there ever any physical altercations between you

18   and she?

19           INMATE HILL:  No, never.

20           PRESIDING COMMISSIONER ENG:  What about with any

21   of your other wives?

22           INMATE HILL:  I would rather not talk about

23   those at all.  Those are personal life events.

24           PRESIDING COMMISSIONER ENG:  Okay.  Well, Vicky

25   Hill was your second wife, correct?

26           INMATE HILL:  She's my third wife.

27           PRESIDING COMMISSIONER ENG:  She's your third

1    wife?

2              INMATE HILL:  Yeah.

3              PRESIDING COMMISSIONER ENG:  Okay.  I might come

4    back and ask some more questions later.  Let me move on

5    here a little bit.  In terms of your prior criminality,

6    I believe that the record reflects that there is no

7    juvenile record noted, correct, sir?

8              INMATE HILL:  That's correct.

9              PRESIDING COMMISSIONER ENG:  And regarding your

10   adult conviction and arrests, I see an arrest in

11   November of 1961 in Ogden, Utah?

12             INMATE HILL:  Yes, ma'am.

13             PRESIDING COMMISSIONER ENG:  For petty larceny,

14   and you were placed on six months probation?

15             INMATE HILL:  Yes, ma'am.

16             PRESIDING COMMISSIONER ENG:  Okay.  And then you

17   were arrested in February of 1973 by the Santa Ana

18   Police Department for assault and battery, but there

19   was no disposition noted.  And then arrested in June of

20   1987 for assault and battery and disturbing the peace,

21   and the charges were dismissed.  What happened with

22   those two?

23             INMATE HILL:  I'd rather not talk about them.

24             PRESIDING COMMISSIONER ENG:  Okay.  That's fine.

25             INMATE HILL:  Any of that.

26             PRESIDING COMMISSIONER ENG:  Okay.

27             INMATE HILL:  Would you introduce that, please?

1          ATTORNEY STRINGER:  Introduce what?

2          INMATE HILL:  The consideration of the past

3   arrest records.  It's right here.

4          ATTORNEY STRINGER:  Why don't you read it?

5          INMATE HILL:  May I read this, or would you like

6   to?

7          PRESIDING COMMISSIONER ENG:  Are you going to

8   read that entire page?

9          INMATE HILL:  No, no.  This is from the Title

10  XV.

11         PRESIDING COMMISSIONER ENG:  Uh-huh.

12         INMATE HILL:  Okay.  It's Section 2322, criminal

13  history.

14         PRESIDING COMMISSIONER ENG:  Okay.  Well, excuse

15  me.  Counselor, are you objecting to just my stating

16  what those are?

17         ATTORNEY STRINGER:  Can I have a minute?

18         PRESIDING COMMISSIONER ENG:  Sure.  We're going

19  to take a brief recess.  I'm going to put you on mute.

20         (Off the Record)

21         DEPUTY COMMISSIONER STAR:  Okay.  We're back on

22  record.

23         PRESIDING COMMISSIONER ENG:  Okay.  Mr.

24  Stringer?

25         ATTORNEY STRINGER:  I think I've quantified Mr.

26  Hill's objection.  Certainly, he's not objecting to the

27  fact that an arrest did occur because it's in the

48

1          PRESIDING COMMISSIONER ENG:  Six grandchildren,

2     okay.  Is that split between your daughter --

3          INMATE HILL:  And my son.

4          PRESIDING COMMISSIONER ENG:  Okay.

5          DEPUTY COMMISSIONER STAR:  Ms. Eng, can I ask a

6     question?

7          PRESIDING COMMISSIONER ENG:  Yes.

8          DEPUTY COMMISSIONER STAR:  This is the daughter

9     who you believe lied in court; is that correct, sir?

10          INMATE HILL:  Yes, I know she lied in court.

11          DEPUTY COMMISSIONER STAR:  And you wrote to her.

12     What is your feeling in relationship about that if she

13     lied in court and has caused you a life term, but

14     you've said that you've tried to write to her?  Do you

15     have a feeling one way or another?

16          INMATE HILL:  As I stated earlier, I'm a very

17     family oriented man.  I believe in family.

18          DEPUTY COMMISSIONER STAR:  So you forgive for

19     what she's done?

20          INMATE HILL:  Oh, absolutely.

21          DEPUTY COMMISSIONER STAR:  Okay.

22          INMATE HILL:  I blame myself.  This is my fault.

23          DEPUTY COMMISSIONER STAR:  In what way is it

24     your fault, sir?

25          INMATE HILL:  I could have stopped it, but I

26     didn't.  I'm totally to blame for this.

27          PRESIDING COMMISSIONER ENG:  Going back on that,

1       first marriage.  The inmate states, as in

2       the file account, that the daughter

3       actually committed this offense, as the

4       signed affidavit from his wife to that

5       effect.  When asking the inmate his role

6       in the crime, he said that he was in

7       southern California at the time and did

8       not know any of this was taking place.  He

9       states that his daughter had called him

10      several times and was very upset.  She was

11      telling him that something had to be done,

12      and he was telling her to leave it alone.

13      It was none of her business.  The inmate

14      goes on to say, 'I feel responsible.  I

15      could have stopped it by flying home and

16      talking to my daughter.  During the trial

17      she blamed me and stated that she has to

18      raise my grandchildren.'  The inmate

19      states he was found guilty in a trial.  He

20      tried to appeal but lost the appeals.  The

21      inmate goes on to say, 'I had a difficult

22      time admitting to something that I did not

23      do.'  The inmate goes on to express

24      remorse over the death of his ex-wife and

25      how he feels responsible for what

26      happened."

27      I believe you addressed this in terms of

1    earlier -- in terms of, Mr. Hill, how you feel

2    responsible, and if I heard you correct, you're saying

3    it was because you're saying that you should have

4    stopped it?

5         INMATE HILL:  Yes.

6         DEPUTY COMMISSIONER STAR:  Okay.  Now, earlier

7    this statement refers to his sister, but that is your

8    daughter.  That was an error?

9         INMATE HILL:  Right, that was an error, and

10   there's another error in here.

11        DEPUTY COMMISSIONER STAR:  Go ahead.

12        INMATE HILL:  His wife -- his ex-wife's death.

13        DEPUTY COMMISSIONER STAR:  She's not --

14        INMATE HILL:  She's alive.

15        DEPUTY COMMISSIONER STAR:  Exactly.

16        INMATE HILL:  In prison.

17        DEPUTY COMMISSIONER STAR:  Okay.  She's in

18   prison for what?

19        INMATE HILL:  Aggravated manslaughter.

20        DEPUTY COMMISSIONER STAR:  Okay.

21        INMATE HILL:  She shot her husband in the head

22   while he was sleeping.

23        DEPUTY COMMISSIONER STAR:  This is the -- this

24   is the victim -- alleged victim of your commitment

25   offense is in prison now for aggravated manslaughter?

26        INMATE HILL:  Yes, ma'am.

27        DEPUTY COMMISSIONER STAR:  Okay.  And then

1    situation, and just weeks prior to the instant offense

2    he was charged with regarding harassing with his wife."

3    So I understand there's no disposition here, but I'm

4    going to ask you, in your interview with the doctor,

5    did you discuss that there was an arrest for harassing

6    this wife?

7            ATTORNEY STRINGER:   Again, I'm going to object.

8    This is predisposing the Board to denying Mr. Hill on

9    the basis of non-convicted crimes.   That is exactly

10   where this is going, and it's the -- the Board is not

11   allowed to do it under Title XV.

12           DEPUTY COMMISSIONER STAR:   Okay.   I'm just going

13   to -- I think we've already answered that, but I'm

14   asking about his interview with the doctor.   Did you

15   have a discussion?

16           ATTORNEY STRINGER:   But if the Board uses it as

17   a reason for denial tumultuous and unstable

18   relationships based on non-convicted criminal acts,

19   that's clearly legal error in my view.

20           DEPUTY COMMISSIONER STAR:   Well --

21           DEPUTY DISTRICT ATTORNEY ZARATE:   You're talking

22   about history being provided to a psychologist.

23           DEPUTY COMMISSIONER STAR:   I have two

24   psychologists' reports that reference --

25           PRESIDING COMMISSIONER ENG:   Domestic violence.

26           DEPUTY COMMISSIONER STAR:   And unstable

27   relationships.

66

1          PRESIDING COMMISSIONER ENG:   That's correct.

2          DEPUTY COMMISSIONER STAR:   And I think we

3    certainly can proceed to ask any questions we want

4    about those psychologists' comments.

5          ATTORNEY STRINGER:   Then the end result of the

6    Board is predetermined in my view because there's

7    nothing in the psychological reports that has any

8    historical reference to it.   In other words, they

9    didn't go back to the courts and pull the records and

10   say this is what happened because it's very easy, and I

11   do a great amount of family law, it's very easy to have

12   one person come in and make an accusation against

13   another person, especially during a divorce proceeding,

14   and it proves to be false, but in this setting it is

15   taken as gospel.

16         PRESIDING COMMISSIONER ENG:   Excuse me, it is

17   our responsibility as the Panel that given the

18   information that we have if it raises any questions --

19   this is why we're asking you, Mr. Hill, to elaborate

20   one way or the other because these documents state that

21   according to you, so we are inquiring.   We are not

22   making decisions based on what we're reading here.

23   What we're doing is trying to discuss this and ask you

24   why, you know, did something happen, why, give us the

25   circumstances.   We are not assuming that because of

26   divorce proceedings that these people made these

27   accusations.   Mr. Hill has every opportunity to explain

1          **PRESIDING COMMISSIONER ENG:**  All right.  Did

2    your client want to comment or make a response to what

3    Commissioner Star was discussing regarding the 2003

4    psychological evaluation?

5          **ATTORNEY STRINGER:**  No, Commissioner, I'll

6    address that in closing.

7          **PRESIDING COMMISSIONER ENG:**  Okay.

8          **DEPUTY COMMISSIONER STAR:**  Okay.  Just a couple

9    other comments from that then I'll wrap it up, Ms. Eng.

10   On page four on the report, on the prior psych report,

11   in the middle the doctor says:

12         "He believes that he has changed for the

13          better, stating he has continued to

14          educate himself, taught himself to play

15          the guitar and has written two or three

16          books.  He added that he has analyzed his

17          ways.  However, he was unable to identify

18          relationship patterns and resisted the

19          suggestion that there may be a problem.

20          He admitted to impulsive behavior earlier

21          in his life and that this at times

22          interfered with his relationships, as well

23          as work, but he thought he had become less

24          impulsive.  It is this examiner's opinion

25          that he lacks insight into the severity of

26          the problematic nature of his

27          relationships and the dynamics behind

1    them, and that Mr. Hill has a signature

2    blind spot about this issue.  He evidenced

3    a strong tendency to blame -- to place

4    blame on others when things went badly and

5    resisted taking responsibility for painful

6    or destructive events in his life.  While

7    it is beyond the scope and purpose of this

8    evaluation to make judgments about his

9    guilt or innocence, it is likely not an

10    either/or situation.  Mr. Hill failed to

11    address his responsibility in terms of the

12    degree to which he may have contributed to

13    the events that took place over a period

14    of time."

15    And the last thing I want to read is from page

16    five of that prior report, number five, and it says:

17    "His level of dangerousness within the

18    structured setting of a correctional

19    institution is very low.  Based on his

20    institutional history and his level of

21    function, he is unlikely to be involved in

22    a violent situation.  It is difficult to

23    generalize behavior from a correctional

24    setting to that of free society,

25    particularly when the individual in

26    question denies culpability.  However, his

27    risk of recidivism outside of prison is

1      PRESIDING COMMISSIONER ENG:  Okay.  I'll get

2  back to that.  Let's go over your parole plans.  Okay.

3  I see based -- again, the December 2006 board report

4  that this states that you would -- you plan to obtain

5  an out-of-state parole to the state of Utah.  Is that

6  correct, sir?

7      INMATE HILL:  If I can.  I have parole plans --

8  two parole plans for the state of California and two

9  for the state of Utah.

10      PRESIDING COMMISSIONER ENG:  Right.  We're going

11  to go through those because I have these support

12  letters.  The first one I have is dated December 8th,

13  2006, from your older brother Max Hill, and he states

14  in this, I believe, he lives in Sunset, Utah?

15      INMATE HILL:  Yes, ma'am.

16      PRESIDING COMMISSIONER ENG:  Okay.

17      INMATE HILL:  Just outside of Ogden.

18      PRESIDING COMMISSIONER ENG:  Outside of Ogden.

19  And your older brother states that -- he says, "I will

20  accept him into my home to live with me as long as he

21  wishes."  How large of a home does your brother have?

22      INMATE HILL:  four bedrooms.

23      PRESIDING COMMISSIONER ENG:  four bedrooms.  And

24  who is living in the home?

25      INMATE HILL:  Just he and his wife.

26      PRESIDING COMMISSIONER ENG:  So you would have

27  your own room?

1          INMATE HILL:  Yes, ma'am.

2          PRESIDING COMMISSIONER ENG:  And how old is this

3   brother?

4          INMATE HILL:  73.

5          PRESIDING COMMISSIONER ENG:  He's 73?

6          INMATE HILL:  Yes, ma'am.

7          PRESIDING COMMISSIONER ENG:  Does he drive?

8          INMATE HILL:  Yes.

9          PRESIDING COMMISSIONER ENG:  Still drives?

10         INMATE HILL:  Yes, just around the area.

11         PRESIDING COMMISSIONER ENG:  Okay.  So would he

12  provide transportation for you?

13         INMATE HILL:  He has vehicles.  I suspect he

14  would give me a vehicle.  They've made that perfectly

15  clear to me that they would provide me with a vehicle.

16         PRESIDING COMMISSIONER ENG:  How about financial

17  support?

18         INMATE HILL:  I think you'll find that under

19  Thayne Hill.

20         PRESIDING COMMISSIONER ENG:  Yes, that's the

21  next support letter September 8th, 2006, from Thayne,

22  T-H-A-Y-N-E, Hill who resides in Roy, R-O-Y, Utah.  Is

23  that also a suburb of Ogden?

24         INMATE HILL:  Yes, ma'am.

25         PRESIDING COMMISSIONER ENG:  This is your

26  nephew?

27         INMATE HILL:  Yes, ma'am.

1 PRESIDING COMMISSIONER ENG:  He states that he's

2 traveled here to California to see you on several

3 occasions, and he states that you're welcome to live in

4 his home for as long as he chooses.  The majority of

5 your remaining family members reside in the state of

6 Utah.  Okay.  "I have the desire and financial ability

7 to assist Tharon with establishing a residence,

8 residing with me temporarily and helping with his

9 reintroduction into society."  So does that mean he

10 will help you find another residence?

11 INMATE HILL:  It means he will do anything he

12 can to help me get reestablished.  He's quite well to

13 do.

14 PRESIDING COMMISSIONER ENG:  All right.  How old

15 is your nephew?

16 INMATE HILL:  46.

17 PRESIDING COMMISSIONER ENG:  And what does he

18 do?

19 INMATE HILL:  He's a computer expert.  He's only

20 one of six in the United States that's graduated from

21 Carnegie Mellon and Computer with a computer degree in

22 their specialty field.  He flies all over the United

23 States and works.  He goes down to (inaudible) at $500

24 an hour and spends two weeks at a time there and other

25 places in Florida and throughout the United States.

26 PRESIDING COMMISSIONER ENG:  Is he married with

27 a family?

```
 1          INMATE HILL:  He just recently got married.

 2          PRESIDING COMMISSIONER ENG:  So how large is his

 3    home?

 4          INMATE HILL:  He just built a new house.  It's a

 5    huge home.

 6          PRESIDING COMMISSIONER ENG:  All right.  Then we

 7    have an October 3rd, 2006, letter signed by Kyle, K-Y-

 8    L-E, Terzian, T-E-R-Z-I-A-N, program manager, certified

 9    addiction treatment specialist.  His agency has been in

10    touch with you.  They're located in Menlo Park on the

11    VA grounds, and their agency -- what's the name of the

12    agency?  What's the name of this agency, sir?

13          ATTORNEY STRINGER:  It's Homeless Veteran

14    Emergency Housing.

15          PRESIDING COMMISSIONER ENG:  Okay.  The agency

16    provides a number of services to the Veterans who had

17    an honorable discharge, which you have.  They help vets

18    get back on track through transitional housing and

19    whatever treatment is necessary, including vocational

20    training, job placement support and substance abuse.

21    So they provide transportation to 12 step meeting,

22    which is good.  Okay.  So they're located on the

23    grounds of the VA services.  "So if and when Mr. Hill

24    is released, he will have housing through our program

25    along with the rest of the services we offer."  What do

26    you know about this organization, sir?

27          INMATE HILL:  I know that they -- they're an
```

1    upstanding organization.  They have assisted other

2    people who are paroling.  The parole agents have gone

3    there and have to check out their facilities, and

4    accepted -- wholeheartedly accepted it.

5         PRESIDING COMMISSIONER ENG:  So do you know

6    approximately how many people -- I mean, do they

7    have --

8         INMATE HILL:  They have 400 beds.

9         PRESIDING COMMISSIONER ENG:  Room and houses or

10   something?

11        INMATE HILL:  They have 400 beds with two

12   occupancy per room.

13        PRESIDING COMMISSIONER ENG:  Okay.  Are they

14   usually at full capacity, 50 percent capacity?

15        INMATE HILL:  They're about 80 percent right

16   now.

17        PRESIDING COMMISSIONER ENG:  Okay.  So at least

18   this would -- this is in Menlo Park?

19        INMATE HILL:  Yes, ma'am.

20        PRESIDING COMMISSIONER ENG:  Okay.  Is that it

21   for the residency letters?

22        INMATE HILL:  No, there's one from Nona R.

23   Stewart.

24        PRESIDING COMMISSIONER ENG:  Okay.  Let's see.

25   I tried to loop them together.  That's all I have.

26   Okay.  So Mr. Hill just provided the Panel with a

27   letter dated June 20th of 2006 from Nona, N-O-N-A,

1    Stewart, S-T-E-W-A-R-T, whose address is in Moreno

2    Valley, California.

3          ATTORNEY STRINGER:  That is my file by the way,

4    Commissioner.

5          PRESIDING COMMISSIONER ENG:  It could be back

6    here, but I just went with the new letters.  You're

7    right.  It's probably here.  Yeah, I do have it.  Okay.

8    That's good.  That she states that -- I guess your

9    family has been close friends for a long time.  Is that

10   true?

11         INMATE HILL:  Yes, ma'am.

12         PRESIDING COMMISSIONER ENG:  Okay.

13         INMATE HILL:  My brother is married to her

14   sister.

15         PRESIDING COMMISSIONER ENG:  Okay.  All right.

16   "So he will have my home to live in for as long as he

17   desires."  Okay.  "This offer is open to Tharon for as

18   long as we live."  How old are -- is she?

19         INMATE HILL:  She's 69.

20         PRESIDING COMMISSIONER ENG:  Okay.  She have

21   children or a large family or --

22         INMATE HILL:  Yes, she has three or four

23   children who do not reside with her.  She has

24   grandchildren as well, and her brother and I grew up

25   together.  We were very close friends.

26         PRESIDING COMMISSIONER ENG:  Where's Moreno

27   Valley?

1    approximately five pounds of explosive material taped

2    against the outside bedroom wall of the mobile home.

3    There were two separate bundles with a fuse and a cap,

4    and the fuses appeared to be charred as if a flame had

5    been applied to the ends of the fuses.  The following

6    day the police found the body of Mike Hoskison in the

7    nearby yard.  The cause of death was a gunshot wound.

8    Okay.  Regarding Mr. Hill's institutional behavior, we

9    just want to note that only misconduct while

10   incarcerated includes just one 128(a) counseling chrono

11   that dates back to 1989 and was failure to follow

12   instructions.  The psychological evaluation dated

13   November 17th of 2006 and authored by R. Starrett, S-T-

14   A-R-R-E-T-T, the Panel finds is not totally supportive

15   of release, and the Panel finds that it is not thorough

16   in addressing the issues of the previous Board's

17   evaluation request, specifically the insight into the

18   inmate's role in the life crime.  The parole plans, Mr.

19   Hill does have viable residential plans, but the Panel

20   feels that they do need to be stronger and have some

21   backup for Butte County or county of commitment and/or

22   additional information for the San Mateo County, which

23   is where you lived, I think, it was an organization to

24   do with Veteran Administration and the housing.  We

25   also recommend -- we did find that in terms of your

26   employment and financial support was not strong enough

27   THARON HILL  D-87967  DECISION PAGE 3  12/19/06

1    and feel that you need better documentation and

2    verifiable sources of financial support, as the

3    Commissioner has stated to you previously.  Okay.  The

4    Hearing Panel notes that responses to 3042 notices

5    indicate opposition to a finding of parole suitability,

6    specifically from the District Attorney of Butte

7    County.  Mr. Zarate had stated that the District

8    Attorney's office is opposed to parole at this time.

9    The Panel makes the following findings, that the

10   prisoner needs therapy if available in order to face,

11   discuss, understand, and cope with stress in a

12   nondestructive manner.  More specifically, we feel that

13   you, sir, you really need to understand and get in

14   touch with the causative factors that led you up to the

15   life crime.  Until progress is made, the prisoner

16   continues to be unpredictable and a threat to others.

17   Nevertheless, the prisoner should be commended for his

18   participation in developing a positive attitude and the

19   Vietnam Veterans and in Alcoholics Anonymous.  And we

20   also want to note that you do have exceptional ratings

21   in your vocational plumbing.  However, these positive

22   aspects of his behavior do not outweigh the factors of

23   unsuitability.  Sir, we're giving you a two-year

24   denial.  In a separate decision, the Hearing Panel

25   finds that it's not reasonable to expect that parole

26   would be granted at a hearing during the following

27   THARON HILL  D-87967  DECISION PAGE 4  12/19/06

1    two years.  Specific reasons for this finding are as

2    follows.  Again, the prisoner committed the offense in

3    a very cruel manner.  Specifically you, sir, the

4    inmate, hired a hit man and actually had two different

5    ones, to the try to kill his ex-wife Vicky Hill with

6    the use of explosives.  The offense was carried out in

7    a very dispassionate and calculated manner, and

8    obviously it was calculated because it had been planned

9    out in advance two times.  It was carried out in a

10   manner which demonstrates a very callous disregard for

11   human suffering.  There was no thought given that with

12   five pounds of explosives attached to a mobile home

13   that had that gone off could have severely injured

14   many, many people besides the intended victim, and the

15   motive for the crime is inexplicable or trivial in

16   relation to the offense.  We had the feeling that it

17   was money-motivated but also revenge-motivated.  Okay.

18   The recent psychological report dated November 17th of

19   2006 and authored by Dr. Starrett, again, we state was

20   not thorough or conclusive, particularly in reference

21   to the life crime, and I'm going to read into this what

22   caused us to really question.  "The inmate claims that

23   he is innocent and does not accept responsibility for

24   what he failed to do.  There is some insight.  His

25   insight into his interpersonal relationship problems

26   with women is limited.  The inmate does continue to

27   **THARON HILL   D-87967   DECISION PAGE 5   12/19/06**

1   claim his innocence.  This makes his rating on this the

2   factor difficult."  Therefore, we find a longer period

3   of observation and evaluation of this prisoner is

4   required before the Board should find that the prisoner

5   is suitable for parole.  Sir, the Panel recommends the

6   following, that you remain disciplinary free.  You've

7   done a very, very good job all these years of doing

8   that.  It's very difficult.  That if available you

9   participate, or you should continue to participate, in

10  self-help, and if available get some therapy

11  programming.  Again, you gave this Panel the impression

12  that almost, and I hate to use this term, almost like

13  there's a conspiracy theory going on all against you.

14  That all the people involved in the life crime somehow

15  worked against you, and that you were claiming your

16  innocence.  And likewise, with all the documentation

17  that previous Panels and this Panel had to refer to,

18  you basically stated you felt that they were very, very

19  unfair to you.  We really recommend that you try to

20  seek out some additional therapy to really understand

21  what's driving that feeling in you so that you can come

22  to terms with what brought you to the point of the life

23  crime and then the taking the responsibility for it.

24  We're asking -- we can continue to go.

25          DEPUTY COMMISSIONER STAR:  Go ahead.

26          PRESIDING COMMISSIONER ENG:  We ask that you

27  THARON HILL  D-87967  DECISION PAGE 6  12/19/06

111

1   cooperate with clinicians in completion of a clinical

2   evaluation.  Sir, we are ordering a new psychological

3   evaluation.  We have done the paperwork for it, and

4   again, because we found that the previous Panel's

5   request in ordering the other psych were not adequately

6   met by this current psych.  Okay.  So that basically

7   concludes this hearing.  Have I missed anything,

8   Commissioner?

9              DEPUTY COMMISSIONER STAR:  No, you haven't.

10             PRESIDING COMMISSIONER ENG:  That basically

11  concludes the reading of the decision.  I'm going to

12  ask if my two fellow Commissioners have any additional

13  comments they would like to make.

14             DEPUTY COMMISSIONER STAR:  No, I think you

15  really covered it well.

16             DEPUTY COMMISSIONER HERRON:  No.

17             PRESIDING COMMISSIONER ENG:  Okay.  Sir, we wish

18  you the best of luck.  The time is now 12:07.

19                  A D J O U R N M E N T

20                     --o0o--

21

22

23  PAROLE DENIED TWO YEARS.

24  THIS DECISION WILL BE FINAL ON:  APR 1 8 2007

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  THARON HILL  D-87967  DECISION PAGE 7  12/19/06

112

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated transcriber,
HOUSE OF SCRIBES do hereby declare and certify under
penalty of perjury that I have transcribed tape(s)
which total two in number and cover a total of pages
numbered 1 - 111, and which recording was duly recorded
at SAN QUENTIN STATE PRISON at SAN QUENTIN, CALIFORNIA,
in the matter of the SUBSEQUENT PAROLE CONSIDERATION
HEARING of THARON HILL, CDC No. D-87967, on DECEMBER
19, 2006, and that the foregoing pages constitute a
true, complete, and accurate transcription of the
aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party
in the above-captioned matter and have no interest in
the outcome of the hearing.

Dated March 7, 2007, at Sacramento County,
California.


_____

Stacy Wegner
Transcriber
**House of Scribes**

EXHIBIT    B    PAROLE PLANS

From: Max C. Hill
1992 North 300 West
Sunset, UT 84015

Date: Sept 8, 2006                          RE: Tharon B. Hill, D87967

To: Board of Prison Terms
San Quentin State Prison
San Quentin, CA. 94974

Dear Board Members,

I am the elder brother of Tharon B. Hill.

It is my understanding that Tharon will again be evaluated for Parole. I live within the
State of Utah along with the majority of his family members and if paroled, I will accept
him into my home to live with me for as long as he wishes. I believe it is important for
him to rejoin his family members here in Utah to aid in his adjustment into private life.

I pray this honorable board will find Tharon eligible and acceptable for parole.

If the board has any questions, please feel free to contact me at (801) 825-8095.

Sincerely,

Max C. Hill

Public Notary, State of Utah

To:     Board of Paroles                    Date: Sept 8, 2006
        San Quentin State Prison
        San Quentin, CA 94974

From:   Thayne M. Hill
        2162 West 5700 South
        Roy, Utah.  84067
        801-644-3836


Subject:  Parole of Tharon Hill, D87967


Dear Board Members:

I am a Nephew of Tharon B. Hill.   Although I am a resident of Utah, I have traveled to California
to see him on several occasions since his incarceration.  It is my understanding that he will be
evaluated for the possibility of parole within the next few months.

I would like to inform the Parole Board, that if paroled, Tharon is welcome to live in my home
for as long as he chooses.  Since I and the majority of his remaining family members reside in the
State of Utah, I would request immediate assistance to have his parole transferred to this state.

However, when initially paroled into the State of California, I have the desire and financial ability
to assist Tharon with the establishment a residence, residing with him temporarily and helping
with his reintroduction into society.

I am hopeful this board will come to the conclusion that his continued incarceration serve no
further purpose and you will release Tharon for the remaining years of his life, allowing him the
dignity and respect of a free man.

I would greatly appreciate your consideration of this request.

_____

                        Sincerely,

                        *Thayne M. Hill*
                        Thayne M. Hill

_____

Public Notary, State of Utah



795 Willow Rd. Bldg. 323B
Menlo Park, CA 94025
650-493-5000 x22044
650-614-9821 — Fax

October 3, 2006

To: Executive Officer of the California State Prison Board

Re: Tharon B. Hill (D-87967)

This letter is being written to let you know of our Agency and to inform you of our contact with Mr. Hill. We are located in Menlo Park on the V.A. grounds; our Agency provides a number of services to Veterans who have an honorable discharge, which Mr. Hill does have. Our main function is to help Vets. Get their lives back on track through transitional housing and whatever treatment is necessary including vocational training, job placement, and support with substance abuse including transportation to 12-step meetings. What is unique about our Agency is that we are located on the same grounds the Veterans Administration Services are and do referrals on a daily basis.

If and when Mr. Hill is released he will have housing through our Program along with the rest of the services we offer. It would be an honor for me to help a Veteran, who has been honorably discharged, return to becoming a productive member of society once again.

If there is any further information needed or any questions feel free to call me at (650)-493-5000 ex 24208

Sincerely,

Kyle Terzian
Program Manager
Certified Addiction Treatment Specialist

"Changing Lives One Vet At A Time"

Nona I. Stewart                                    June20,2006
14627 Grandview Drive
Moreno Valley, Ca. 92555


RE: Tharon B. Hill   D87967

To: Parole Board Members
      San Quentin State Prison
      San Quentin, Ca. 94974


Dear Board Members;

Once again I am writing to this honorable board to express my gratitude to
you for considering the wishes of my family and close friends in the release
of Tharon Hill. Our friendship goes back over fifty years and I know him to
be a good man.

If Tharon is granted parole, he will have my home to live in for as long as he
desires . This offer is open to Tharon for as long as we live.

It is my greatest wish that you will find Tharon as fine a man as I know him
to be and parole him into the care of his loving family.

You may contact me at my home at any time should you have any questions
for me.

(951) 486-0161


Respectfully,

*Nona I. Stewart*
Nona I. Stewart

EXHIBIT  C    PSYCHOLOGICAL REPORTS

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

August 1991 Calendar
Richard J. Donovan Correctional Facility
August 1, 1991

a.    This is the first report to the Board on this inmate

b.    This writer has had an interview with this inmate and
has reviewed his medical file.

c.    This inmate is a 52 year old, Married Caucasian male
with two grown children  He is in prison for conspiracy
to commit murder.  He states that his daughter sent her
boyfriend to his ex-wife's home to dynamite it.
However, the boyfriend was shot and killed by the ex-
wife he was charged with murder and conspiracy
to commit murder and sentenced to 25 years to Life
prior to episode resulting in the death of this man,
the inmate had filed for divorced and had moved to
Washington and was working as a construction
superintendent.  He states that his wife called him up
there and went up there to see him and they decided to
reestablished their relationship..  In that process
they returned to Los Angeles.  Sum of money was taken
by the wife from the inmate's account and the inmate
felt that at the end that his wife was entitled to this
amount.  He and his wife divorced.  He graduated high
school and had two years of college.  He worked in
construction and various capacities for thirty years he
was born in Idaho and came to California in 1961.  He
has three brothers, there is no family history of
mental illness or alcoholism.  He has no history of
mental illness, he has no history of drug or alcohol
abuse.  He has never made a suicide attempt.
Mental Status Examination – He is alert and oriented x3
He is neat and clean in appearance, he denies auditory
or visual hallucinations and denies suicide or
homicidal ideation.

d.    No Psychiatric Diagnosis

e.    Psychiatric Conclusion:

        General Conclusion:

        A.    No diagnosed psychopathology.


HILL THARON      D87967      RJDCF-SD      (jb)            8-1-91

8-2-91

Page 2

    B.   During observation in the institution, he was psychiatrically showed no significant change.

    C.   In a less controlled setting, such as returned to the community, this inmate is likely to hold present gains.

2.    Suggested Actions.  This inmate should be removed from special calendar because psychopathology is not significantly related to future criminal behavior, and psychiatric opinion will not contribute to a release decision.

f.   I have no further recommendations to the Classification Committee

*S.J. Falkenstein*

S.J. FALKENSTEIN, M.D.
Staff Psychiatrist

HILL, THARON    D87967   RJDCF-SD    (jb)    8-1-91

Richard J. Donovan Correctional Facility

# BOARD OF PRISON TERMS PSYCHIATRIC EVALUATION

### JUNE CALENDAR 1997

May 13, 1997

Mr. Hill is 58-years-old. He continues to work as a clerk in Mr. Reitz's office. He has had good work evaluations and has been there for four (4) years. In his free time, he helps other inmates with legal work. He likes to draw and enjoys walking at night. He states he has written some books which have not been published. He has had no CDC-115's. He completed Hands of Peace in 1994. His wife visits every week and calls him. He is presently taking Paxil, 20 mg, a day which is working well for him. He is not experiencing any depression at this time. He maintains that he is innocent of the crime for which he was convicted and he is currently appealing his case. Mr. Hill is a high functioning man of above average intelligence and clearly is able to provide for himself if he were to be released to the community. It is very doubtful that he would be involved in criminal activity in the community if he were to be released.

**SHELDON FALKENSTEIN, M.D.**
**Staff Psychiatrist**

HILL, THARON    D-87967    RJDCF    SF/gdj  05-14-97    F1-02-119L

Copy sent to inmate 5-20-97

**Cynthia E. Harris, LCSW**
**510-798-4637**

December 09, 2004

To: Board of Prison Terms
San Quentin State Prison
San Quentin, California
Re: Mr. T. Hill

I would like to take this opportunity to recommend Inmate Hill for consideration and release with supervision. I provided CCCMS and counseling to Mr. Hill during my time working at San Quentin. During the course of treatment the inmate was very open and honest about his crime and it's effects on the victim and the rest of his family.

He expressed considerable insight as to his problems at the time, the circumstances that led to the abuse he inflicted on loved ones, and how his incarnation and rehabilitation has totally changed the person that he was. He continues to feel remorse, shame and deep regret about the tragic turn of events that he was responsible for. In my opinion Mr Hill has learned the social skills required and ability to cope with lifes stresses during his time served; he has grown into a better person during these years. This inmate is unlike others in that he has strong professional background and will certainly be able to sustain himself as a productive member of society.

I have no hesitation what so ever in asking you to consider him for release. I would have no hesitation in receiving him as a member of my community. I believe that he will find a way to give back and help others; perhaps through the church.

Please contact me if you require any additional information.

Respectfully submitted,

Cynthia E. Harris, LCSW

### Life-Term Inmate Evaluation for the Board of Parole Hearings
### MENTAL HEALTH EVALUATION

### SAN QUENTIN STATE PRISON

### PSYCHOSOCIAL ASSESSMENT

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| NAME: | Hill, Theron |
| CDC #: | D-87967 |
| AGE: | 67 years |
| DOB: | 03/22/39 |
| MARITAL STATUS: | Widowed |
| RACE: | Caucasian |
| SEX: | Male |
| RELIGION: | Latter Day Saints |
| DATE OF REPORT: | 11/17/06 |

This report is based on review of the inmate's medical file, review of his C-File, prior Board of Prison Terms reports, prior psychological evaluations, current classification information and probation officer's report. The current interview with the inmate and the report are limited by the amount of information given to this examiner by the inmate at the time of the interview. The following information is accurate to the extent that the records and the inmate's self-report are accurate. As a result, the absolute accuracy cannot be assured. The primary purpose of this report is to provide the Board of Prison Terms psychological data, psychiatric diagnostic information and an assessment of dangerousness in regard to his possible release to the community. This evaluator is not responsible for any inaccurate statements or changed opinions expressed by the inmate at a later date. The inmate was interviewed for approximately 60 minutes, the initial medical file and C-File were reviewed for the interview for 1 hour, the inmate's C-File file was reviewed for approximately 4 to 6 hours and dictating, report writing and editing took 4 hours.

The inmate was informed that the interview was not confidential and a report with the results of the evaluation would be submitted to the Board of Prison Terms to assist in determining his eligibility for parole. The inmate was informed that any disagreement with the substantive conclusion could be most appropriately address at the inmate's Board hearing. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition which may qualify under the American's with Disabilities Act, the evaluation was conducted by a licensed clinical psychologist.

This information is based on the inmate's statements during the time of the interview. The inmate's crime occurred on April 20, 1987. He was received into California Department of Corrections on September 21, 1988. He was 48 years old at the time of the crime. He was convicted of PC §187 Conspiracy to Commit Murder in the First Degree with Explosives. He received a 25 years to life sentence. His minimum eligible parole date was April 6, 2004. He has served almost 20 years. His initial Board was in 2003 and this is his third subsequent. His last Board was in 2005.

This information is based on the inmate's statements during the time of the interview. The inmate has no CDC 115's. He has none for alcohol or drugs and none for violence. The inmate has had one 128, which was in 1988. His points are 19.

The inmate has taken some college courses while incarcerated. He has trades in plumbing and drafting. He is currently in PIA plumbing. He plans to be retired upon release. The inmate has been active in AA for the last three years. He is in Positive Attitude class for the last almost four years. The inmate states that he has been involved in other self-help groups and Vietnam Veterans group since September of 2003. He has laudatory Chronos over the last three to four years. The inmate states he plans to be active in self-help, his religion and AA and NA upon release.

## II. DEVELOPMENTAL HISTORY:

This information is based on the inmate's statements during the time of the interview. The inmate was born in Bloomington, Idaho. He denies any prenatal or birth complications, or birth defects growing up. He states that his development in terms of speech, language, and motor skills were within normal limits. He denies any enuresis, speech problems and emotional problems. He did have some learning difficulties but was never diagnosed or treated. He denies any health problems in childhood. He denies any traumas or abuse in childhood. There were no disruptions to childhood.

## III. EDUCATION:

The inmate graduated from high school and went into the Navy for four years and then returned to complete two years of community college. He denies any diagnosed learning problems, grade failures, or ever being in special education classes. He denies any behavioral problems in school. He was never suspended or expelled, never got into fights.

The inmate has had educational upgrades while incarcerated.

## IV. FAMILY HISTORY:

The inmate was born in Idaho and raised in Utah. He was raised by his parents. He is the youngest of five children. The family has lived in two residences. His father worked for the forest department and was a civilian in the Army. His mother also was a civilian in the Army depot. He had a wonderful relationship with both of them growing up. There is no family history of health problems. There was no use of alcohol or drugs in the home, no mental health problems, and no one else was ever arrested. There was no spousal abuse, there was no emotional, physical or sexual abuse of the children.

The inmate states his family is still very supportive of him and he has letters of support.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He describes his sexual orientation as heterosexual in nature. He denies any crimes against children or any sex related crimes. He has had domestic violence behavior toward women and his current crime. He denies high risk behavior, such as prostitutes, intravenous drug use or exposure to HIV.

## VI. MARITAL HISTORY:

The inmate has been married four times. The inmate's first marriage lasted 14 years and he has two children. He has an off-and-on relationship with them. The next marriage was for 2 years with no children. The next marriage was for 9 years with no children and the last marriage was for 11 years with no children.

## VII. MILITARY HISTORY:

The inmate was in the military for four years and nine months and had an honorable discharge.

## VIII. EMPLOYMENT/INCOME HISTORY:

The inmate states that his longest job was as a general contractor for 30 years. He denies ever receiving public assistance or Social Security Disability.

## IX. SUBSTANCE ABUSE HISTORY:

The inmate drank some beer. He states that his daughter got upset with his drinking when he was going through a divorce. Beer was involved in his controlling case.

Hill, Theron                    PAGE 3          MENTAL HEALTH EVALUATION

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Medical:

The inmate denies any allergies, asthma, cardiac, respiratory, vision, or hearing orthopedic problems. He does have glaucoma, which is going to affect his vision. He has had laser surgery to his right eye. He has no head injuries. He denies any seizures, thyroid, diabetes or venereal diseases. He sees his current health as fair.

Mental Health:

The inmate states that he was in the mental health system while incarcerated in the 1990's when he was dealing with depression around his ex-wife. He was out of the mental health system and then back in the late 1990's when his wife passed away. The inmate has no current mental health problems and is not in the mental health. He is not being treated with psychiatric medication.

## XI. PLANS IF GRANTED RELEASE:

The inmate would like to parole to Utah and that has been approved. He also has plans for Southern California in the Veterans' Administration in San Mateo. The inmate plans on retiring. He has made contact with the Veterans' Administration to help him in transition.

## CLINICAL ASSESSMENT

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

The inmate was oriented by person, place and time. He was alert and cooperative. His simple registration was intact along with short-term memory. He could do simple math in his head. His simple abstract thinking was intact but complex problem solving abilities were impaired.

At the current time, he denies any problems with depression, anxiety, mood swings or mood disorder. He denies any auditory or visual hallucinations. He denies any delusional or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

Hill, Theron                          PAGE 4            MENTAL HEALTH EVALUATION

**DIAGNOSTIC IMPRESSIONS DSM-IV:**

AXIS I          Alcohol Abuse, in remission since incarceration in 1987 and in
                treatment over the last three years.

AXIS II         Deferred.

AXIS III        Glaucoma.

AXIS IV         Psychosocial Stressors: Incarceration.

AXIS V          Global Assessment of Functioning (GAF): 80.

The inmate is currently in the General Population and has never been a member of the
MHSDS system while incarcerated. He is active in AA and in self-help groups along
with his religion.


**XIII. REVIEW OF LIFE CRIME:**

The inmate was convicted of PC §187 Conspiracy to Commit Murder in the First Degree
with Explosives. He received a 25 years to life sentence. His minimum eligible parole
date was April 6, 2004. He has served almost 20 years.

Summary of the Crime: In 1978, the inmate and Vicky Hill married. In late 1984, Hill
had an affair with another woman and Mrs. Hill sought a divorce. However, the Hills
reconciled and subsequently moved to Washington State. They eventually broke up again
and Mrs. Hill moved to Chino, California while Hill remained in Washington. In 1984,
Hill returned to California. He explained to his daughter, Shannon Lopes, from his
previous marriage, that Mrs. Hill had taken with her to California $110,000 of his money.
Ms. Lopes stated that Mrs. Hill should be killed for stealing his money and leaving him.

On April 20, 1987, the Hills had a violent argument. Shortly thereafter, the inmate
bought six or seven sticks of dynamite, several plastic caps and a fuse cord from Mr.
Dalton Mosk. Hill had formulated a plan to kill his former wife by blowing up her
vehicle or mobile home. Hill shared this plan with Ms. Lopes, who recommended Mr.
Keith to complete the task. In May 1987, Mr. Keith agreed to receive $1,000 to dynamite
Mrs. Hill's home while she was inside. In contradictory accounts, Mr. Keith either
changed or botched the plan. While tossing dynamite at Mrs. Hill's mobile home, the
explosive rolled underneath her unoccupied truck and exploded, causing damage to the
vehicle and to her front porch. Hill procured four more sticks from Mosk, who gave them
to Lopes. Lopes then arranged for Mike Hoskison to dynamite Mrs. Hill's home.


Hill, Theron                    PAGE 5          MENTAL HEALTH EVALUATION

On July 24, 1987, Mrs. Hill was awakened by her dog at approximately 1:00 A.M. Mrs. Hill went to her bedroom window and observed a prowler outside. She also observed the prowler with what appeared to be lighted object in his hand. Mrs. Hill, armed with an automatic pistol, placed her weapon against the inside window and fired at what she thought the general area of the prowler so that she would scare him off. Upon responding to Mrs. Hill's telephone call for help, Butte County sheriff's deputy found approximately five pounds of explosive material taped against the outside bedroom wall of the mobile home. There were two separate bundles with a fuse and a cap and fuses appeared to be charred as if a flame had been applied to the ends of the fuses.

At approximately 8:30 A.M. the following morning, the body of Peter Hoskison was found in a nearby yard. Cause of death was a gunshot wound and clutched in his hand was a cigarette lighter. Police learned that Hoskison was living with Shannon Lopez just prior to the incident. Following the investigation Hill, his daughter, Dalton Mosk and John Keith were all arrested and charged in the instant offense.

Hill was convicted on April 22, 1988 of conspiracy to commit murder in the first degree. He was acquitted of a second charge of PC §187 Murder in the First Degree in the death of Peter Hoskison. It should be noted that Shannon Lopes, John Keith and Dalton Mosk all testified at trial against Hill in exchange of immunity from prosecution.

Inmate's Version: After Hill's arrest, Hill provided the statement, which documented in pages 11 to 13 in the Butte County Probation Officer's Report dated May 11, 1988. During a personal interview with his assigned correctional counselor on September 13, 2005, Hill had the aforementioned statement read to him. He acknowledged this statement as recorded in the Probation Officer's Report is still fully accurate and reflect his version of the events. In addition to that statement, Hill also would like for the Board of Prison Terms to recognize the notarized affidavit dated January 12, 1993 from his first wife, Karen Medley. In the affidavit, Mrs. Medley states Hill's daughter, Shannon Lopes, articulated to her, she, Ms. Lopes, was solely responsible for the instant offense and Hill had nothing to do with it. The affidavit can be located in the BPT section of the central file.

Aggravating Factors: The victim was particularly vulnerable. Hill had the opportunity to cease, but continued with the crime. Circumstances of the crime created the potential for serious injury to others.

Mitigating Factors: Hill had a minimum or no criminal history. Another mitigating factor in this individual's case is his age.

Juvenile Arrest History: The inmate had no juvenile arrest history.

Adult Arrest History: January 28, 1961, Ogden, Utah, petty larceny; February 13, 1978, Santa Ana Police Department, assault and battery, no disposition; June 15, 1987, assault, battery and disturbing the peace, charges dismissed.

Regarding his juvenile history, the inmate states there is none. Regarding his adult history, the inmate states that the reason why he was getting into trouble as a young man was relationship problems. His family was supportive of him.

In the current interview, when asking the inmate why this crime occurred, he said that his ex-wife loaded a shotgun and gave it to his son and told his son that everyone hated him and that he should just kill himself. When he told his sister, Ms. Lopes about this, she went through the roof. Then later one, when she found out that the ex-wife had stolen a large amount of money from her father, the inmate states that she went off the deep end. His son and daughter by his first marriage. The inmate states as in the file account, that the daughter actually committed this offense and that he has this signed affidavit from his wife to that affect.

When asking the inmate his role in this crime, he said that he was in Southern California at the time and did not know any of this was taking place. He states that his daughter had called him several times and was very upset. She was telling him that something had to be done and he was telling her to leave it alone. It was none of her business. The inmate goes on to say that "I feel responsible. I could have stopped it by flying home and talking to my daughter. During the trial, she blamed me and stated that she has to raise my grandchildren." The inmate states that he was found guilty in a trial. He tried to appeal, but lost the appeals. The inmate goes on to say "I have a difficult time admitting to something that I did not do." The inmate goes on to express remorse over the death of his ex-wife, how he does feel responsible for what happened.

When asking the inmate what has changed about him, he says living in prison every day is self therapy. You have to deal with it moment-by-moment and "I've had no write-ups."

## XIV. ASSESSMENT OF DANGEROUSNESS:

In order to determine the inmate's risk of representing a substantial danger of physical harm to others, he was assessed on a number of research derived risk factors that are associated with an increased risk for future violence.

### History of Violence:

According to the Probation Officer's Report and prior records, the inmate's criminal history would be a mitigating factor. In rating this individual on the historical factors, he would rate in the low range in terms of his likelihood to commit future violent acts when compared to other inmates with similar crimes. His only elevations would be relationship instability, prior domestic violence, possible assault and battery charges, and some use of alcohol.

Hill, Theron                    PAGE 7          MENTAL HEALTH EVALUATION

Prior Performance on Supervised Release:

This would be a mitigating factor.

Inmate's Compliance with Board Requests and Treatment:

The inmate has never had any 115's and his last 128 was in 1988. He has upgraded himself educationally and vocationally. He has been active in AA, his religion and self-help.

Substance Abuse:

Relapsing in the use of alcohol and drugs may be a concern. However, he has been clean and sober for 20 years and been in treatment for at least the last three.

Mental Health Issues:

The inmate, at the current time, is placed in the general population and is not in the mental health system. He does not appear to have any complicating mental health problems.

Clinical/Insight:

The inmate claims that he is innocent but does accept some responsibility for what he failed to do. There is some insight. His insight into his interpersonal relationship problems with women is limited. The inmate does continue to claim his innocence. This makes his rating on this factor difficult.

Environmental Risks/Risk Management:

The inmate's parole plans seem to be adequate. The inmate has handled compliance, stress and destabilizers well in the institutional setting. The inmate would rate in the low range in terms of his risk management for the future.

In summary, this individual overall appears to rate in the low range in his propensity to commit violence the future when compared to similar violent inmates. The inmate's crime is a crime of passion, or an affective crime, which do not reoccur and inmate's age is another factor.

## XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

It is recommended that the inmate continue to program positively.

Thank you for the opportunity to assist in this interesting consultation.

_____                    _11-17-6_
RICHARD STARRETT, Ph.D., Ph.D.                       Date
Contract Psychologist, CA License PSY 13628
San Quentin State Prison

RS/ls/cam

EXHIBIT  D    STAFF LETTERS - THERAPY

September 25, 2006

Lifer Board Desk
San Quentin State Prison
San Quentin, California 94964

Dear San Quentin and the Board of Prison Terms,

I am writing this letter on behalf of Mr. Tharon Hill, D-87967, 1N262, and to express my belief in his suitability for parole. Mr. Hill has been attending the weekly support group called "Developing a Positive Attitude" that is sponsored by the Center for Attitudinal Healing and Marin AIDS Interfaith Network for the past few years. The group helps participants take responsibility for their emotions and actions by non-judgmental listening to and support of each other. The basic tenets of Attitudinal Healing can be summed up by the following: "Attitudinal Healing affirms that we are responsible for our thoughts and whatever feelings we experience and encourages us to re-examine our relationships, bringing them into the present by releasing past judgments and grievances."

A quiet but attentive presence in the group, Mr. Hill's strength is in his listening skill. He is well respected by others in the group and they often turn to him for research and help in legal matters. Besides being a gifted artist, Tharon is obviously a man of great intelligence and has a rather wry sense of humor. One of the basic principles of a Positive Attitude is that " We can choose and direct ourselves to be peaceful inside regardless of what is happening outside." Tharon has practiced incorporating this principle by using his sense of humor, intelligence, art, and practice of living in the present to meet the many inevitable stressful situations encountered in the prison environment with equanimity.

I urge you to consider Mr. Hill for parole. In my opinion he does not constitute a threat to society in any way. And with the support of his family and friends, he would not only fulfill the terms of his parole, but also be a respectable and conscientious member of society.

Sincerely,

*Rebecca Morehouse*

The Rev. Rebecca Morehouse
The Episcopal Church of the Nativity
333 Ellen Drive
San Rafael, CA 94903

October 30, 2006

Board of Prison Terms,

I am writing this letter in support of the parole of Mr. Tharon Hill, D-87967.

Mr. Hill has been a regular participant in the weekly support group "Developing A Positive Attitude" for more than three years. In this self-help group, Tharon has demonstrated that he has dealt with stress in a non-destructive manner. He also exhibits positive ways to express his thoughts and feelings and to relate to others in constructive ways. He is a consistent positive contributor to the group and encourages others to better themselves in many ways.

I do not perceive Mr. Hill to be a threat to society and I would welcome him into my own neighborhood. He has much to contribute to society and I am sure he will do so if granted parole by this Board of Prison Terms.

Thank you for your consideration on his behalf.

Sincerely,

Rev. David Martin
San Rafael, California
Co-Facilitator, "Developing A Positive Attitude" weekly support group

PATRICK MALONEY
San Quentin Prison
Arts In Corrections


September 24, 2006                    RE:  Tharon Hill  D87967


BOARD OF PRISON HEARINGS
San Quentin State Prison
San Quentin, CA. 94964

To Whom It May Concern:

I am a professional artist who works in Arts In Corrections
here at San Quentin.  I have worked with Tharon Hill for the
past three years, and  he is a dedicated artist, who is quiet,
congenial, and hard working.

Mr. Hill has on numerous occasions contributed art to be sold,
which helps to maintain the arts program.   Art is an important
part of his life, and if found suitable for parole, he hopes
to continue in this profession as a free man.

I sincerely hope you will be able to give him this opportunity.


Patrick Maloney

*Patrick Maloney*

STEVEN EMRICK
Art Facilitator
Arts in Corrections
San Quentin State Prison

December 4, 2006                          RE: HILL, T., D-87967

BOARD OF PRISON TERMS
San Quentin State Prison
San Quentin, Ca. 94964

Dear Board Members,

I presently work as the Arts in Corrections Artist Facilitator, and I have known Inmate
Hill, D-87967 for the past three and a half years. During his participation in this program,
he has contributed to the class by way of donating his paintings to art exhibits at the
Marin Community Foundation in Novato at Hamilton Field, and presently has several
pieces of work on display at MarinLink in the mall at Northgate, San Rafael.

Inmate Hill participates in the Creative Writing program, and has written two books and
is presently working on his third. He also contributed his writing to an "Anthology,"
which is for sale on the internet with proceeds benefiting the Williams James
Association, a non-profit organization, which provides art materials for youth and prison
programs.

Inmate Hill is a serious artist and plans to continue his painting when released from
prison. He also gets along well with staff and inmates alike. I am also impressed with
his demeanor, courtesy and creativity. Moreover, he gives without asking for anything in
return.

As a long standing employee of the state, I can say without reservation that Mr. Hill has
been an asset to the program and community through his involvement in Arts in
Corrections.

Steven Emrick
Arts in Corrections
Artist Facilitator
Ext: 6021

To The Board of Prison Hearings
San Quentin State Prison


August 08, 2003                          RE: Tharon B. Hill, D87967


To Whom It May Concern:

I am writing this letter of support on behalf of Inmate HILL,
D-87967. I've known Inmate HILL for over one-and-a-half years
(1½), to which I have had the opportunity to observe his
demeanor. Since my acquaintance with Inmate HILL, I have found
him to be diligent and sincere, to which he has maintained a
positive attitude, always taking into consideration his peers
and staff alike. Through our continued communication it has
become evident that Inmate HILL has set goals and conditions
to achieve a good life style within the community.

During my many years of correctional experience, and being able
to observe all types of inmate behavior, it is apparent how
stressful and volatile the prison environment can be. However,
Inmate HILL has not let himself become subjected to the everyday
stresses and volatility that occurs within the prison system,
and I commend him for being able to manage his time in a positive
and productive manner.

I, therefore, ask this Board to seriously consider Inmate HILL
for release, for I believe he will be an asset to the community.

Sincerely,


W. Carmichael
Correctional Officer

EXHIBIT  E    2005 BOARD MATRIX

1  participating in AA and the 'Hands for Peace'

2  group, as well as the Vietnam Veterans therapy

3  group and remains disciplinary free; which

4  again, is indeed a commendable accomplishment.

5      However, these positive aspects to his

6  behavior do not outweigh the factors of

7  unsuitability.  Commissioner do you have any

8  comments?

9      **DEPUTY COMMISSIONER ARMENTA:** Right, yes.

10  Mr. Hill, you've done a lot of time.  You've

11  been in CDC seventeen years.

12      **INMATE HILL:** Eighteen years total.

13      **DEPUTY COMMISSIONER ARMENTA:** Eighteen

14  with total.  Seventeen years (indiscernible).

15  If I look at the chart on first degree and the

16  fact that someone did not die, or even a first

17  degree, you cut that in half and that is fifteen

18  years.  You already done – your conduct has been

19  good so you get all your credit.  You've already

20  done your time and more.  Nevertheless, there is

21  still some issues that hopefully can be resolved

22  in the next hearing or two, and hopefully you'll

23  be a free man at some point.

24      **INMATE HILL:** Am I allowed to ask a question?  I

25  have – some place in here – the factors for

26  suitability for parole under –

27  **THARON HILL D-87967   DECISION PAGE 4   10/04/05**

EXHIBIT F



F I L E D
Butte County
Superior Court
JUN 04 2007
Sharol Strickland Clerk
By _____ Deputy

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF BUTTE

In the Matter of the Application )
)
of )
) CASE NO.: 096061
)
Tharon  Hill )
) Order Denying Petition Or
) Transferring Petition
For Writ of Habeas Corpus )
)

The Petition for Writ of Habeas Corpus filed **May 21, 2007** has been read
<u>(Date)</u>
and considered.

✓ (1)  The Writ of Habeas Corpus is denied for the following reason:

_____ The vague, unsupported, and conclusionary allegations contained in the Petition
are insufficient to allow for intelligent consideration of the issues which petitioner
had attempted to raise. (In re: Swain (1949) 34 Cal.2D 300; In re Patton 1918)
178 Cal. 629).

✓ Petitioner has failed to establish a prima facie case for relief on habeas corpus (In
re Lawler 23 Cal. 3rd 190,194).

_____ Petitioner is required to exhaust administrative remedies before seeking relief in
the courts. (In re Muszalski (1975) 52 Cal. App. 3D 500).

CC: Def

_____ Petitioner has available remedies at law that have not been exhausted.

IN THE
# Court of Appeal of the State of California

## IN AND FOR THE
## THIRD APPELLATE DISTRICT

# FILED

JUL 1 2 2007

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT

BY_____ Deputy

In re THARON B. HILL on Habeas Corpus.

C055955
County No.

BY THE COURT:

The petition for writ of habeas corpus is denied.

Dated:  July 12, 2007

_____ DAVIS, Acting P.J.

_____

cc: See Mailing List

## PROOF OF SERVICE

### C.C.P. section 1013a & 2015.5; 28 U.S.C. section 1746

I, THARON B. HILL, am a resident of San Quentin State Prison, in the County of Marin, State of California, am over the age of eighteen (18) years and am a party to the above-entitled action. My State prison address is San Quentin Prison, San Quentin, California 94974.

On July 16, 2007, I served the foregoing information to which was a Petition for Review on the party(s) herein by placing a true copy(s) thereof, enclosed in sealed envelope(s), with postage thereon fully paid, in the United States mail, in a deposit box so provided by the U.S. Postal Service, addressed as follows:

California Supreme Court
350 McAllister St.
San Francisco, CA 94102

Office of the Attorney General
Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

There is delivery service by United States mail at the places so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed. I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of July 2007.

SS: Tharon B. Hill
Tharon B. Hill
Petitioner Pro-se